No. 24-1420

———————————————

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————————

RAYMOND LOFSTAD; GUS LOVGREN,

Plaintiffs – Appellants,

v.

GINA RAIMONDO, in her official capacity as Secretary United States
Department of Commerce; JANET COIT, in her official capacity as
Assistant Administrator of the National Marine Fisheries Service;
NATIONAL MARINE FISHERIES SERVICE,

Defendants – Appellees.

———————————————

On Appeal from the United States District Court
for the District of New Jersey
Honorable Robert Kirsch, District Judge

———————————————

**APPELLANTS' OPENING BRIEF**

———————————————

DAMIEN M. SCHIFF
MICHAEL POON
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
DSchiff@pacificlegal.org
MPoon@pacificlegal.org

*Attorneys for Plaintiffs –
Appellants Raymond Lofstad
and Gus Lovgren*

# TABLE OF CONTENTS

TABLE OF CITATIONS .............................................................................iii

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES................................................................... 2

STATEMENT OF RELATED CASES AND PROCEEDINGS................ 4

STATEMENT OF THE CASE ............................................................... 5

    I.     The Magnuson-Stevens Act ................................................ 5

    II.    Amendment 22 and the Rule .............................................. 8

    III.   The District Court Litigation............................................. 9

SUMMARY OF THE ARGUMENT ....................................................... 10

ARGUMENT ....................................................................................... 12

    I.     Standard of Review (per L.A.R. 28.1(b))............................. 12

    II.    Standing .......................................................................... 13

    III.   The Secretary's Rulemaking Power Under the
          Magnuson-Stevens Act...................................................... 14

    IV.   Council Members Must Be Appointed Pursuant
          to the Appointments Clause ............................................. 15

         A.    Continuing Positions................................................. 17

         B.    The Standard for Identifying Significant Authority ... 18

                1.    What the Test Is.............................................. 19

                2.    What the Test Is Not......................................... 24

         C.    The Council's Significant Authority ........................... 27

                1.    The Council's Two-Step Rulemaking Powers..... 28

                       a.    Review Is Irrelevant to Significant
                           Authority................................................. 29

i

b.   The Secretary's Review Is Limited ............ 29

c.   Even a De Novo Review by the
Secretary Leaves the Council with
Significant Authority Within the
Two-Step Rulemaking Process ................. 36

2.   The Council's Powers Outside of the
Two-Step Rulemaking Process ........................... 48

V.   The Putative Council Members Were Not Appointed
Pursuant to the Appointments Clause ................................. 53

A.   The Putative Council Members Were Not
Properly Appointed as Principal Officers .................... 54

1.   *Edmond* Analysis ............................................... 56

2.   *Arthrex* Analysis ............................................... 59

B.   The Putative Members Were Not Properly
Appointed as Inferior Officers .................................... 60

VI.   The Secretary's Rulemaking Lacked the Key
Statutory Prerequisite ......................................... 62

CONCLUSION ................................................... 69

COMBINED CERTIFICATES ................................................ 70

# TABLE OF CITATIONS

## Cases

*Alliance Against IFQs v. Brown,*
   84 F.3d 343 (9th Cir. 1996) ................................................. 31

*Arnesen v. Raimondo,*
   No. 24-60055 (5th Cir.) ........................................................ 4

*Arnesen v. Raimondo*, Nos. 23-cv-145, 23-cv-160,
   2024 WL 377820 (S.D. Miss. Jan. 31, 2024) ...................................... 42

*Aurelius Invest., LLC v. Puerto Rico,*
   915 F.3d 838 (1st Cir. 2019),
   *rev'd on other grounds*, 140 S.Ct. 1649 (2020) ................................... 23

*Bandimere v. SEC,*
   844 F.3d 1168 (10th Cir. 2016) ............................................. 23

*Bracy v. Gramley,*
   520 U.S. 899 (1997) ......................................................... 35

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ........................................... 22–23, 46, 48, 53

*Burgess v. FDIC,*
   871 F.3d 297 (5th Cir. 2017) ............................................... 23

*CFPB v. Nat'l Coll. Master Student Loan Trust,*
   96 F.4th 599 (3d Cir. 2024) .............................................. 17, 62

*Cirko v. Commissioner of Social Security,*
   948 F.3d 148 (3d Cir. 2020) ................................. 23, 27, 63–64, 68–69

*Collins v. Yellen,*
   141 S.Ct. 1761 (2021) ................................................ 17, 61–62

*Cottrell v. Alcon Labs.,*
   874 F.3d 154 (3d Cir. 2017) .............................................. 13

*DHS v. Regents of the Univ. of Cal.,*
   140 S.Ct. 1891 (2020) ...................................................... 15

*Edmond v. United States,*
520 U.S. 651 (1997) .............................................. 11, 16, 23, 25, 54, 68

*Ellis v. Westinghouse Elec. Co.,*
11 F.4th 221 (3d Cir. 2021) ................................................................ 12

*Ex parte Siebold,*
100 U.S. 371 (1880) ........................................................................... 23

*Federal Election Commission v. NRA Political Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993),
*cert. dismissed,* 513 U.S. 88 (1994) ............................................... 64–66

*Freytag v. Commissioner,*
501 U.S. 868 (1991) .............................. 19–21, 23–24, 27, 33, 37–38, 60

*Hall v. Evans,*
165 F.Supp.2d 114 (D.R.I. 2001) ...................................................... 31

*Jones Bros., Inc. v. Secretary of Labor,*
898 F.3d 669 (6th Cir. 2018) ............................................................. 23

*Landry v. FDIC,*
204 F.3d 1125 (D.C. Cir. 2000) .................................................... 23, 68

*Lucia v. SEC,*
585 U.S. 237 (2018) ............ 15–17, 20–22, 24–25, 33, 37–40, 51–52, 62

*Motor Veh. Mfrs. Ass'n of U.S., Inc. v.*
*State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................. 31

*N.J. Carpenters & the Trustees Thereof v.*
*Tishman Constr. Corp. of N.J.,*
760 F.3d 297 (3d Cir. 2014) .............................................................. 54

*National Association of Home Builders v. Defenders of Wildlife,*
551 U.S. 644 (2007) ....................................................................... 33–34

*New England Fishermen's Stewardship Ass'n v. Raimondo,*
No. 23-cv-339 (D. Me.) ........................................................................ 4

iv

*Nguyen v. United States*,
    539 U.S. 69 (2003) ........................................................ 66–68

*Oceana, Inc. v. Ross*, No. 17-cv-5146,
    2018 WL 11346743 (C.D. Cal. Oct. 24, 2018) .............................. 42–43

*Oceana, Inc. v. Ross*, No. 17-cv-5146,
    2020 WL 5239197 (C.D. Cal. Jan. 8, 2020) ................................ 44–45

*Palmer v. Hendricks*,
    592 F.3d 386 (3d Cir. 2010) ............................................... 68

*Pennsylvania v. U.S. Department of Health & Human Services*,
    80 F.3d 796 (3d Cir. 1996) ................................................ 55

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ....................................................... 69

*Ryder v. United States*,
    515 U.S. 177 (1995) .................................................. 16–17, 62

*United Cook Inlet Drift Association v. National Marine
    Fisheries Service*, Nos. 21-cv-255, 21-cv-247,
    2022 WL 2222879 (D. Alaska June 21, 2022) ................................. 4

*United States v. Arthrex*,
    594 U.S. 1 (2021) ..................................... 16, 26–27, 54–60

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ....................................................... 35

## U.S. Constitution

U.S. Const. art. II, § 2, cl. 2 .......................................... 15, 26

## Statutes

5 U.S.C. § 702 ............................................................. 1

5 U.S.C. § 704 ............................................................. 1

5 U.S.C. § 706 .......................................................... 1, 14

5 U.S.C. § 706(2)(A) .............................................. 30–31, 63

5 U.S.C. § 706(2)(B) ................................................................. 10, 63

5 U.S.C. § 706(2)(C) ................................................................. 10, 63

5 U.S.C. § 706(2)(D) ................................................................. 10, 63

5 U.S.C. §§ 7541–43 ....................................................................... 57

15 U.S.C. § 78d-1(c) ........................................................................ 21

16 U.S.C. Chapter 38 ........................................................................ 1

16 U.S.C. §§ 1801–91d ...................................................................... 5

16 U.S.C. § 1851 ............................................................................. 30

16 U.S.C. § 1851(b) .................................................................. 36, 56

16 U.S.C. § 1852(a)(1) .............................................................. 11, 17

16 U.S.C. § 1852(a)(1)(B) ................................................................ 6

16 U.S.C. § 1852(a)(1)(E) .............................................................. 18

16 U.S.C. § 1852(b)(1)(A) ....................................................... 6, 56–60

16 U.S.C. § 1852(b)(1)(B) ............................................................... 6

16 U.S.C. § 1852(b)(2)(C) ......................................................... 6, 61

16 U.S.C. § 1852(b)(6)(A) ............................................................. 57

16 U.S.C. § 1852(b)(6)(B) ............................................................. 57

16 U.S.C. § 1852(d) ....................................................................... 17

16 U.S.C. § 1852(e)–(i) ................................................................. 56

16 U.S.C. § 1852(g)(1)–(3) ............................................................ 39

16 U.S.C. § 1852(h) .................................................................. 11, 56

16 U.S.C. § 1852(h)(3) .................................................................. 39

16 U.S.C. § 1853(a) ......................................................... 7, 38–39, 50

16 U.S.C. § 1853(b) ......................................................................... 7

16 U.S.C. § 1853(c) ............................................................ 11, 14

16 U.S.C. § 1854(a) .............................. 11, 28, 35, 47–48, 58–59

16 U.S.C. § 1854(a)(1) ............................................................... 7

16 U.S.C. § 1854(a)(1)(A) .......................................................... 7

16 U.S.C. § 1854(a)(1)(B) ........................................................ 39

16 U.S.C. § 1854(a)(3) ............................................... 7, 34, 37, 40

16 U.S.C. § 1854(a)(3)(A) ........................................................ 30

16 U.S.C. § 1854(a)(4) ............................................................ 37

16 U.S.C. § 1854(b) ...................... 10–11, 14, 28, 35, 43, 47–48, 58–59, 62

16 U.S.C. § 1854(b)(1) ..................................................... 7, 41–42

16 U.S.C. § 1854(b)(1)(A) ............................................. 34, 39, 42

16 U.S.C. § 1854(b)(1)(B) ..................................................... 8, 37

16 U.S.C. § 1854(b)(2) ............................................................ 37

16 U.S.C. § 1854(b)(3) ..................................................... 8, 42–45

16 U.S.C. § 1854(c) ................................................................ 15

16 U.S.C. § 1854(c)(1) ............................................................ 49

16 U.S.C. § 1854(c)(3) ................................................. 11, 51, 59

16 U.S.C. § 1854(c)(6) ............................................................ 41

16 U.S.C. § 1854(h) ................................................. 11, 48–49, 59

16 U.S.C. § 1855(c)(2)(A) ........................................... 11, 52, 59

16 U.S.C. § 1855(c)(2)(B) ........................................................ 52

16 U.S.C. § 1855(f)(1) ......................................................... 1, 14

16 U.S.C. § 1855(f)(1)(B) ........................................... 10, 63, 69

16 U.S.C. § 1855(f)(4) ............................................................ 54

16 U.S.C. § 1856(a)(3)(A)(i) ........................................................ 50

16 U.S.C. § 1856(a)(3)(A)(ii) ....................................................... 50

16 U.S.C. § 1856(a)(3)(B) ................................................. 50–51, 59

16 U.S.C. § 1861(d) ........................................................................ 1

26 U.S.C. § 7443A ....................................................................... 37

26 U.S.C. § 7443A(c) (1991) ....................................................... 27

28 U.S.C. § 1291 ............................................................................ 1

52 U.S.C. § 30106(c) .................................................................... 47

52 U.S.C. § 30107(a)(8) ............................................................... 47

## Regulations

17 C.F.R. § 201.360 ..................................................................... 21

17 C.F.R. § 201.452 ..................................................................... 39

## Rules

Fed. R. Civ. P. 56(a) ................................................................... 12

L.A.R. 28.1(a) ............................................................................ 2–3

## Other Authorities

85 Fed. Reg. 7246 (Feb. 7, 2020) .............................................. 44

87 Fed. Reg. 49,573 (Aug. 11, 2022) ........................................... 8

87 Fed. Reg. 68,925 (Nov. 17, 2022) ................................ 5, 9, 14

89 Fed. Reg. 9072 (Feb. 9, 2024) ............................................... 58

89 Fed. Reg. 15,062 (Mar. 1, 2024) ........................................... 58

89 Fed. Reg. 19,760 (Mar. 20, 2024) ......................................... 58

89 Fed. Reg. 25,820 (Apr. 12, 2024) .......................................... 58

89 Fed. Reg. 28,679 (Apr. 19, 2024) .......................................... 58

Defendants' Opposition to Plaintiff's Motion to Enforce Court
    Order, *Oceana, Inc. v. Ross*, No. 17-cv-5146,
    Docket No. 124 (C.D. Cal. Nov. 18, 2019) .......................................... 43

Plaintiff's Motion to Enforce Court Order,
    *Oceana, Inc. v. Ross*, No. 17-cv-5146,
    Docket No. 119 (C.D. Cal. Nov. 14, 2019) .......................................... 43

Reorganization Plan No. 4 of 1970.......................................................... 58

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 16 U.S.C. §§ 1855(f)(1) and 1861(d) and 5 U.S.C. §§ 702, 704, and 706, because this case is a petition for review of a regulation promulgated by the Secretary of Commerce under 16 U.S.C. Chapter 38.

The Court of Appeals has jurisdiction under 28 U.S.C. § 1291, because this is an appeal from the District Court's final judgment.

The appeal is timely, because the notice of appeal was filed on March 5, 2024, six days after the District Court's final judgment on February 28, 2024.

## STATEMENT OF ISSUES

1.    Whether the putative members of the Mid-Atlantic Fishery Management Council must be appointed as officers under the Appointments Clause.

Pursuant to Local Appellate Rule 28.1(a), Plaintiffs-Appellants raised this issue at 5JA1028–40, the government objected at 5JA1037–53, and the District Court ruled against Plaintiffs-Appellants at 1JA43–50.

2.    If such Council members must be appointed as officers, whether they are properly appointed under the Appointments Clause.

Pursuant to Local Appellate Rule 28.1(a), Plaintiffs-Appellants raised this issue at 5JA1040–50. The government did not respond to Plaintiffs-Appellants' argument that the putative Council members are not properly appointed if they must be appointed as officers under the Appointments Clause. The District Court did not reach this issue.

3.    If they are not properly appointed, whether that defect deprived the Secretary of Commerce of the authority to promulgate the

final rule's fishing-quota reallocations such that the reallocations must be vacated.

Pursuant to Local Appellate Rule 28.1(a), Plaintiffs-Appellants raised this issue at 5JA1050–53. The government did not object to Plaintiffs-Appellants' argument that the rule's reallocations must be vacated if the putative Council members are not properly appointed. The District Court did not reach this issue.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court.

Related cases are pending before the Court of Appeals for the Fifth Circuit, No. 24-60055, and the U.S. District Court for the District of Maine, No. 23-cv-339. To Plaintiffs-Appellants' knowledge, no other related cases are pending. A related case was completed in 2022 in the U.S. District Court for the District of Alaska. *See* Nos. 21-cv-255, 21-cv-247, 2022 WL 2222879 (D. Alaska June 21, 2022)**.**

## STATEMENT OF THE CASE

Plaintiffs-Appellants Raymond Lofstad and Gus Lovgren ("Fishermen") are Mid-Atlantic commercial fishermen who focus their fishing efforts on summer flounder, scup, and black sea bass. Annual federal regulations set a fishing quota for each of these species. Other regulations divide those quotas between the commercial and recreational sectors. On November 17, 2022, the National Marine Fisheries Service ("NMFS"), acting on behalf of the Secretary of Commerce ("Secretary"), published a final rule that permanently reduced the percentage of quota available to commercial fishermen for these three fish. 87 Fed. Reg. 68,925 (Nov. 17, 2022) ("Rule") (3JA593). The Rule was promulgated under the Magnuson-Stevens Fishery Conservation and Management Act ("Act"), 16 U.S.C. §§ 1801–91d, but the Secretary lacked the authority to issue the Rule under the Act. The District Court therefore should have vacated the Rule's reallocations. The Court should reverse.

## I.    The Magnuson-Stevens Act

The Act established eight Regional Fishery Management Councils as independent bodies within the Executive Branch. These Councils drive

the Act's special rulemaking process to determine fisheries policy within their respective geographic regions.

The Rule was created by the Mid-Atlantic Fishery Management Council ("Council"), which "ha[s] authority over the fisheries in the Atlantic Ocean seaward of" New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina. § 1852(a)(1)(B). The Council has 21 seats. Seven seats are filled by the seven respective governors with each state's "principal State official with marine fishery management responsibility." § 1852(b)(1)(A). One seat is taken by "[t]he regional director of the National Marine Fisheries Service" for the Atlantic Ocean, the Greater Atlantic Regional Administrator. § 1852(b)(1)(B). The regional director and the governor designees can appoint their own designees to replace themselves. § 1852(b)(1)(A)–(B).[1] For the remaining 13 seats, the seven state governors nominate individuals for each vacancy. § 1852(b)(2)(C). Each vacancy receives at least three nominations. The Secretary must make her selection for these vacancies from these nominees, unless one does not satisfy statutory

---

[1] At the relevant times, five of the governor-designated seats were filled by designees of the designees. *See* 5JA999–1000; 5JA994–96; 5JA1076 ¶ 1 n.2.

qualifications. In that case, the Secretary must await a qualified slate of nominees from the governor and make her selection therefrom. She cannot nominate and then select her own qualified appointee.

The Act creates a two-step rulemaking procedure. First, the Council adopts a fishery management plan ("FMP") or an amendment to such a plan. § 1854(a)(1). FMPs are comprehensive, highly specific frameworks for regulating fisheries. *See* § 1853(a)–(b) (regarding FMP contents). The measure is reviewed by the Secretary of Commerce for consistency with statutory factors and "other applicable law." § 1854(a)(1)(A). If the plan or amendment is lawful, the Secretary must approve it; if she fails to act within 30 days, the measure "take[s] effect as if approved." § 1854(a)(3). If the Secretary disapproves an FMP or amendment, she must identify "the applicable law with which the plan or amendment is inconsistent" and send the measure back to the Council for revision. *Id.*

Second, the Council adopts a regulation to implement the plan or amendment. § 1854(b)(1). Again, the Secretary reviews the regulation for lawfulness and, if it is lawful, must approve and promulgate it. *Id.* If the regulation is not consistent with law, the Secretary must return it to the

Council for revision. § 1854(b)(1)(B). "The Secretary shall consult with the Council before making any revisions" herself. § 1854(b)(3).

The Secretary has delegated her authority under the Act to the Administrator of the National Oceanic and Atmospheric Administration ("NOAA"). 3JA604. The NOAA Administrator has in turn delegated that authority to the Assistant Administrator for Fisheries, who leads the National Marine Fisheries Service ("NMFS"), a component agency of NOAA. 3JA611.

## II.  Amendment 22 and the Rule

Before the Rule was promulgated, commercial fishermen were allocated 60%, 78%, and 49% of annual quotas of summer flounder, scup, and black sea bass, respectively. 87 Fed. Reg. 49,573, 49,574 (Aug. 11, 2022). On December 14, 2021, the putative members of the Mid-Atlantic Council agreed upon Amendment 22. 5JA1004–05; 3JA594. The National Marine Fisheries Service approved Amendment 22 as lawful. 3JA594. The putative members of the Council also transmitted to NMFS a proposed regulation to implement Amendment 22, which NMFS approved, published for comment, and then promulgated as a final rule. 3JA564; 3JA593. Consistent with Amendment 22, the Rule permanently

8

reduced commercial allocations of quota for summer flounder, scup, and black sea bass to 55%, 65%, and 45%, respectively. 87 Fed. Reg. at 68,926 (3JA594). Although this effected a reduction of 5%, 13%, and 4% of commercial fishing from the *total* quotas for these species, this represents 8.33%, 16.67%, and 8.16% reductions in *commercial* quotas. The Rule inflicts significant harms on the Fishermen, whose incomes rely heavily on these three species. *See generally* 5JA1055–74 (declarations).

### III. The District Court Litigation

On December 16, 2022, the Fishermen filed a complaint challenging the Rule in the District Court for the District of New Jersey. 2JA59. The Fishermen alleged that NMFS lacked authority to promulgate the regulation, because the Council did not validly adopt Amendment 22 and the Rule due to the putative Council members' improper appointments under the Appointments Clause.

Cross-motions for summary judgment were briefed. On February 28, 2024, the District Court denied the Fishermen's motion for summary judgment and granted the government's cross-motion for summary judgment. 1JA51. The court ruled that the Fishermen have standing to challenge the Rule, but it held that Council members were

9

not vested with significant authority and so did not require appointment as officers under the Appointments Clause.

The District Court entered final judgment for the government. 1JA7. The Fishermen file a notice of appeal on March 5, 2024. 1JA1, 1JA4.

## SUMMARY OF THE ARGUMENT

The Secretary of Commerce lacked the power to promulgate the Rule because, under the relevant statutory provision, § 1854(b), she can only approve and promulgate a regulation that had been validly adopted by the Council. Furthermore, the regulation must be supported by an FMP or FMP amendment that had been validly adopted by the Council. *Id.* The Council, however, did not validly adopt the Rule or Amendment 22, because the putative Council members were not appointed consistent with the Appointments Clause, so their actions adopting the relevant measures were void *ab initio*. As a result, the Secretary lacked the necessary statutory predicate to promulgate the Rule, and the Rule's reallocations must be set aside as contrary to statute, constitutional right, and required procedure. § 1855(f)(1)(B); 5 U.S.C. § 706(2)(B)–(D).

Council members were not but should have been appointed consistent with the Appointments Clause, because they are officers of the United States, i.e., they possess continuing positions and significant authority. Council positions are continuing because they are established by law and do not expire. *See* § 1852(a)(1). And the Council possesses significant authority because the Magnuson-Stevens Act vests the Council with primary policymaking authority over Mid-Atlantic fisheries and also authorizes it to order or forbid the Secretary from taking certain regulatory actions. *See, e.g.*, §§ 1852(h), 1853(c), 1854(a)–(b), (c)(3), (h), 1855(c)(2)(A).

In the District Court, the government argued only against standing and officer status. *See generally* 5JA1085, 5JA1151. The government did not address the Fishermen's next arguments, i.e., that if Council members are officers, they must be appointed as principal officers but were not so appointed, and the Secretary lacked the power to issue the Rule.

Council members must be Senate-confirmed as principal officers because they are not sufficiently supervised and controlled by a Senate-confirmed official. *See Edmond v. United States*, 520 U.S. 651, 663 (1997).

11

Even if Council members are inferior officers, they were still not properly appointed. The seven governor-designated individuals and the NMFS regional administrator were not appointed by the President, a head of department, or a court of law. The procedure for the other 13 members—a system of gubernatorial nomination and Secretarial confirmation—gives a share of the appointment power to state governors in violation of the Appointments Clause.

Thus, all 21 seats on the Council are unconstitutionally structured, the Council's adoptions of Amendment 22 and the Rule are void, and the Secretary accordingly lacked the power to issue the Rule.

## ARGUMENT

## I.    Standard of Review (per L.A.R. 28.1(b))

This Court reviews summary judgments de novo. *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 229 (3d Cir. 2021). A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and [the movant] is entitled to judgment as a matter of law." *Id.* at 229–30 (quoting Fed. R. Civ. P. 56(a)). As the District Court noted, there is no dispute of fact in this case. 1JA22 n.12. The District Court

erred in its legal conclusion that Council members need not be appointed as officers under the Appointments Clause.

## II.  Standing

The District Court correctly held that the Fishermen have standing. The elements of standing are "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) (simplified). For purposes of the standing inquiry, courts assume that the claims are meritorious, for the standing inquiry is only "whether the plaintiff is the proper party to bring th[e] claims." *Id.*

Plaintiffs-Appellants are commercial fishermen who fish for scup, black sea bass, and summer flounder. The Rule's reallocations injure the Fishermen by reducing the amount of fish they may catch—regardless of the form that reduction takes, e.g., reduced trip limits, shorter seasons, reduced bag limits, etc. *See generally* 5JA1055–74 (declarations). The reallocations also decrease the value of Appellant Lofstad's fishing assets and reduce his retail-merchandise income. *See* 5JA1062–63 ¶¶ 29–34. That injury is traceable to Defendants-Appellees, because the Rule was

issued by NMFS, *see* 87 Fed. Reg. 68,925 (3JA593), which is directed by Assistant Administrator Coit pursuant to delegated authority from Secretary Raimondo. And the injury is redressable because the Court must vacate the Rule's reallocations if, as the Fishermen allege, Defendants-Appellees lacked authority to issue the Rule. § 1855(f)(1); 5 U.S.C. § 706. That is all that standing requires.

## III.   The Secretary's Rulemaking Power Under the Magnuson-Stevens Act

NMFS issued the Rule under 16 U.S.C. § 1854(b). *See* 87 Fed. Reg. at 68,928 (discussing "section 304(b)(3) of the Magnuson-Stevens Act"). That provision conditions the Secretary's (and so NMFS's) rulemaking power on the satisfaction of a statutory prerequisite. Specifically, the Secretary may promulgate a regulation only if it has been validly adopted by the Council. Furthermore, the regulation must be supported by an FMP or FMP amendment validly adopted by the Council. *See* § 1854(b) (allowing promulgation of regulation adopted by Council under § 1853(c)); § 1853(c) (empowering Council to adopt regulations to implement an FMP or FMP amendment). In the absence of a valid, Council-adopted regulation and FMP or FMP amendment, § 1854(b) does not allow the Secretary to issue any rules. In such circumstances, the

14

Secretary's rulemaking power is restricted to conditions and procedures not followed here.[2] *See, e.g.*, § 1854(c).

As explained below, Amendment 22 and the Rule were not validly adopted by the Council, because Council seats may be filled only pursuant to the Appointments Clause, and the putative Council members who approved Amendment 22 and the Rule were not appointed consistent with that Clause.

## IV.   Council Members Must Be Appointed Pursuant to the Appointments Clause

The Appointments Clause provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. When a position qualifies as an office of the United States, the Appointments Clause provides the "exclusive means" of filling that position. *Lucia v. SEC*, 585 U.S. 237, 244 (2018). An office

---

[2] Moreover, the government cannot now rely on the Secretary's unilateral rulemaking power, as it was not invoked when the Rule was promulgated. *DHS v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1909 (2020).

is any continuing position vested with significant federal authority. *Id.* at 245. Because Council seats are continuing and are vested with significant authority, they are offices that may be filled only pursuant to the Appointments Clause. The District Court erred in holding that Council positions are not vested with significant authority.

Significant authority separates officers from nonofficers; but amongst officers, principal and inferior officers are differentiated by whether the officer "is directed and supervised" by a Senate-confirmed official. *Edmond*, 520 U.S. at 663. Inferior officers are those who are adequately controlled by a Senate-confirmed official. All other officers are principal officers. *United States v. Arthrex*, 594 U.S. 1, 11–13 (2021). Principal offices may be filled only by Presidential nomination and Senate confirmation. That is also the default method for filling inferior offices. *Edmond*, 520 U.S. at 660. But if Congress provides "by Law," the appointment of an inferior officer may be vested in the President, a head of department, or a court of law. *Id.*

When an individual's selection does not conform to the Appointments Clause, his "appointment … to office is deficient," and he acts only "under the color of official title." *Ryder v. United States*, 515

16

U.S. 177, 180 (1995). This is because the relevant statutory appointment provision, being "unconstitutional[,] … is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment)." *Collins v. Yellen*, 141 S.Ct. 1761, 1788–89 (2021). With the statutory provision displaced, those individuals were not appointed to office and "lack[] the authority to carry out the functions of the office." *Id.* at 1788 (contrasting appointment claims with removal claims). The actions of improperly appointed individuals are therefore "void *ab initio*" as actions of their putative offices. *CFPB v. Nat'l Coll. Master Student Loan Trust*, 96 F.4th 599, 606 (3d Cir. 2024).

### A.   Continuing Positions

A position must be "continuing" to qualify as an office and trigger application of the Appointments Clause. *See Lucia*, 585 U.S. at 245. Council seats are continuing. They are "created by statute, down to [their] duties, salary, and means of appointment." *Id.* at 248 (simplified); *see* § 1852(d) (setting compensation). They are permanent positions; no provision of law provides for the sunset or other termination of these Council positions. § 1852(a)(1) ("There shall be established" the Council

positions.). Their duties are also continuing, in that a Council is responsible at all times for managing fisheries in its geographical jurisdiction. § 1852(a)(1)(E).

## B.    The Standard for Identifying Significant Authority

The District Court ruled for the government because it held that the Council lacks significant federal authority, meaning Council members need not be appointed as officers. The issue of significant authority is therefore at the heart of this appeal.

The crux of the District Court's analysis is that officials possess significant authority only if they can take final agency action without review by other Executive Branch officials. *See, e.g.*, 1JA48 (holding that the Council "does not exercise federal power" because "no action of the Council can become binding on any private party, like Plaintiffs, without the Secretary's explicit, considered approval"). But that is not the test.

Plaintiffs in this section review the Supreme Court's guidance for identifying when authority is significant; in the next section, Plaintiffs consider the Council's powers.

### 1. What the Test Is

The Supreme Court explained the meaning of significant authority in *Freytag v. Commissioner*, which held that the Tax Court's Special Trial Judges ("STJs") exercise significant authority and must be appointed as officers. Tax cases are assigned to Tax Court Judges, *see* 501 U.S. 868, 871 (1991), but the Chief Judge of the Tax Court may assign STJs to "assist … judges," *id.* at 870. STJs may preside over two types of cases: In the first type, STJs may be assigned "not only to hear and report on a case but also to decide it." *Id.* at 873. In the second type of case—called a (b)(4) case—STJs may be assigned "only to hear the case and prepare proposed findings and an opinion." *Id.* In (b)(4) cases, STJs "lack … authority actually to decide those cases," and "[t]he actual decision … is rendered by a regular judge of the Tax Court" under the advice of the STJ's recommendation. *Id.* at 873–74.

The tax case at issue in *Freytag* was assigned to a Tax Court Judge who fell ill, whereupon the case was assigned to an STJ as a (b)(4) case to render a recommendation. *Id.* at 871. The Supreme Court held that the STJ's (b)(4) authority constituted significant authority requiring appointment as an officer.

19

The government's argument in *Freytag* echoes its argument here. It argued that an STJ assigned a (b)(4) case "acts only as an aide to the Tax Court judge responsible for deciding the case," *id.* at 880, or as the Court later put it, his "opinion counts for nothing unless the regular judge adopts it as his own," *Lucia*, 585 U.S. at 249 (describing *Freytag*). In the government's view, because the STJ "does no more than assist the Tax Court judge" and "lack[s] authority to enter a final decision," STJs need not be appointed as officers. *Freytag*, 501 U.S. at 880–81.

The Court disagreed because "this argument ignores the significance of the duties and discretion that special trial judges possess." *Id.* at 881. STJs, the Court observed, possess continuing positions and "perform more than ministerial tasks." *Id.* In particular, STJs "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Id.* at 881–82. In performing these "important functions," STJs "exercise significant discretion." *Id.* at 882.

The Court went on to rule in the alternative: even if STJs' (b)(4) powers were not significant, their non-(b)(4) powers were significant, because STJs may enter decisions in such cases (when assigned such a

case by the Chief Tax Court Judge). *Id.*; *Lucia*, 585 U.S. at 247 n.4 (noting that this was "an alternative basis for viewing the STJs as officers"). Though the facts of *Freytag* involved a (b)(4) case only, an official's officer status is determined by considering *all* of their duties, and so STJs' significant non-(b)(4) powers counted. *Freytag*, 501 U.S. at 882; *Lucia*, 585 U.S. at 247 n.4 ("[It] made no sense to classify the STJs as officers for some cases and employees for others.").

The Court followed *Freytag* in *Lucia*, where the Court held that SEC administrative law judges ("ALJs") exercise significant authority. In particular, ALJs, like STJs, preside over cases, so they "critically shape the administrative record." *Lucia*, 585 U.S. at 248. But ALJs' powers were even more clearly significant because ALJ decisions have "potentially more independent effect." *Id.* at 248–49. Whereas STJs' (b)(4) decisions must be reviewed by a Tax Court judge, "the SEC can decide against reviewing an ALJ decision at all," causing the ALJ decision to "'become[] final'" and be "'deemed the action of the Commission.'" *Id.* at 249 (quoting 17 C.F.R. § 201.360 & 15 U.S.C. § 78d-1(c)). "That last-word capacity makes [*Lucia*] an *a fortiori* case: If the Tax Court's STJs are

21

officers, as *Freytag* held, then the Commission's ALJs must be too." *Id.* The Court therefore held that SEC ALJs must be appointed as officers.

*Buckley v. Valeo* shows that significant authority is not a particularly high bar. In that landmark opinion establishing the significant-authority requirement, the Court reaffirmed past decisions that even postmasters first class and district court clerks must be appointed as officers—and "[i]f a postmaster first class and the clerk of a district court are … officers of the United States within the meaning of the Appointments Clause, *as they are*, surely the [FEC] Commissioners before us are" officers as well. 424 U.S. 1, 126 (1976) (emphasis added). That is, an official holds significant authority if his authority is greater than that of postmasters first class or district court clerks.

Foreshadowing *Freytag*'s (b)(4) analysis, *Buckley* held that even the FEC's power to issue *advisory opinions* was a significant power because that power does not "operate[] merely in aid of congressional authority to legislate" and is not "sufficiently removed from the administration and enforcement of public law." *Id.* at 141. Indeed, the Court characterized officers as all officials "exercising responsibility under the public laws of the Nation." *Id.* at 131.

*Freytag*, *Lucia*, and *Buckley* point to a single standard for determining when authority is significant: An official possesses significant authority if the authority is "more than ministerial," that is, "[i]n the course of carrying out … important functions, the [official] exercise[s] significant discretion." *Freytag*, 501 U.S. at 881–82.

This Court adopted that standard in *Cirko v. Commissioner of Social Security*, 948 F.3d 148, 152 (3d Cir. 2020). And it is joined by the other courts of appeals, which consider the standard "the birthmark of federal officers who are subject to the Appointments Clause." *Aurelius Invest., LLC v. Puerto Rico*, 915 F.3d 838, 857 (1st Cir. 2019), *rev'd on other grounds*, 140 S.Ct. 1649 (2020); *accord Burgess v. FDIC*, 871 F.3d 297, 301–02 (5th Cir. 2017); *Jones Bros., Inc. v. Secretary of Labor*, 898 F.3d 669, 679 (6th Cir. 2018); *Bandimere v. SEC*, 844 F.3d 1168, 1179 (10th Cir. 2016); *Landry v. FDIC*, 204 F.3d 1125, 1134 (D.C. Cir. 2000). This standard encompasses not only agency heads but also other officials the Supreme Court has identified as officers: agency adjudicators, *supra*, postmasters first class, district court clerks, and election supervisors. *Buckley*, 424 U.S. at 126; *Edmond*, 520 U.S. at 661 (discussing *Ex parte Siebold*, 100 U.S. 371 (1880)).

23

### 2.    What the Test Is Not

The District Court never applied this standard, despite the Fishermen's briefing. Instead, the District Court's analysis turned on the Council's (supposed) inability to take final agency action without review. The Supreme Court, however, has expressly rejected that analysis.

The District Court's conclusion ignores *Freytag*, where the Court held that STJs exercise significant authority in presiding over (b)(4) cases. The Court there recognized that STJs cannot take final action in (b)(4) cases and their recommendations are always reviewed by Tax Court Judges. *Freytag*, 501 U.S. at 880–81 (considering the government's arguments); *compare Lucia*, 585 U.S. at 249 (STJ's (b)(4) recommendation "counts for nothing unless the regular judge adopts it as his own."), *with* 1JA43 ("In short, without the Secretary's subsequent action to implement a regulation, the Council's suggestions or proposals are toothless."). Yet, STJs wielded significant authority in presiding over (b)(4) cases because they exercise significant discretion over important functions, specifically by "critically shap[ing]" the record. *Lucia*, 585 U.S. at 248 (discussing *Freytag*).

Brushing past *Freytag*, the District Court relied on *Lucia* instead. In that case, according to the District Court, it was significant that "the ALJs' proposed order could become final and binding on the litigant without SEC review if the SEC decided against reviewing an ALJ decision at all[.]" 1JA48 (simplified). But as the Supreme Court explained, this potentiality "makes [*Lucia*] an *a fortiori* case" over *Freytag*. *Lucia*, 585 U.S. at 249. It is not itself a requirement for authority to be significant.

Indeed, the District Court's analysis tracks *Lucia*'s dissent, which opined that "a prerequisite to officer status is the authority to issue at least some final decisions." *Id.* at 247 n.4 (discussing dissent) (simplified). The *Lucia* majority disagreed, observing that *Freytag*'s "primary analysis" regarding (b)(4) cases "explicitly rejects [the] theory that final decisionmaking authority is a *sine qua non* of officer status." *Id.*

Intertwined with the issue of final action is the question of review. The District Court relied on the fact that some of the Council's powers are subject to the Secretary's review. But review does not determine whether an official wields significant authority. In *Edmond*, 520 U.S. at 663, the Court explained that the line between principal and inferior

25

officer depends on whether an officer "is directed and supervised" by a Senate-confirmed official; an officer controlled by another qualifies as inferior and may be appointed under relaxed requirements under the Appointments Clause, U.S. Const., art. II, § 2, cl. 2. And whether an officer is "directed and supervised" turns on three factors—including whether a Senate-confirmed official "could review the [officer's] decisions." *Arthrex*, 594 U.S. at 14–16 (describing *Edmond*). The Court further explained in *Arthrex* that only principal officers may make final decision without review. *Id.* Review—and supervision in general—thus goes to the principal-inferior distinction, not the officer-employee distinction.

Put another way, the District Court implicitly asked "how much power [the Council] exercises free from control by a superior," but the Court has held that this inquiry draws the line between inferior and principal officers. *Id.* at 17–18. Subjecting an official's significant authority to supervision and control makes the official an *inferior officer*, not an employee; the authority is still significant, even if supervised.

The District Court's reasoning would mean that only officials empowered to make unreviewable decisions are officers. But officials

whose decisions are not subject to review are *principal* officers under *Arthrex*. *Id.* at 14–15. Thus, under the District Court's reasoning all officers are principal officers, and there are no inferior officers. That, of course, cannot be the case. Rather, the Supreme Court's decisions imply that there exist inferior officers whose decisions are reviewable.[3]

*       *       *

Authority is significant whenever it is "more than ministerial," that is, it is an "important function[]" over which an official has "significant discretion." *Freytag*, 501 U.S. at 881–82; *accord Cirko*, 948 F.3d at 152. Consistent with that test—and under the Court's precedents—an official may have significant authority even without the power to take final, unreviewable action.

## C.   The Council's Significant Authority

The Council exercises significant discretion in carrying out important functions. But more than that, Council members also have the final, unreviewable word across a range of issues.

---

[3] Note that though STJs' decisions under non-(b)(4) cases could become final if no party pursued review, they were *all* subject to review. 26 U.S.C. § 7443A(c) (1991).

The Council's powers fall into two buckets: Its powers within the two-step rulemaking process, and its powers outside that process.

### 1.   The Council's Two-Step Rulemaking Powers

The Council decides fisheries policy in part through the Act's two-step rulemaking process. *See* § 1854(a)–(b); *see generally supra* pp. 7–8 (overview of process). Through this process, the Council may enact all manner of fishery policy, including permanent fisheries closures, directly affecting the livelihoods of fishermen and their communities. The rulemaking power is much broader, more discretionary, and more coercive than SEC ALJs and STJs, whose decisions affect only discrete individuals. In partaking in the rulemaking process, the Council performs important functions with significant discretion and therefore wields significant power.

The District Court held that the Secretary's ability to review FMPs, amendments, and regulations for consistency with law means the Council "does not exercise federal power." 1JA48. Not so. First, under Supreme Court precedent, whether an official's decisions are subject to review does not affect whether they have significant authority. Second, the Secretary may only block a Council measure for unlawfulness; the

Council has free reign to select from lawful policy options. That is significant authority. Third, even if—contrary to statutory text—the Secretary may review the measure de novo, that merely places the Council in the same position as the *Freytag* STJ whose (b)(4) decision was a recommendation only.

### a.    Review Is Irrelevant to Significant Authority

As a threshold matter, the existence of review cannot, as a rule, render authority nonsignificant. *See supra* pp. 24–27 ("What the Test Is Not"). At most, review would subject Council members to supervision and control, making them inferior officers rather principal officers.[4] But in determining whether Council members are officers in the first place, the question is whether they carry out important functions over which they have significant discretion.

### b.    The Secretary's Review Is Limited

Even if review affected the significant-authority inquiry, the Secretary's review only permits her to reject a Council measure for

---

[4] But as the Fishermen argue later, the Secretary's review is not sufficient to allow Council members to be appointed as inferior officers.

unlawfulness; the Council possesses the power to choose amongst lawful policy options, which is an important function with significant discretion.

The District Court disagreed, concluding that the Secretary can overrule the Council's measures on policy grounds because she can "make policy decisions" in reviewing fishery measures. 1JA47. In particular, she reviews them for consistency with the National Standards, ten statutory requirements for every FMP and implementing regulation, *see* § 1851, which the District Court characterized as "deliberately broad parameters." 1JA47.

*First*, the National Standards do not permit the Secretary to reject measures on policy grounds. The Standards may be abstract, but they are still legal requirements. For example, when the Secretary disapproves an FMP or amendment for inconsistency with a National Standard, she must "specify … the applicable law with which the plan or amendment is inconsistent." § 1854(a)(3)(A).

And in determining whether a fishery measure is consistent with law, the Secretary's review is like judicial review; there is no policy component available during the review. When petitioned under the APA, courts review a fishery measure to determine whether it is "in accordance

with law," 5 U.S.C. § 706(2)(A), including the National Standards. *See, e.g.*, *Hall v. Evans*, 165 F.Supp.2d 114, 117 (D.R.I. 2001) (vacating regulatory provision that violated National Standards). In doing so, courts have observed that the National Standards reflect "a necessary tension, perhaps inconsistency, among the[ir] objectives," so that they "necessarily require[] that each goal be sacrificed to some extent to meeting the others." *Alliance Against IFQs v. Brown*, 84 F.3d 343, 349 (9th Cir. 1996). Thus, resolving the trade-off one way or another cannot render a fishery measure inconsistent with a National Standard—whether a court or the Secretary is considering the measure. Such tradeoffs are "an unavoidable consequence of the statutory scheme." *Id.* at 350.

Accordingly, the Secretary may not reject a Council measure as *unlawful* simply because it strikes a balance amongst the National Standards that she disagrees with. Rather, the Council may resolve the tensions amongst the National Standards. This has always been the way in which all agency decisions implicating competing values have been reviewed for *lawfulness. See Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

*Second*, even if the Secretary were entitled to weigh the National Standard's conflicting values, the National Standards give the Secretary only ten grounds on which to reject a measure. And all ten grounds concern technocratic, geographically local issues directly impacting the fishery. But fishery regulations affect much more than those ten concerns. And for policy issues falling outside of the National Standards, the Council calls the shots without interference by the Secretary.

For example, the National Standards do not permit the Secretary to reject a measure for its environmental impacts outside of the fishery. If the Council wishes to authorize a type of fishing gear that requires more plastic or energy to manufacture—but is just as efficient and cost-effective as existing gear—an environmentally motivated Secretary would have no means of rejecting that authorization.

Similarly, the National Standards do not empower the Secretary to reject a measure for cultural or moral reasons. If the Council wishes to authorize a fishing method that has become a political flashpoint in an election year because it contravenes the practices of Native Americans in the area or because it catches fish in a way that is particularly gruesome and inhumane—but is just as efficient or cost-effective as existing

methods—a Secretary would have no means of stopping that measure. These moral and cultural concerns are the Council's province.[5] So too with *any* other policy consideration falling outside the National Standards.

A similar issue was decided in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). The case related to EPA's authority under the Clean Water Act to transfer EPA's permitting powers to a state. Under the Act, EPA "'shall'" transfer permitting powers to a state that has met "nine specified criteria." *Id.* at 661 (quoting Clean Water Act). The issue was whether EPA's judgment that the nine criteria had been satisfied was "an exercise of discretion." *Id.* at 671. An environmental organization argued, like the government here, that the decision was discretionary because "the EPA's decision to authorize a transfer is not entirely mechanical; … it involves some exercise of judgment as to whether a State has met the [nine] criteria." *Id.* The Court rejected the argument. "While the EPA may exercise some judgment in

---

[5] It is not relevant that these particular concerns were not implicated by Amendment 22. An Appointments Clause inquiry considers *all* of the powers possessed by an individual, whether or not exercised in the case at hand. *Lucia*, 588 U.S. at 247 n.4; *Freytag*, 501 U.S. at 882.

33

determining" whether the criteria are met, it cannot consider a "separate prerequisite to that list." *Id.* "By its terms, the statutory language is mandatory and the list exclusive; if the nine specified criteria are satisfied, the EPA does not have the discretion to deny a transfer application." *Id.* at 661. Thus, "the transfer of [Clean Water Act] permitting authority is not discretionary, but rather is mandated once a State has met the criteria[.]" *Id.* at 673.

Likewise here, the lawfulness determination is not discretionary. The Secretary's review may not consider a concern "separate" from the National Standards and other law; it cannot consider moral, cultural, non-local environmental, or other concerns. *Id.* Just as in *National Association*, "the statutory language is mandatory and the list exclusive," *id.* at 661, so Council measures "shall" be approved and implemented if they are lawful, § 1854(a)(3), (b)(1)(A). Thus, if the Secretary sincerely believes that a measure violates the National Standards, she *must* reject it. Conversely, if she sincerely believes the measure to be lawful, she *must* approve it—even if she disagrees with the measure as a policy matter.

Theoretically, the Secretary could pretextually reject a disfavored fishery measure as inconsistent with the National Standards, despite

actually believing the measure to be consistent with the Standards and other law. But the potential for this unlawful tactic is irrelevant, for "we presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (simplified).

The statute's construction supports limits on the Secretary's disapproval power. Congressional intent in delegating a power must be judged by "common sense as to the manner in which Congress would have been likely to delegate such power." *West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022) (simplified). If, as the District Court concluded, Congress had meant to allow the Secretary to reject a Council measure at will to "match the President's policy priorities," 1JA47, it would defy common sense for Congress to do so through the "oblique [and] elliptical" method of providing a *legality* determination under § 1854(a)–(b) and relying on their *further* reference to ten specific National Standards. *West Virginia*, 597 U.S. at 723. Common sense dictates that, if Congress meant for the Secretary to be able to reject Council measures at will, Congress would simply have said so. The conclusion must be that the Council has the prerogative to choose among the array of lawful policy options.

Furthermore, if the Secretary could reject fishery measures at will, § 1851(b) would be rendered surplusage. That provision limits the Secretary's explications of the National Standards to "guidelines" that explicitly "shall not have the force and effect of law." § 1851(b). This protects the Council's prerogative to develop fishery measures consistent with the National Standards as written, rather than the Secretary's interpretations of them. Section 1851(b) would have no purpose if the Secretary could use the National Standards as a blank check to reject Council measures during the lawfulness determination. Shielding Council measures from interference would only make sense if the Council were meant to be in charge, which is the case—especially when it comes to policy concerns outside of the National Standards.

### c. Even a De Novo Review by the Secretary Leaves the Council with Significant Authority Within the Two-Step Rulemaking Process

Even if the Secretary may reject Council measures on any grounds, such that Council measures were recommendations only, Council members would still possess significant discretion over important functions—just as the *Freytag* STJs wielded significant authority in recommending dispositions in (b)(4) cases.

36

*First*, the Council's measures have independent effect. When the Secretary decides *not* to block an FMP, amendment, or regulation, it is the *Council's* action that becomes effective as written. The Council is therefore like the ALJ in *Lucia*. There, an ALJ's decision has "independent effect" because it "becomes final and is deemed the action of the Commission" if the SEC so orders. 585 U.S. at 248–49 (simplified).

The Council's actions have even more independent effect than SEC ALJ decisions, because if the SEC reviews an ALJ decision and disagrees with it, the SEC's contrary decision would simply displace the ALJ's. In contrast, if the Secretary rejects a Council measure, she must return it to the Council for revision. § 1854(a)(3)–(4), (b)(1)(B)–(2). As a result, it is always the *Council's* handiwork that is eventually made into law, even if the Secretary must approve it.

A comparison to *Freytag* also demonstrates the Council's power. In *Freytag*, an STJ could preside over a case—whether it was a (b)(4) case or a non-(b)(4) case—only if the Chief Tax Judge first assigned the case to the STJ. *Freytag*, 501 U.S. at 873; *see id.* at 871 (Chief Tax Judge assigned the *Freytag* case to STJ after Tax Judge fell ill); 26 U.S.C. § 7443A. So the STJ could exercise its power only if another official

37

permitted it—but the STJ still had significant power. That is the same situation here: Under the District Court's (erroneous) reasoning, the Council's decisions become law only if the Secretary permits it. But just as that did not undercut the STJ's significant authority, it does not undercut the Council's.

*Second*, the Council shapes the administrative record on which any final decision must be based. In *Freytag*, the STJs' decisions were purely recommendary, "count[ing] for nothing unless the regular [Tax Court] judge adopts it." *Lucia*, 585 U.S. at 249. Still, STJs possessed significant authority because they had "authority to hear cases and prepare proposed findings and opinions." *Freytag*, 501 U.S. at 874. In doing so, they "critically shape the administrative record" that informs the Tax Court judges' decisions. *Lucia*, 585 U.S. at 248.

Like STJs, the Council "critically shapes" the administrative record of a fishery measure, deciding the key facts upon which any final decision must be justified. When adopting an FMP or amendment, the Magnuson-Stevens Act requires the Council to specify every relevant fact, including: "the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery," how much of the

38

optimum yield may be fished and how, the likely costs of management measures, those measures' "cumulative conservation, economic, and social impacts," relevant "economic information," the presence of essential fish habitat, the "scientific data which is needed for effective implementation of the plan," and numerous other types of information. § 1853(a). The Council also shapes the record by collecting comments from the public, § 1852(h)(3), and reports from the advisory committees and panels that it assembles and oversees, § 1852(g)(1)–(3). Thus, even if the Secretary could disagree with Council measures on any ground, Council members would still possess significant discretion over the important function of shaping the record.

The District Court dismissed this power because "nothing in the MSA suggests that the Secretary's review is limited only to the facts assembled by the Council." 1JA49. True enough; the Secretary also collects public comments. § 1854(a)(1)(B), (b)(1)(A). But that does not detract from the fact that the Council "critically shape[s]" the record, which is the relevant inquiry. *Lucia*, 585 U.S. at 248. Even in *Lucia*, the SEC "may allow the submission of additional evidence" on appeal from an ALJ, 17 C.F.R. § 201.452, yet that did not dissuade the Court from

concluding that SEC ALJs critically shape the record, *Lucia*, 585 U.S. at 248.

The Council critically shapes the record because the facts that it must assemble, *see supra*, are crucial to the final promulgation of the rule. Accordingly, the Council is responsible for a much larger proportion of the record than the Secretary. Here, for example, the record items that the agency identified as attributable to the Council amount to 3354 pages, while those attributable to NMFS amount to 294 pages, or about 8% of the total. *See* 2JA88–91.[6] That is as expected, given the vast amounts of information and analyses that the Council must assemble, compared to the Secretary's limited responsibilities. It is clear that the Council critically shapes the record.

*Third*, the Council's FMP or amendment becomes final by default if the Secretary simply fails to approve or disapprove it. § 1854(a)(3). This is like the *Lucia* ALJs, whose decisions become final if the Commission declines to review it. *Lucia*, 585 U.S. at 249. The District Court dismissed this fact because "the FMP by itself would not bind any third party," and

---

[6] Excluded from these calculations are the parts of the administrative record devoted to the appointment paperwork for the putative Council members.

regulations, which *do* bind third parties, cannot be effective by default because they require the Secretary's affirmative approval to move forward. 1JA43. So, the District Court reasoned, "without the Secretary's subsequent action to implement a regulation," the FMP is "toothless." *Id.*

That is not so. While FMPs and amendments do require regulations to bind *third parties*, FMPs and amendments bind the government itself, because they govern the contents of any future regulation. Specifically, regulations must be "consistent with the fishery management plan[] [and] plan amendment," in addition to "other applicable law." § 1854(b)(1); *see also* § 1854(c)(6) ("The Secretary may propose regulations … to *implement*" certain plans or amendments. (emphasis added)).

Furthermore, FMPs are so specific that they usually completely determine the contents of any implementing regulation. Here, for example, Amendment 22 required that any implementing regulation have the exact allocations that are injuring Plaintiffs. 5JA1004–05.

An official promulgating an implementing regulation—whether the Council or the Secretary—is bound to carry out the mandate of an FMP or amendment, unless the FMP is first amended again. Thus, the power

41

to enact FMPs by default is a significant power with independent effect. *See Arnesen v. Raimondo*, Nos. 23-cv-145, 23-cv-160, 2024 WL 377820, at *13 (S.D. Miss. Jan. 31, 2024) (so holding).

*Fourth*, in certain circumstances, the Council can force the Secretary to promulgate regulations that the Secretary opposes. After the Secretary approves a Council-adopted regulation, she must publish it for notice and comment. § 1854(b)(1)(A). "[W]ithin 30 days after the end of the comment period," "[t]he Secretary shall promulgate final regulations." § 1854(b)(3).

Sometimes, the public comments prompt the Secretary to change her mind about the regulation. However, she may revise a regulation only if she first "consult[s] with the Council." § 1854(b)(3). Without consultation within a 30-day period, the Secretary "shall" issue the regulation as a final rule. § 1854(b)(1). And the Council may simply deny consultation for that 30-day period, forcing the Secretary to publish the regulation as is.

This is exactly what happened in 2020. There, NMFS approved a Pacific Council regulation as lawful and published it for public comment. *Oceana v. Ross*, No. 17-cv-5146, 2018 WL 11346743, at *2 (C.D. Cal.

Oct. 24, 2018). The public comments prompted NMFS to conduct additional analyses that led the agency to conclude that the regulation was actually unlawful, and NMFS tried to retract the measure. *Id.* A nonprofit sued NMFS, arguing that under § 1854(b)(3), NMFS must issue the regulation as is because the agency had not consulted with the Council. The court agreed that NMFS must "adhere to the precise process set out in § 1854(b)," meaning it must "publish the proposed regulations as is or consult with the Pacific Council." *Id.* at *6 (emphasis added). The court granted summary judgment to the nonprofit and remanded the matter to NMFS. *Id.*

More than a year later, the Council still had not consulted with NMFS, and the nonprofit moved to enforce the district court's judgment. *Id.*, Docket No. 119 (Nov. 4, 2019). The government pleaded for the district court to look the other way, protesting that "NMFS has repeatedly attempted to consult with the Pacific Council," but "NMFS lacks the authority to *compel* the independent Pacific Council to place this item on its agenda or deliberate further on this subject." *Id.*, Docket No. 124, at 8–9 (Nov. 18, 2019) (government brief).

43

The court, however, could only enforce the statute. It ordered the government to consult with the Pacific Council within 30 days or promulgate the regulations as-is. *Id.*, 2020 WL 5239197, at *5 (Jan. 8, 2020). The court emphasized that it was simply "Enforc[ing] the Timeline Codified in 16 U.S.C. § 1854(b)(3)," given that "a thirty-day timeline is already codified in section 1854(b)(3)." *Id.* at *4.

The Council had already denied consultation for more than a year by that point, and it continued to do so. As a result, the Council was able to force NMFS to publish the rule 30 days later over the agency's objections. 85 Fed. Reg. 7246, 7247 (Feb. 7, 2020) (stating that NMFS published the rule without revision because it was not able to consult with the Council).

As *Oceana* demonstrates, in some circumstances, the Council can force the Secretary to publish regulations, even ones she believes to be unlawful. That is significant authority.

The District Court dismissed this power, characterizing the *Oceana* rule as being published "only … because of a Court order." 1JA45 n.25. The District Court, however, failed to consider that the *Oceana* court stated that it was simply enforcing the terms of § 1854(b)(3).

44

The District Court also stated that § 1854(b)(3) only requires the Secretary to "*attempt* to consult with the Council" before revising a regulation. 1JA45 (emphasis added). Not so. The statute states that "[t]he Secretary *shall* consult with the Council before making any revisions to the proposed regulations[.]" § 1854(b)(3) (emphasis added). In fact, *Oceana* explicitly rejected the government's argument that "they are in compliance with the Court's order [to comply with § 1854(b)(3)] because they have attempted to confer with the Pacific Fishery Management Council." *Oceana*, 2020 WL 5239197, at *3.

Finally, the District Court notes that this circumstance arises only after the Secretary has already approved the regulation, triggering the comment period and the subsequent 30-day clock to promulgate the rule. 1JA45. That is irrelevant. The fact is that the Secretary sometimes changes her mind after an initial approval, particularly after notice-and-comment, and the Council can forbid her from doing so, going so far as to be able to force her to issue regulations she believes to be unlawful. This power may be used only under specific circumstances, but the Appointments Clause does not create exceptions for significant authorities that are infrequently used.

45

Forcing the Secretary of Commerce to publish regulations she opposes—even ones she believes to be unlawful—is significant authority. It is certainly a greater power than that vested in a postmaster first class or district court clerk. *See Buckley*, 424 U.S. at 126.

\*   \*   \*

*Freytag* STJs wielded significant authority in (b)(4) cases because they critically shaped the record on which any final decision must be based. Here, not only does the Council (1) critically shape the record, but (2) the Council decides policy for Mid-Atlantic fisheries, especially for policy concerns that fall outside of the ten National Standards; (3) any approved measure casts the Council's work into law; (4) its FMPs, which bind the contents of future regulations, can become effective by default; and (5) under some circumstances, it can force the Secretary to issue regulations she opposes. The Council's two-step rulemaking powers are clearly important functions over which the Council has significant discretion.

Stepping back from the details, it is undisputed that rulemaking is a significant power. *See Buckley*, 424 U.S. at 141 (holding that "rulemaking" is a "significant governmental duty exercised pursuant to

a public law"). Together, the Council and the Secretary can make rules under § 1854(a)–(b). Thus, that provision must vest significant authority *somewhere*, specifically, in the Council, the Secretary, or both. And within the procedure of § 1854(a)–(b), the Council possesses the greater share of power, for it writes and adopts rules, while the Secretary only possesses the negative power to block them. The Council's positive power certainly cannot be a *lesser* one. The Council's § 1854(a)–(b) authority must therefore be significant.

In essential terms, the two-step rulemaking procedure is no different than rulemaking by a typical multi-member body like the six-member FEC.[7] Consider any particular FEC Commissioner, say Ms. Shana Broussard. Ms. Broussard can make rules only with the assent of other Commissioners; they can block her rulemakings. 52 U.S.C. § 30107(a)(8) (rulemaking power); *id.* § 30106(c) (requiring majority vote). And those five other Commissioners can make rules without her. Yet Ms. Broussard's seat is not without significant power

---

[7] The differences between § 1854(a)–(b) rulemaking and FEC rulemaking boil down to the FEC Commissioners' coequality, whereas the Council has a greater share of § 1854(a)–(b)'s rulemaking power than the Secretary, as discussed in detail above. Thus, the differences counsel even more strongly for the Council's significant authority.

simply because she cannot act unilaterally. *Cf. Buckley*, 424 U.S. at 141 (holding that FEC Commissioners' powers required their appointment as officers). The Appointments Clause's careful design is not foiled simply because significant power is vested jointly in multiple positions. What matters is that Ms. Broussard's seat, together with other positions, can enact rules. So too with the Council: The Council and Secretary together can enact rules under the two-step rulemaking procedure, so they both hold significant power under § 1854(a)–(b).

### 2.   The Council's Powers Outside of the Two-Step Rulemaking Process

The discussion above concerns only the Council's powers within the two-step rulemaking process of § 1854(a)–(b). The District Court devoted little attention to the Council's powers outside the two-step rulemaking process, but that was a mistake. The Council has multiple other important functions entailing significant discretion—all of which are final decisions not subject to the Secretary's review.

*First*, the Council may block the Secretary's attempt to "repeal or revoke a fishery management plan for a fishery under the authority of a Council." § 1854(h). Under § 1854(h), even if the Secretary invokes her unilateral rulemaking authority, she cannot revoke an FMP unless she

receives the permission of a three-quarters supermajority of the Council, meaning a small minority of the Council can block the action—and the Council may block the revocation for *any* reason, not just for illegality only. *Id.* Determining whether the Secretary may revoke an FMP is an important function over which the Council has significant discretion. Furthermore, unlike with the two-step rulemaking process, there is no avenue for the Secretary to review, overturn, or appeal the Council's decision; the Council's decision is final.

Even if the Secretary's ability to block Council rulemakings for illegality were deemed so significant as to overwhelm the Council's otherwise significant powers under the two-step rulemaking procedure, the Council would still be vested with significant power because it may block certain Secretarial action on *any* ground.

The District Court brushed past this power in one sentence, stating that the Secretary can unilaterally amend an FMP. 1JA50. That is irrelevant. The Secretary's unilateral power to amend an FMP is extremely narrow, usually limited to instances where the Council has failed to act. *See* § 1854(c)(1). But more importantly, whether to *revoke* an FMP is a critical decision in itself, because the Act provides that states

49

may freely manage fisheries in federal waters if "there is no fishery management plan or other applicable Federal fishing regulations for the fishery in which the vessel is operating." § 1856(a)(3)(A)(i). Otherwise, state regulations are subject to the applicable FMP and regulations.[8] § 1856(a)(3)(A)(ii). Thus, a Secretary who wishes to return regulatory power to the states must seek the Council's permission. As a result, the Council decides the balance of power between states and the federal government—the core issue of federalism. This is clearly an important function over which the Council has significant discretion.

Section 1856 contains other important Council functions requiring significant discretion. The section permits the Secretary to delegate management to a state (consistent with an FMP) "only if the Council approves the delegation … by a three-quarters majority." § 1856(a)(3)(B). Again, the Secretary is placed in a position of seeking the Council's permission to act, which permission the Council may deny on any ground. And when a state's delegated management efforts are inconsistent with

---

[8] A Secretary may not accomplish the effect of revocation by amending the FMP to be blank. *See* § 1853(a) (requiring FMPs to specify fishing quotas and other requirements).

the FMP, the delegation is suspended until the Secretary *and* the Council "find that the State has corrected the inconsistencies." *Id.*

Each of these § 1856 powers permit the Council to grant regulatory power to a state or take it away. Each of them are unreviewable by the Secretary; rather, the Secretary must seek the *Council's* permission to act. These powers are clearly "more than ministerial"—they are important functions requiring significant discretion. *Lucia*, 585 U.S. at 246–47.

*Second*, and similarly, "the Secretary may not … establish[] a limited access system … unless such system is first approved by a majority of the voting members" of the relevant Council. § 1854(c)(3).[9] Thus, even if the Secretary determined that the *only* way to stop a fishery's decline is to restrict fishing to specifically licensed individuals, and even if she invoked her unilateral rulemaking powers, the Council could still block the Secretary's action on policy grounds. The Council's decision is unreviewable. *Id.* That is significant discretion over an important function.

---

[9] A limited-access system limits participation in a fishery to specific, licensed individuals, rather than establishing overall quotas in which anyone may participate.

*Third*, the Act empowers the Council to compel the Secretary to issue regulations. "[T]he Secretary *shall* promulgate emergency regulations or interim measures … if the Council, by unanimous vote of the … voting members," "finds that an emergency exists or that interim measures are needed to reduce overfishing." § 1855(c)(2)(A) (emphasis added). This power is not subject to the Secretary's review; if the Council unanimously commands action, the Secretary shall take action. The Secretary's mandatory compliance with the Council's directive under § 1855(c)(2)(A) is underscored by the next subparagraph, which provides that "the Secretary *may* promulgate emergency regulations" if the Council's emergency determination is not unanimous. § 1855(c)(2)(B) (emphasis added). The Council obviously possesses "more than ministerial" powers; it exercises significant discretion in discharging important functions. *Lucia*, 585 U.S. at 246–47.

\*    \*    \*

In addition to its impressive powers under the two-step rulemaking process—far greater than the *Freytag* STJ's significant (b)(4) powers—the Council also has the final, unreviewable power to block or force Secretarial action on critical issues such as emergency management of

fisheries and the balance of power between states and the federal government. These are indisputably important functions over which the Council has significant discretion.

In considering whether FEC Commissioners possessed significant authority, the Supreme Court reasoned that, "[i]f a postmaster first class and the clerk of a district court are inferior officers of the United States within the meaning of the Appointments Clause, as they are, surely the Commissioners before us are at the very least such 'inferior Officers' within the meaning of that Clause." *Buckley*, 424 U.S. at 126 (citations omitted). *Buckley*'s binding reasoning compels the conclusion that Council members possess significant authority.

## V.    The Putative Council Members Were Not Appointed Pursuant to the Appointments Clause

Because Council seats are continuing positions vested with significant authority, they may be filled only pursuant to the Appointments Clause. Specifically, Council members must be Senate-confirmed as principal officers, but the 21 putative members were not so appointed. And even if they may be appointed as inferior officers, they

were not properly appointed. These 21 individuals were therefore not appointed pursuant to the Appointments Clause.[10]

## A. The Putative Council Members Were Not Properly Appointed as Principal Officers

The Council's authority and independence are such that Council members must be appointed as principal officers. Yet, no putative member was nominated by the President and confirmed by the Senate.

Principal officers are all officers who do not qualify as inferior. *Arthrex*, 594 U.S. at 12. And "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663. The inquiry is "how much power an officer exercises free from control by a superior." *Arthrex*, 594 U.S. at 17. "[T]he

---

[10] The District Court did not reach this issue because it concluded that Council members need not be appointed as officers. Nevertheless, "[i]t is appropriate for [this Court] to reach an issue that the district court did not if the issues provide purely legal questions, upon which an appellate court exercises plenary review." *N.J. Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 305 (3d Cir. 2014) (simplified). A remand would predictably end in another appeal by the loser and simply delay this Court's judgment of this pure question of law. A remand would thus contradict Congress's command to expedite this case "in *every* possible way," § 1855(f)(4) (emphasis added); *see* Docket Nos. 11–12, and thwart judicial economy.

governing test from *Edmond*" turns on three kinds of control: whether a Senate-confirmed official (1) exercises "administrative oversight" over the officer, (2) may remove the officer without cause, and (3) "could review the [officer's] decisions" before they become final. *Id.* at 13–14, 16–17.[11] *Arthrex* singled out the third factor for special treatment: Principal-officer review is not just one factor to be considered but a requirement for inferior-officer status. In other words, if an official can make a final decision for the Executive Branch, the official must be appointed as a principal officer. *Id.* at 14–16. Under both tests, Council members are principal officers.

---

[11] This Court employed different factors in *Pennsylvania v. U.S. Department of Health & Human Services*, 80 F.3d 796, 802 (3d Cir. 1996), drawing on the Supreme Court's *Morrison v. Olson* decision. To the extent those factors differ from *Edmond*'s analysis, this Court should apply *Edmond*, which was decided after and directly conflicts with *Pennsylvania*, *see id.* (concluding that "supervision" is not required for inferior officers), and which the Supreme Court has definitively pronounced to be "the governing test." Regardless, *Pennsylvania*'s *Morrison* analysis is even more favorable for the Fishermen, since Council members have strong removal protections, broad duties including the formulation of policy, jurisdiction over a large part of the Atlantic Ocean, and permanent or three-year tenures. *See id.*

### 1.   *Edmond* Analysis

*First*, the Council is not subject to administrative oversight. Examples of administrative oversight include "prescribing rules of procedure and formulating policies" to control officers and deciding when adjudicators may hear a case, which adjudicators will hear a case, and which past decisions bind future adjudications. *Id.* at 13–14.

The Council is not subject to any such oversight. By statute, Councils set their own priorities, establish and direct their own staff, and create their own operating procedures. § 1852(e)–(i). No official controls what FMPs, FMP amendments, or implementing regulations the Council adopts; indeed, that power is protected from interference by the Secretary, who may only "assist" the formulation of FMPs by "establish[ing] advisory guidelines" that explicitly "shall not have the force and effect of law." § 1851(b). And no official controls in any way the Council's significant powers outside of the two-step rulemaking process.

*Second*, no Council member is removable at will by a Senate-confirmed officer. The seven governor-designated members cannot be removed by the Secretary at all. § 1852(b)(1)(A). The Regional Administrator is a career SES employee, 3JA619 (Box 6-B), and so cannot

be removed except for cause, *see* 5 U.S.C. §§ 7541–43. And the 13 governor-nominated members are removable by the Secretary only "for cause" and only if two-thirds of the Council first seek removal of that member or if the member violates certain financial conflict-of-interest provisions. § 1852(b)(6)(A)–(B).

*Third*, the Council's decisions cannot be countermanded by others in the Executive Branch. Within the two-step rulemaking process, the Secretary must approve and promulgate the Council's lawful fishery measures, as discussed above. She cannot countermand the Council's policy decisions, especially when the policy concern falls outside the National Standards. This is like *Arthrex*, where the Director had to "take final action to cancel a patent claim or confirm it" after the Administrative Patent Judges' ("APJs'") decision, but the *substantive* final power to decide cases still lay with the APJs. 594 U.S. at 15 (simplified). Here, in the rulemaking context, the substantive final power is in deciding policy, not deciding consistency with law. And inferior officers must be "directed … on matters of law *as well as* policy." *Id.* at 18 (emphasis added). Without direction on policy, "[t]he chain of command" under the two-step rulemaking procedure "runs not from the [Secretary]

to [the Council], but from the [Council] to the [Secretary]," and so Council members must be appointed as principal officers. *Id.* at 15.

Additionally, the Secretary does not actually conduct the § 1854(a)–(b) review. Supervision in the Appointments Clause context is not decided on formalities. *See id.* at 18 (An officer's formal rank or technically greater responsibilities is irrelevant.). And it was not the Secretary but rather the Assistant Administrator who reviewed Amendment 22 and the Rule for lawfulness. 3JA564, 3JA587. That is the standard operating procedure for the legality review. *See, e.g.*, 89 Fed. Reg. 28,679, 28,680 (Apr. 19, 2024) ("Pursuant to [§ 1854(b)], the NMFS Assistant Administrator has determined that this final rule is consistent with … applicable law."); 89 Fed. Reg. 25,820, 25821 (Apr. 12, 2024) (same); 89 Fed. Reg. 19,760, 19761–62 (Mar. 20, 2024) (same); 89 Fed. Reg. 15,062, 15,063 (Mar. 1, 2024) (same); 89 Fed. Reg. 9072, 9073 (Feb. 9, 2024) (same). The Assistant Administrator is not Senate-confirmed. Reorganization Plan No. 4 of 1970 § 2(e)(1). The fact on the ground is that no Senate-confirmed officer conducts even the minimal review required by the Act.

Principal-officer review is even more starkly absent from the Council's exercise of its other significant powers. For example, the Secretary cannot overturn the Council's decision when it blocks the Secretary's actions under § 1854(h) and (c)(3) and § 1856(a)(3)(B), or when it forces the issuance of a regulation under § 1855(c)(2)(A). Those decisions are final without opportunity for review. Indeed, rather than subjecting the Council to the Secretary's supervision and control, these authorities empower the Council to supervise and control the Secretary.

Without supervision and direction by a Senate-confirmed official, Council members must be appointed as principal officers under *Edmond*.

### 2. *Arthrex* Analysis

Council members must also be appointed principal officers under *Arthrex*, because, as discussed above, they have the final word with regard to emergency regulations, limited-access systems, repeals of FMPs, and state regulatory powers over fisheries. *See* §§ 1854(a)–(b), (h), (c)(3), 1855(c)(2)(A), 1856(a)(3)(B). Each of these powers is therefore a "principal-officer power." *Arthrex*, 594 U.S. at 17 (simplified).

Additionally, they have the final word on policy under the two-step rulemaking procedure, especially for policy concerns outside the National

Standards. This is also a principal-officer power, because inferior officers must be "directed … on matters of law *as well as* policy." *Id.* at 18 (emphasis added).

\* \* \*

Because Council members are principal officers, their seats may be filled only by Presidential nomination and Senate confirmation. The 21 putative Council members were not so appointed.

## B.    The Putative Members Were Not Properly Appointed as Inferior Officers

Even if Council members may be appointed as inferior officers, no putative Council member was properly appointed. "Even with respect to 'inferior Officers,' the Clause allows Congress only limited authority to devolve appointment power on the President, his heads of departments, and the courts of law." *Freytag*, 501 U.S. at 884.

The Act provides that seven seats are designated by governors or by the governors' designees. § 1852(b)(1)(A). And the regional administrator is a Senior Executive Service career official hired by a lesser official within the Department of Commerce, not the Secretary of Commerce. 3JA614, 3JA616, 3JA617. These eight individuals are obviously improperly appointed.

But the 13 governor-nominated individuals are also not properly appointed as inferior officers. Though they are nominally selected by the Secretary, a head of department, her choice is restricted to governors' nominees. § 1852(b)(2)(C). And governors may nominate as few as "three individuals for each applicable vacancy." *Id.* Critically, the Act forbids the Secretary from rejecting a nominations list for a vacancy unless one of the nominees fails to satisfy objective statutory qualifications. *Id.* The Secretary may not reject a nominations list because of the individuals' character, policy prescriptions, or likely faithfulness in executing the law. *Compare with Collins*, 141 S.Ct. at 1787 (The President must be able to exclude from his officers "those who have different views of policy," "those who come from a competing political party," and those he determines are "not intelligent or wise." (simplified)). If the Secretary determines that a nominee is not qualified, she must wait for the governor to amend his nominations; she cannot pick her own appointees. § 1852(b)(2)(C).

The Fishermen argued below that this procedure unlawfully splits the appointment power between the Secretary and governors, with the latter possessing the lion's share of the power. The government did not respond to this argument.

61

## VI.   The Secretary's Rulemaking Lacked the Key Statutory Prerequisite

As previously discussed, § 1854(b) permits the Secretary to promulgate a regulation only if it has been validly adopted by the Council and if it is supported by an FMP or FMP amendment validly adopted by the Council. Because of the Council's structural defects, however, the Council never validly adopted Amendment 22 or the Rule.

The Appointments Clause provides the "exclusive means" of filling officer positions. *Lucia*, 585 U.S. at 244. When an individual's selection does not conform to the Appointments Clause, his "appointment … to office is deficient," and he acts only "under the color of official title." *Ryder*, 515 U.S. at 180. This is because the statutory appointment provision, being "unconstitutional[,] … is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment)." *Collins*, 141 S.Ct. at 1788–89. The result is that those individuals were not appointed to the office and "lack[] the authority to carry out the functions of the office." *Id.* at 1788. Their actions are therefore "void *ab initio*" as actions of their putative offices. *National Collegiate*, 96 F.4th at 606.

This is the case for the 21 putative Council members, and so their adoptions of Amendment 22 and the Rule were void *ab initio* as Council actions. NMFS therefore was presented with no amendment or regulation approved by the Council and was therefore obligated not to act on the measures submitted by the putative Council members. Without a validly adopted FMP amendment and regulation from the Council, NMFS lacked the power *under statute* to issue the Rule. *See* 5 U.S.C. § 706(2)(A), (C), (D). The promulgation was also contrary to constitutional right, in its assumption that the putative Council members in fact held Council seats, *see id.* § 706(2)(B), violating both Fishermen's "individual constitutional rights" to be governed by accountably appointed policymakers and "the structural imperative of separation of powers," *Cirko*, 948 F.3d at 153. The Fishermen are therefore entitled to the reallocations mandated by the Rule and Amendment 22 being "set aside." § 1855(f)(1)(B). The government addressed none of this below.

Furthermore, even if some Council seats comply with constitutional requirements, if *any* Council member was incorrectly appointed, the Council as an entity was improperly constituted, with all the results noted above. This is because the Court may not assume that the members

63

serving constitutionally would have approved Amendment 22 and its implementing regulation in the absence of the unconstitutional putative members.

As this Court has recognized, "it will often be difficult or impossible for someone subject to a wrongly designed scheme, including an Appointments Clause violation, to show that the design—the structure— played a causal role in his loss." *Cirko*, 948 F.3d at 154 (simplified). Thus, "harm is presumed." *Id.* If the Council contained any unconstitutionally structured seats, the "scheme" under which Amendment 22 and the Rule were adopted was "wrongly designed," and resulting "harm is presumed." *Id.* (simplified). There is no requirement that Plaintiffs-Appellants show a properly appointed majority would not have adopted Amendment 22 and the Rule in the absence of the improperly appointed minority. *Id.* ("An individual litigant need not show direct harm or prejudice caused by an Appointments Clause violation.").

*Cirko* is consistent with the treatment of analogous issues by the Supreme Court and other lower courts.

Most on point is the D.C. Circuit's *Federal Election Commission v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), *cert. dismissed*,

513 U.S. 88 (1994). There, the court dismissed an FEC enforcement action against the NRA because two out of eight FEC members served unconstitutionally. Six voting members were Senate-confirmed, but two *nonvoting* members were unconstitutionally appointed by Congress. The nonvoting members, the government argued, "have no *actual* influence on agency decisionmaking" and so were "constitutionally harmless." *Id.* at 826. In other words, the government argued (as it does here) that the actions of the constitutional members—who had sufficient statutory authority to make decisions by themselves—are presumed to be untainted by the unconstitutional ones. The court held the opposite: The two officials were placed on the Commission "to exercise *some* influence." *Id.* Even if they were "completely silent during all deliberations (a rather unlikely scenario), their mere presence as agents of Congress conveys a tacit message to the other commissioners" and so "has the potential to influence" them. *Id.* The rule is that the presence of improper members "ha[s] some impact (even though the extent of which may be impossible to measure)." *Id.* at 825. The court therefore granted relief. *Id.* at 828.

*NRA* applies here. The point of placing, for example, the seven governor-designated officials on the Council is "to exercise *some*

influence." *Id.* at 826. Thus, even if they were "completely silent," "a rather unlikely scenario," their "mere presence as agents of" the seven states would be expected to influence the other members. *Id.* So too with the regional administrator's presence as an agent of the Department of Commerce. The impact "may be impossible to measure," but the presumption is that the harm exists. *Id.* at 825. In fact, the presumption of such an impact is here even stronger than in *NRA*, because the officials here are voting members of the Council, with the deliberation, influence, and compromises that come with voting membership in a multi-member body.

*Cirko* is also consistent with the Supreme Court precedent. In *Nguyen v. United States*, 539 U.S. 69 (2003), a conviction was affirmed by a Ninth Circuit panel consisting of two Article III judges and an Article IV judge sitting by designation. The Court determined that the inclusion of the Article IV judge was not authorized by statute. The government argued, however, that the Ninth Circuit's judgment should not be vacated, because the two Article III judges formed a quorum. The Court disagreed "[f]or two reasons." *Id.* at 82.

First, improper constitution of a multi-member body requires vacatur of that body's purported actions even if properly serving members could by themselves establish a quorum. While "settled law permits a quorum to proceed to judgment when one member of the panel dies or is disqualified," "this Court has never doubted its power to vacate the judgment entered by an improperly constituted court of appeals, even when there was a quorum of judges competent to consider the appeal." *Id.* (collecting cases). When a panel is improperly constituted, "it [is] inappropriate … to assess … whether the fairness, integrity, or public reputation of the proceedings were impaired by the composition of the panel" or "the merits of petitioners' convictions," i.e., whether the error was harmless. *Id.* at 80.

"Second, the statutory authority for courts of appeals to sit in panels requires the inclusion of at least three judges in the first instance," so "it is at least highly doubtful" that the quorum of two judges could have "serve[d] by themselves as a panel." *Id.* at 82–83 (citation omitted).

*Nguyen*'s first reason applies. A Council with vacancies due to death or disqualification may still act if it has a quorum, but when the Council is improperly constituted, the rule is vacatur; a court does not "assess"

67

whether the regulatory outcome was "impaired by the composition of the" Council. *Id.* at 80.

*Cirko*, *NRA*, and *Nguyen* are explained by the doctrine of structural violations. "Certain types of constitutional error are considered structural, and subject to automatic reversal," for example when the errors infect an "entire trial process" or when it is difficult to "asses[] the effect of the errors." *Palmer v. Hendricks*, 592 F.3d 386, 397 (3d Cir. 2010) (simplified). The Appointments Clause is a "structural safeguard[.]" *Edmond*, 520 U.S. at 659. As the D.C. Circuit has held, the structural-error doctrine applies to "[i]ssues of separation of powers (including Appointments Clause matters)," because "it will often be difficult or impossible for someone subject to a wrongly designed scheme to show that the design—the structure—played a causal role in his loss." *Landry*, 204 F.3d at 1131. Rather, "the opposite is often true"; the assumption of prejudice "is so automatic that it usually goes unmentioned." *Id.* That is the reasoning of *Cirko* also. *See* 948 F.3d at 154.

So too here. Because the scheme within which Amendment 22 and the Rule were approved violates the Appointments Clause, harm is presumed. The 21 individuals were so deeply enmeshed in the entire

decision-making process that the precise effect of any one of them on the outcome cannot be measured. The separation of powers "is a prophylactic device," "rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995). Thus, if even one putative Council member is improperly appointed, "harm" from the violation "is presumed," *Cirko*, 948 F.3d at 154, and the Rule's reallocations should be set aside.

## CONCLUSION

For the above reasons, the Secretary lacked authority to adopt the Rule's reallocations, which should be "set aside." § 1855(f)(1)(B). The Court should reverse.

Dated: April 26, 2024.

Respectfully submitted,

 /s/ Michael Poon
MICHAEL POON
DAMIEN M. SCHIFF

*Attorneys for Plaintiffs –*
*Appellants Raymond Lofstad*
*and Gus Lovgren*

# COMBINED CERTIFICATES

I, Michael Poon, hereby certify

that Damien M. Schiff and Michael Poon are members in good standing of the bar of this Court;

that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)(A) and 32(a)(6) because it has been prepared in 14-point Century Schoolbook font;

that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,953 words;

the text of the electronic brief is identical to the text in the paper copies;

that Pacific Legal Foundation's documents are scanned for viruses with Symantec Endpoint Protection v.14.3.1169 and this document contains no known viruses; and

that on April 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: April 26, 2024.                    s/ Michael Poon
                                          MICHAEL POON