No. 24–1420

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

RAYMOND LOFSTAD; GUS LOVGREN,
*Plaintiffs-Appellants,*

v.

GINA RAIMONDO, in her official capacity as Secretary of Commerce;
JANET COIT, in her official capacity as Assistant Administrator for
Fisheries, National Marine Fisheries Service;
NATIONAL MARINE FISHERIES SERVICE,
*Defendants-Appellees.*

Appeal from the United States District Court
for the District of New Jersey
Civil Action No. 22-7360 (Hon. Robert Kirsch)

## FEDERAL DEFENDANTS' ANSWERING BRIEF

TODD KIM
*Assistant Attorney General*

RACHEL HERON
ARIELLE MOURRAIN JEFFRIES
JOHN E. BIES
*Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

RELATED CASES AND PROCEEDINGS .............................................xiii

GLOSSARY ........................................................................................xiv

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................... 3

STATEMENT OF THE ISSUES .............................................................. 4

PERTINENT CONSTITUTIONAL PROVISIONS AND
    STATUTES ...................................................................................6

STATEMENT OF THE CASE ................................................................. 6

    A.    Statutory and regulatory background ....................................6

        1.    The Magnuson-Stevens Act ...........................................6

            a.    The role of the Secretary and the
                Regional Fishery Management
                Councils ...............................................................8

            b.    Fishery Management Plans .................................9

            c.    Binding fishery regulations ...............................11

        2.    Delegation of the Secretary's Magnuson-
            Stevens Act authorities .............................................13

        3.    The Atlantic States Marine Fisheries
            Commission ...............................................................14

    B.    Factual background ...........................................................15

        1.    Summer flounder, scup, and black sea bass ...............15

i

2. Amendment 22 ............................................................. 16

3. Final Rule ................................................................... 17

C. Proceedings below ................................................. 18

SUMMARY OF ARGUMENT .................................................. 19

STANDARD OF REVIEW ........................................................ 23

ARGUMENT .......................................................................... 24

I. The Final Rule implementing Amendment 22 is lawful. .............. 24

    A. The Magnuson-Stevens Act gives the Secretary final word on fishery management plans and exclusive authority to promulgate regulations. .................... 25

        1. The Act does not limit the Secretary's review of proposed fishery management plans. ........................................................... 25

        2. Even if limited to review for consistency with the National Standards and applicable law, the Secretary would still retain ultimate discretion over fishery management plans. ....................................... 29

        3. The Secretary has exclusive authority over the terms of binding fishery regulations. .................... 33

    B. The Magnuson-Stevens Act assigns Regional Fishery Management Councils only an advisory role. ...................................................................... 39

    C. Council members are not officers of the United States. ................................................................... 43

D.  The Court must construe any ambiguity in the
    Magnuson-Stevens Act to avoid constitutional
    doubt. ................................................................................. 57

II. Plaintiffs are not entitled to relief against the Final
    Rule. ................................................................................. 59

    A.  If Regional Council recommendations improperly
        constrict the Secretary's discretion, statutory
        restrictions on Secretarial discretion should be
        severed to the extent constitutionally necessary .................. 59

    B.  Plaintiffs have not shown any injury resulting
        from any constitutional infirmity in Regional
        Councils. ....................................................................... 66

CONCLUSION ....................................................................... 72

CERTIFICATE OF COMPLIANCE ....................................... 73

CERTIFICATE OF SERVICE ................................................ 74

# TABLE OF AUTHORITIES

## Cases

*Alaska Factory Trawler Ass'n v. Baldridge,*
  831 F.2d 1456 (9th Cir. 1987) ............................... 35

*All. Against IFQs v. Brown,*
  84 F.3d 343 (9th Cir. 1996) ................................... 32

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006) ............................... 22, 59, 64

*Barr v. Am. Ass'n of Pol. Consultants,*
  140 S. Ct. 2335 (2020) ................................... 63, 64

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .............................................. 48

*Burke v. Coggins,*
  521 F. Supp. 3d 31 (D.D.C. 2021) ........................ 37

*Clark v. Rameker,*
  573 U.S. 122 (2014) .......................................... 40

*Conservation Law Foundation v. Ross,*
  374 F.Supp.3d 77 (D.D.C. 2019) ........................ 32

*Cyberworld Enterprise Technologies, Inc. v. Napolitano,*
  602 F.3d 189 (3d Cir. 2010) ............................... 37

*Edmond v. United States,*
  520 U.S. 651 (1997) .......................................... 53

*Estes v. U.S. Dep't of the Treasury,*
  219 F. Supp. 3d 17 (D.D.C. 2016) ........................ 53

*Fed. Election Commission v. NRA Pol. Victory Fund,*
  6 F.3d 821 (D.C. Cir. 1993) ........................... 70, 71

*Fishing Co. of Alaska v. Gutierrez,*
  510 F.3d 328 (D.C. Cir. 2007) ............................ 34

*Flaherty v. Ross*,
373 F. Supp. 3d 97 (D.D.C. 2019) ............................................37, 38, 46

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................42, 64

*Freytag v. Comm'r of Internal Revenue*,
501 U.S. 868 (1991) ...........................................24, 48, 50, 52

*J.H. Miles & Co. v. Brown*,
910 F. Supp. 1138 (E.D. Va. 1995) ........................................46

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ..............................................................58

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. United States*, 259 F. Supp. 2d 783 (W.D. Wis. 2003),
*aff'd*, 367 F.3d 650 (7th Cir. 2004).......................................57

*Lovgren v. Locke*,
701 F.3d 5 (1st Cir. 2012) .....................................................32

*Lucia v. Sec. & Exch. Comm'n*,
585 U.S. 237 (2018) .........................43, 47, 48, 50, 51, 52, 53

*Massachusetts v. Pritzker*,
10 F. Supp. 3d 208 (D. Mass. 2014).......................................14

*McIntosh v. United States*,
144 S. Ct. 980 (2024) .......................................................29, 36

*Myers v. United States*,
272 U.S. 52 (1926) ................................................................68

*N.C. Fisheries Ass'n v. Gutierrez*,
550 F.3d 16 (D.C. Cir. 2008) ...........................................11, 54

*National Association of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) .........................................................32, 33

*Nguyen v. United States*,
539 U.S. 69 (2003) ................................................................70

*Oceana, Inc. v. Ross*,
No. 17-cv-05146, ECF No. 124 (C.D. Cal. Nov. 18, 2019).............36, 37

*Opinion of the Justices*,
3 Greenl. (Me.) 481 (1822) ....................................................45

*State of New York v. Raimondo*,
84 F.4th 102 (2d Cir. 2023)..............................................31, 32

*Thomas v. Cumberland County*,
749 F.3d 217 (3d Cir. 2014) ...................................................23

*United Cook Inlet Drift Association v. NMFS*,
No. 3:21-cv-00247-JMK, 2022 WL 2222879
(D. Alaska June 21, 2022)......................................................46

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ..................21, 22, 42, 53, 56, 59, 61, 62, 63

*United States v. Concord Mgmt. & Consulting LLC*,
317 F. Supp. 3d 598 (D.D.C. 2018) ........................................71

*United States v. Hansen*,
599 U.S. 762 (2023) .........................................................38, 58

*West Virginia v. Env. Prot. Agency*,
597 U.S. 697 (2022) ..............................................................36

## Statutes

5 U.S.C. § 3395 ......................................................................56

5 U.S.C. § 3592 ......................................................................56

5 U.S.C. § 7513 ......................................................................61

Magnuson-Stevens Fishery Conservation and Management Act,
16 U.S.C. §§ 1801 *et seq.*........................ 1, 2, 4, 5, 13, 14, 20, 21, 24, 25,

...................................................... 26, 27, 28, 34, 37, 39, 40, 41, 43, 46,

...................................................... 50, 54, 57, 59, 60, 62, 63, 65, 67, 69

§ 1801 ................................................................................. 6

§ 1801(a)(1)–(3) ............................................................. 6

§ 1801(a)(6) .................................................................... 7

§ 1801(b)(1) .................................................................... 6

§ 1801(b)(3) ................................................................. 6, 7

§ 1801(b)(4) .................................................................... 7

§ 1801(b)(5) ....................................................... 8, 40, 60

§ 1802(13) ........................................................................ 6

§ 1802(26) ...................................................................... 57

§ 1802(27) ...................................................................... 57

§ 1851(a) ........................................................................... 9

§ 1851(a)(1) ......................................................... 30, 31

§ 1851(a)(4) ................................................................ 30

§ 1851(a)(5) ................................................................ 30

§ 1851(a)(7) ................................................................ 30

§ 1851(a)(8) ................................................................ 30

§ 1851(b) .................................................................. 9, 31

§ 1852 ............................................................................. 13

§ 1852(a) ......................................................................... 8

§ 1852(a)(1) ................................................................ 8

§ 1852(a)(1)(B) ............................................... 41, 68, 69

§ 1852(b) ...................................................................... 8

§ 1852(b)(2) ............................................................... 68

§ 1852(b)(2)(A) .......................................................... 69

§ 1852(b)(2)(C) ................................................... 68, 69

§ 1852(e)(1) ............................................................... 68

§ 1852(f)(1)–(3) ......................................................... 51

§ 1852(h)(1) .......................................... 10, 20, 39, 46

§ 1852(i)(1) ................................................................ 40

§ 1853 ......................................................................... 10

§ 1853(a)(l) .................................................................. 9

§ 1853(a)(1)(C) ............................................................ 9

§ 1853(a)(l)–(15) ......................................................... 9

§ 1853(b)(l)–(14) ......................................................... 9

§ 1853(c)(1) ............................................................... 12

§ 1854 ......................................................................... 13

§ 1854(a) .................................................................... 10

§ 1854(a)(1) ..................................................... 27, 29, 30

§ 1854(a)(1)(A) ..................................................... 10, 60

§ 1854(a)(1)(B) ..................................................... 10, 41

§ 1854(a)(2)(A) ..................................................... 10, 41

§ 1854(a)(3) ......................................... 10, 19, 26, 27, 28, 29, 54, 65

§ 1854(a)(4) ......................................................................... 10, 26

§ 1854(b) ............................................................................. 10, 12

§ 1854(b)(1) ................................................................ 28, 29, 60

§ 1854(b)(1)(A) ............................................................................ 41

§ 1854(b)(1)(B) ...................................................................... 12, 34

§ 1854(b)(3) ................................................ 12, 19, 26, 34, 35, 36

§ 1854(c) ................................................... 11, 19, 27, 38, 57

§ 1854(c)(1)(A) ............................................................................ 67

§ 1854(c)(2)(A) ............................................................................ 11

§ 1854(c)(3) .................................................................... 56, 65

§ 1854(c)(4) ................................................................................. 11

§ 1854(c)(5) ................................................................................. 11

§ 1854(c)(6) ........................................................................ 12, 67

§ 1854(c)(7) ................................................................................. 12

§ 1854(g) ...................................................................................... 11

§ 1854(h) ............................................................................ 56, 65

§ 1855 ........................................................................................... 13

§ 1855(c)(1) ................................................................................. 13

§ 1855(c)(2) ........................................................................ 55, 56, 65

§ 1855(d) ....................................... 8, 12, 13, 19, 25, 38

§ 1855(f)(1) ................................................................................. 41

§ 1855(f)(2) ................................................................... 41

§ 1856(a)(3)(A) ............................................................ 57

§ 1856(a)(3)(B) ............................................. 56, 57, 65

The Atlantic Coastal Fisheries Cooperative Management Act of 1993, 16 U.S.C. §§ 5101 *et seq.* ................................................. 14

§ 5102(1) ...................................................................... 14

§ 5104(a) ...................................................................... 14

28 U.S.C. § 292(a) ............................................................. 70

28 U.S.C. § 46(b) ............................................................... 70

33 U.S.C. § 1342 ................................................................ 33

35 U.S.C. § 6(c) ........................................................... 61, 62

43 U.S.C. § 1301 ................................................................ 25

43 U.S.C. § 1311(a) ............................................................ 25

43 U.S.C. § 1312 ................................................................ 25

52 U.S.C. § 30108 .............................................................. 49

Pub. L. No. 77-539, 56 Stat. 267 (1942) ............................. 14

Pub. L. No. 97-453, 96 Stat. 2481 (1983) ........................... 40

Reorganization Plan No. 4 of 1970, 84 Stat. 2090 (1970) ....... 13

## Regulations

50 C.F.R. § 600.215(a)(2)(i) ............................................... 70

50 C.F.R. § 600.215(b)(1) .................................................. 69

50 C.F.R. §§ 600.305–600.355 .......................................... 31

50 C.F.R. § 600.310(b)(2)(ii) ............................................. 31

50 C.F.R. § 600.310(e)(3)(i) ................................................. 31

85 Fed. Reg. 7,246 (Feb. 7, 2020) ........................................ 37

87 Fed. Reg. 49,573 (Aug. 11, 2022) ..................................... 17

*Agmendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan,*
87 Fed. Reg. 68,925 (Nov. 17, 2022),
https://perma.cc/PTL7-UXY6 (Final Rule) .............................. 15, 16, 17

*Amendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan,*
87 Fed. Reg. 49,796 (August 12, 2022) ................................. 16

## Constitutional Provisions

U.S. Const. Art. 2, § 2, cl. 2 ............................................... 43, 68

## Other Authorities

*American Heritage Dictionary of the English Language*
(3d ed. 1996) ................................................................. 36

Floyd R. Mechem,
*A Treatise on the Law of Public Offices and Officers* § 1 (1890) ........ 45

John N. Pomeroy,
*An Introduction to the Constitutional Law of the United States*
§ 642 (7th ed. 1883) ........................................................ 45

Memorandum Opinion for General Counsels of the Executive Branch from Steven G. Bradbury,
*Officers of the United States Within the Meaning of the Appointments Clause,*
31 Op. O.L.C. 73 (2007) ................................................ 44, 45, 50, 71

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1996) .................... 36

NOAA Fisheries, *Species Directory: Black Sea Bass,*
https://perma.cc/593F-GELP ............................................... 15

NOAA Fisheries, *Species Directory: Scup*,
    https://perma.cc/9JY6-JKK6.................................................15

NOAA Fisheries, *Species Directory: Summer Flounder*,
    https://perma.cc/7F84-NX7L.............................................15

NOAA, *Magnuson-Stevens Act Process,* Table X,
    https://perma.cc/H7SV-3QS9...........................................27

*Power of the Secretary of the Treasury to Remove Inspectors of Hulls and Boilers*,
    10 Op. Att'y Gen. 204 (1862)...........................................69

President Bush Signing Statement on the 2006 Magnuson-Stevens Reauthorization Act,
    2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12, 2007) .................47

President Clinton Signing Statement on the 1996 Sustainable Fisheries Act,
    1996 U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996)................47

President Trump Signing Statement on 2018 Amendments to Magnuson-Stevens Act,
    2018 WL 6839393 (Dec. 31, 2018) .....................................47

The Federalist No. 72 (J. Cooke ed. 1961) (A. Hamilton).......................42

## RELATED CASES AND PROCEEDINGS

Federal Defendants are aware of no related cases not identified by Plaintiffs.

# GLOSSARY

| | |
|---|---|
| Amendment 22 | Amendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan |
| Assistant Administrator | the Assistant Administrator for Fisheries of the National Oceanic & Atmospheric Administration and head of the National Marine Fisheries Service |
| Atlantic Coastal Act | the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101 *et seq.* |
| Atlantic Commission | Atlantic States Marine Fisheries Commission, *established by* Pub. L. No. 77-539, 56 Stat. 267 (1942) |
| Final Rule | *Amendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan*, 87 Fed. Reg. 68,925 (Nov. 17, 2022), https://perma.cc/PTL7-UXY6 |
| Mid-Atlantic Council | Mid-Atlantic Fishery Management Council, *established by* 16 U.S.C. § 1852(a)(1)(B) |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation & Management Act, 16 U.S.C. §§ 1801 *et seq.* |
| NMFS | National Marine Fisheries Service |
| National Standards | Section 301 of the Magnuson-Stevens Act, National standards for fishery conservation and management, 16 U.S.C. § 1851 |
| Regional Councils | Regional Fishery Management Councils |
| the Secretary | the Secretary of Commerce |

# INTRODUCTION

Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) in 1976 to establish a national program to conserve and manage fishery resources within the United States' exclusive economic zone (or "federal waters"). Congress recognized the contribution of fisheries to state and local economies, the need for any national policy to account for differences among regional fisheries, and the coordination required because the resources being managed—fish and other aquatic species—move between federal and state waters. Accordingly, Congress established a structured process by which the Secretary of Commerce ordinarily receives and considers recommendations from advisory bodies representing state and regional stakeholders—the Regional Fishery Management Councils—before she establishes or amends fishery management plans or promulgates implementing regulations.

Federal Defendants followed this process for the challenged allocation of summer flounder, scup, and black sea bass between the commercial and recreational fishing sectors. After receiving new data about the distribution of historical harvest of those three species

between those sectors, the Mid-Atlantic Regional Fishery Management Council (Mid-Atlantic Council) prepared a proposal to revise sector allocations to reflect this new data and submitted it to the National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries (Assistant Administrator), who oversees the National Marine Fisheries Service (NMFS). Following review, exercising the Secretary's delegated authority, the Assistant Administrator proposed, and published for public comment, the Council's recommended revised allocations and regulations. After considering public comments, the Assistant Administrator approved a plan amendment revising the sector allocations and promulgated implementing regulations.

Plaintiffs are commercial fishermen who object to the revised allocations. They have no substantive objection to how the allocations were determined but instead contend the Mid-Atlantic Council members who recommended the revision were not appointed in accordance with the Appointments Clause. This challenge fails because the Mid-Atlantic Council's role is purely advisory. The Magnuson-Stevens Act's procedural requirement that the Secretary obtain input from regional stakeholders does not constrain the Secretary's

substantive policy judgment to faithfully execute the Act's mandate. Council members lack the sort of authority necessary to qualify as officers of the United States. Only promulgated regulations legally bind fishery participants, and only the Secretary can establish fishery management plans and promulgate final implementing regulations. And if there were any ambiguity, constitutional avoidance also compels this understanding of the Act. Besides, even if Council members were exercising significant authority, Plaintiffs are not entitled to vacatur of the regulations. This Court should affirm.

## JURISDICTIONAL STATEMENT

Plaintiffs lack standing for one limited aspect of their claim. *See* page 66, *infra.* Federal Defendants otherwise concur in Plaintiff-Appellants' jurisdictional statement.

# STATEMENT OF THE ISSUES

1.      Whether the Magnuson-Stevens Act unambiguously confers significant federal authority to Regional Fishery Management Council members when

    a.      the Secretary has authority to approve or disapprove Council-recommended fishery management plans and to establish her own plans where necessary even absent a Council proposal, and, moreover, only the Secretary can promulgate regulations that legally bind fishery participants;

    b.      the Secretary can exercise policy judgment in evaluating whether Council proposals are consistent with Congress's direction in the Act's National Standards;

    c.      Councils play an advisory role only, and no provision of the Act empowers them to take any action that has a direct legal effect on any fishery participant; and

    d.      constitutional avoidance requires construing any ambiguity in the Act against finding Council members have significant authority.

2.     Whether Plaintiffs are entitled to relief setting aside the challenged regulations if the Court concludes that Mid-Atlantic Council members unconstitutionally exercise significant authority, when

a.     the proper remedy would be severance of those provisions of the Magnuson-Stevens Act that authorize Council members to unconstitutionally exercise significant authority; and

b.     any injury to Plaintiffs was not caused by any constitutional infirmity in the Council but instead by an independent decision to promulgate regulations by a duly authorized officer, and, moreover, a quorum of the Council composed of members appointed by the Secretary voted to recommend the challenged sector allocations.

# PERTINENT CONSTITUTIONAL PROVISIONS AND STATUTES

This brief's Addendum reproduces pertinent constitutional provisions and statutes.

# STATEMENT OF THE CASE

## A.    Statutory and regulatory background

### 1.    The Magnuson-Stevens Act

Congress enacted the Magnuson-Stevens Act to establish a comprehensive, national approach to managing fisheries[1] within federal waters. 16 U.S.C. § 1801. The Act establishes federal jurisdiction over fishery resources within the United States' exclusive economic zone and provides for their conservation and management.

Congress recognized that fisheries are "valuable and renewable natural resources," the dangers of overfishing, and the economic significance of fisheries to the United States. *See* 16 U.S.C. § 1801(a)(1)–(3). Congress therefore sought "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States," *id.* § 1801(b)(1), and "to promote domestic commercial

---

[1] A "fishery" is "one or more stocks of fish which can be treated as a unit for purposes of conservation and management" and "any fishing for such stocks." 16 U.S.C. § 1802(13).

and recreational fishing under sound conservation and management principles," *id.* § 1801(b)(3).

Congress established a "national program for the conservation and management of the fishery resources of the United States." *Id.* § 1801(a)(6). To do so, Congress created a decisionmaking structure to provide "for the preparation and implementation … of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery," *id.* § 1801(b)(4), and laid out principles to guide their management, *id.* §§ 1851–1856.

### a. The role of the Secretary and the Regional Fishery Management Councils

The Magnuson-Stevens Act vests responsibility for managing the nation's fisheries in the Secretary: "The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him," and "may promulgate such regulations, … as may be necessary to discharge such responsibility or to carry out any other provision of this chapter." 16 U.S.C. § 1855(d).

Congress created Regional Fishery Management Councils to advise the Secretary on regional fishery management. *See* 16 U.S.C. § 1852(a)(1). Each Council is responsible for a specific geographic region and consists of federal officials, state officials, and individuals with regional fisheries expertise appointed by the Secretary. *Id.* § 1852(a), (b). Congress established the Councils to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of" fishery management plans so that they "take into account the social and economic needs of the States." *Id.* § 1801(b)(5).

### b.    Fishery Management Plans

The Magnuson-Stevens Act's process begins with fishery management plans. These plans identify the "conservation and management measures" "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(l). The Act establishes plan requirements, *id.* § 1853(a)(l)–(15), and identifies other, optional elements, *id.* § 1853(b)(l)–(14).

Fishery management plans must be consistent with ten broadly written National Standards Congress enacted to govern fisheries conservation and management. 16 U.S.C. § 1853(a)(1)(C). These standards reflect the complex tradeoffs between sustainability and economic development central to fisheries conservation and management. *See id.* § 1851(a). The Act further requires the Secretary to "establish advisory guidelines …, based on the national standards, to assist in the development of fishery management plans." *Id.* § 1851(b).

Congress created a structured process for establishing, modifying, and implementing fishery management plans that ordinarily begins

with recommendations from Regional Councils. *See* 16 U.S.C. §§ 1852(h)(1), 1853, 1854(a) & (b). Councils "prepare and submit to the Secretary" proposed plans for any fishery in their region that requires conservation and management, and such plan amendments as "are necessary from time to time." *See id.* § 1852(h)(1).

When the Secretary receives a Council-recommended fishery management plan or amendment, the Secretary reviews it, including "to determine whether it is consistent with the national standards, the other provisions of [the Magnuson-Stevens Act], and any other applicable law," 16 U.S.C. § 1854(a)(1)(A), and then publishes a notice of availability soliciting public comment, *id.* § 1854(a)(1)(B). After "tak[ing] into account the information, views, and comments received from interested persons," *id.* § 1854(a)(2)(A), the Secretary decides whether to "approve, disapprove, or partially approve" the plan or amendment "by written notice to the Council." *Id.* § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review." *Id.* § 1854(a)(4).

The Secretary, on her own, may prepare a fishery management plan or "necessary amendment" without a Regional Council proposal if the Council fails to develop and submit a plan required for fishery conservation or management in "a reasonable period of time," or if the Secretary disapproves of the plan submitted and the Council fails to appropriately revise it. 16 U.S.C. § 1854(c). The Secretary must "conduct public hearings" to gather input, *id.* § 1854(c)(2)(A), and solicit comments from the relevant Council and the public, *id.* § 1854(c)(4). After considering any comments, the Secretary may adopt the plan or amendment. *Id.* § 1854(c)(5). The Secretary also prepares fishery management plans for highly migratory species. *Id.* § 1854(g).

### c. Binding fishery regulations

Fishery management plans are not self-executing—the plans are not enforceable without implementing regulations. *See N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). The plans "do not themselves have any regulatory effect" and create no legally binding obligations for fishery participants. *Id.*

Like fishery management plans, implementing regulations may originate with either Regional Councils or the Secretary. If a Council

believes regulations would be "necessary or appropriate" to implement a plan or amendment, it may submit proposed regulations to the Secretary. including with its proposed plan or amendment. 16 U.S.C. § 1853(c)(1). The Secretary reviews proposed regulations, including for consistency with the relevant fishery management plan, the Magnuson-Stevens Act, and any other applicable law, and, if appropriate, publishes a proposed rule, solicits public comment, and ultimately decides what to promulgate as a final rule. *Id.* § 1854(b). The Secretary may decline to publish a proposed rule, returning it to the Council for a revised proposal, *see id.* § 1854(b)(1)(B), or revise the proposed regulations herself after "consult[ing] with the Council" and publishing "an explanation of any differences between the proposed and final regulations" in the Federal Register, *id.* § 1854(b)(3).

The Secretary may also originate regulations. She may "propose regulations in the Federal Register to implement any plan or amendment" she prepared. 16 U.S.C. § 1854(c)(6). She must submit the planned regulations to the Council and open a comment period. *Id.* After the comment period closes, she may issue final regulations. *Id.* § 1854(c)(7). The Secretary also has general authority to "promulgate

such regulations … as may be necessary" to discharge her responsibilities under the Act. *Id.* § 1855(d). The Secretary can also promulgate "emergency regulations or interim measures" that she finds "necessary to address [an] emergency or overfishing." *Id.* § 1855(c)(1).

Federal fishery measures bind fishery participants only after the Secretary promulgates final implementing regulations. Regional Councils cannot promulgate regulations. *See id.* §§ 1852, 1854, 1855.

### 2. Delegation of the Secretary's Magnuson-Stevens Act authorities

The Secretary has delegated her Magnuson-Stevens Act authorities to the Under Secretary of Commerce for Oceans and Atmosphere, who oversees the National Oceanic & Atmospheric Administration. (3-JA-0602–04.) The Under Secretary has in turn delegated those authorities to the Assistant Administrator for Fisheries, currently Janet Coit, who oversees NMFS. (3-JA-0609–12.) The Assistant Administrator is a duly appointed inferior officer of the United States. *See* Reorganization Plan No. 4 of 1970, 84 Stat. 2090, 2091 (1970) (The Assistant Administrator "shall be appointed by the Secretary, subject to approval of the President."). She has the authority

to promulgate regulations under the Magnuson-Stevens Act. *See Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 212 n.4 (D. Mass. 2014).

### 3. The Atlantic States Marine Fisheries Commission

An interstate compact among Atlantic coastal states approved by Congress in 1942 established the Atlantic States Marine Fisheries Commission (Atlantic Commission). Pub. L. No. 77-539, 56 Stat. 267 (1942). The Atlantic Coastal Fisheries Cooperative Management Act of 1993 creates a structure for federal cooperation and collaboration with the Commission on inter-jurisdictional fishery management. *See* 16 U.S.C. §§ 5101 *et seq.* The 1993 Act provides for the Commission to establish coastal fishery management plans for fish resources found in two or more states' waters. *See id.* §§ 5104(a), 5102(1). (These coastal plans are distinct from the Magnuson-Stevens Act's fishery management plans.)

### B. Factual background

#### 1. Summer flounder, scup, and black sea bass

Summer flounder, scup, and black sea bass migrate inshore to Atlantic Ocean coastal waters in summer months. *See* NOAA Fisheries, *Species Directory: Summer Flounder*, https://perma.cc/7F84-NX7L; NOAA Fisheries, *Species Directory: Scup*, https://perma.cc/9JY6-JKK6; NOAA Fisheries, *Species Directory: Black Sea Bass*, https://perma.cc/593F-GELP. North of Cape Hatteras, federal regulators and the Atlantic Commission collectively manage these species under the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan. The Plan creates annual catch limits for each species for sustainable fishing purposes and allocates that catch between the commercial and recreational sectors. These allocations were first "established in the mid-1990s[] based on historical proportions of landings (for summer flounder and black sea bass) and catch (for scup) from each sector." *Amendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan*, 87 Fed. Reg. 68,925, 68,926 (Nov. 17, 2022), https://perma.cc/PTL7-UXY6 (Final Rule).

### 2. Amendment 22

In July 2018, the Marine Recreational Information Program, a
state-regional-federal partnership that prepares recreational catch
estimates, released new estimates of historical harvests of summer
flounder, scup, and black sea bass. Final Rule, 87 Fed. Reg. at 68,926.
Commercial catch data has also been updated since the last allocation.
*Ibid.* The Mid-Atlantic Council and the Atlantic Commission proposed a
plan amendment to revise sector allocations "using the original base
years updated with new data," because it reflects "the best scientific
information available to understand the fisheries in those base years."
*Ibid.* "For all three species, these changes result in a shift in allocation
from the commercial to the recreational sector." *Ibid.* The Council voted
14-5 to recommend the amendment and submitted it to NMFS. (5-JA-
1003–04.) Following review, NMFS published a notice of availability
seeking public comment on the amendment: *Amendment 22 to the
Summer Flounder, Scup, and Black Sea Bass Fishery Management
Plan*, 87 Fed. Reg. 49,796 (August 12, 2022). After considering
comments, the Assistant Administrator approved Amendment 22.
(5-JA-594.)

### 3. Final Rule

The Mid-Atlantic Council also recommended proposed regulations to implement Amendment 22. 87 Fed. Reg. 49,573 (Aug. 11, 2022). Following review, NMFS published a notice of proposed rulemaking and solicited public comment. *Id.* After considering public comments, the Assistant Administrator approved, and NMFS promulgated, the final rule. Final Rule, 87 Fed. Reg. 68,925. The Final Rule establishes new annual catch limits for summer flounder, scup, and black sea bass for both the commercial and recreational sectors, reflecting the revised sector allocation informed by the best historical data. *Id.* at 68,926. The Rule also adopts a framework for future allocation changes and options to transfer portions of the allocation on a year-by-year basis. *Ibid.*

## C. Proceedings below

Raymond Lofstad and Gus Lovgren sued Federal Defendants in the U.S. District Court for the District of New Jersey seeking to set aside the Final Rule. (1-JA-0059–87 (Complaint).) After concluding Plaintiffs had standing, (1-JA-23–38 (Order at 15–30)), the district court found that Mid-Atlantic Council members "are not officers subject to the Appointments Clause's strictures." (1-JA-41 (Order at 33).) The district court's analysis "begins with the role the Council performs pursuant to statute." (1-JA-43 (Order at 35).) Because the Council's proposed fishery management plan and implementing regulations do not have "any binding effect on anyone," (*ibid.*), the district court concluded that the Council does not exercise significant authority; rather, it "is a body of individuals who lend their expertise to the Secretary in carrying out her role," (1-JA-48 (Order at 40)). The court therefore granted Federal Defendants summary judgment. (1-JA-51 (Order at 43).)

# SUMMARY OF ARGUMENT

1.      The Final Rule is lawful under the Appointments Clause.

a.      The Assistant Administrator's decision to implement the challenged sector allocation was not constrained by the Mid-Atlantic Council's recommendations. The Magnuson-Stevens Act conveys broad authority and responsibility over federal fisheries management to the Secretary. 16 U.S.C. § 1855(d). The Act creates a structured process for Regional Councils to inform the Secretary of state and regional equities before she establishes or modifies a fishery management plan or promulgates implementing regulations. The Secretary retains final say over the contents of fishery management plans, *id.* § 1854(a)(3), and has authority to establish or amend plans as she finds necessary if the Regional Councils fail to do so, *id.* § 1854(c). Besides, fishery management plans alone do not have any binding legal effect on fishery participants. Only the Secretary can promulgate binding regulations. The Secretary determines the terms of any rule that legally binds fishery participants, and may revise any Council-proposed rules after merely consulting with the Council and providing an explanation for any changes, *id.* § 1854(b)(3).

b.    Regional Councils play an advisory role only. Councils "prepare and submit" proposed plans, amendments, and implementing regulations to the Secretary. 16 U.S.C. § 1852(h)(1). Those proposals are simply advice; the Secretary retains the final word on the contents of any approved fishery management plan and exclusive authority to promulgate rules. The text and structure of the Act demonstrate the Councils' advisory function.

c.    Regional Council members are not officers of the United States. They do not exercise significant federal authority. No action taken by Regional Councils can bind fishery participants. Instead, Councils provide advice to the Secretary, who must take affirmative action to promulgate binding regulations and has discretion over their terms. Caselaw does not support Plaintiffs' view that the ability to make non-binding recommendations alone constitutes significant authority. Plaintiffs cite several other provisions of the Magnuson-Stevens Act not implicated by the challenged rule, claiming those provisions give Council members significant authority. But none of those provisions empowers Councils to take any legally binding action.

d.     This is the best reading of the Magnuson-Stevens Act, but if there were ambiguity, constitutional avoidance would lead to the same result. At a minimum, it is "fairly possible" to read the Act to assign Regional Councils an advisory role, and so constitutional avoidance favors adopting such a reading, rather than construing the Act in a manner that manufactures constitutional conflict.

2.     If the Court nevertheless concludes that the Magnuson-Stevens Act unambiguously authorizes Regional Councils to constrain the Secretary's discretion in a manner that constitutes significant federal authority, vacating the Final Rule still would be improper.

a.     The appropriate remedy for any constitutional flaw in the Magnuson-Stevens Act would be to sever those provisions of the statute restricting the Secretary's discretion. This approach follows the Supreme Court's direction when confronting a constitutionally flawed statute to disregard "problematic portions while leaving the remainder intact." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021). This "tailored approach" would be the narrowest possible modification that would preserve the core of the Magnuson-Stevens Act—the structured advisory process using Regional Councils—while curing any

constitutional defect. The Act would continue to function as a fully operative law and would provide a valid basis for the Secretary's promulgation of the Final Rule.

This approach would follow recent Supreme Court decisions, including a decision to sever limitations on a principal officer's supervision of inferior officers to cure an Appointments Clause violation. *Arthrex*, 594 U.S. at 25. Plaintiffs' alternative proposal—an invitation to wholesale invalidation of much of the Act—violates the Supreme Court's direction not to "nullify more of a legislature's work than is necessary." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006).

b.     Even if there were constitutional infirmity in Regional Council members' appointment, Plaintiffs have not established that such infirmity caused them injury. Plaintiffs have demonstrated *no* injury from the revised scup allocation. For the other two species, Plaintiffs' injuries flow not from the Council's structure but from the Assistant Administrator's independent decision to promulgate the Final Rule. And regardless, thirteen Mid-Atlantic Council members were appointed by a Department head (the Secretary) and would be duly

appointed if inferior officers. These members constitute a quorum of the Council and voted by majority to recommend Amendment 22 and implementing regulations. So if the remaining members' votes were invalidated, the recommendation would be unchanged.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo. Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

# ARGUMENT

## I.    The Final Rule implementing Amendment 22 is lawful.

Plaintiffs misconstrue the Magnuson-Stevens Act and the Regional Councils' role. Plaintiffs' Appointments Clause challenge fails because only the Secretary (through the Assistant Administrator, her delegee and a properly appointed inferior officer) exercises "significant discretion" in "carrying out [] important functions" executing federal fishery management policy. *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 882 (1991). Councils are advisory bodies only; they lack authority to take any action binding fishery participants. But authority to execute or administer the law is a necessary element for officer status, including in the cases Plaintiffs cite. The Act vests authority to issue binding regulations solely in the Secretary. The Secretary's exclusive authority to give federal fishery policies legal effect is dispositive. And if there were any question, the Court must read the Act to avoid constitutional doubts. The Final Rule is lawful, and its adoption was consistent with the Appointments Clause.

### A. The Magnuson-Stevens Act gives the Secretary final word on fishery management plans and exclusive authority to promulgate regulations.

#### 1. The Act does not limit the Secretary's review of proposed fishery management plans.

The Magnuson-Stevens Act gives the Secretary broad responsibility and authority to implement the Act's requirements. Congress assigned the Secretary "general responsibility to carry out any fishery management plan or amendment approved or prepared by [her]" and authorized her to "promulgate such regulations" "as may be necessary to discharge such responsibility or to carry out any other provision of this [Act]." 16 U.S.C. § 1855(d). This broad authority shows that the Secretary is ultimately responsible—and politically accountable—for executing the Act's requirements.

Congress also recognized the importance of fisheries to state and local economies; the differences among regional fisheries in terms of participants, ecosystems, and environmental challenges; and the need for coordination between federal and state agencies managing a resource that can swim between federal and state waters.[2] Congress

---

[2] States typically have authority to regulate fishing activities within three miles of shore. 43 U.S.C. §§ 1301, 1311(a), 1312.

therefore established a structured process to inform the Secretary of state and regional interests when setting policy.

The Magnuson-Stevens Act creates procedural requirements the Secretary follows before establishing and implementing federal fisheries policies. But these *procedures* do not constrain the Secretary's judgment on *substance*—that is, on how best to conserve and manage federal fisheries consistent with Congress's direction. The Secretary may have to consider a Council's proposal before taking action, absent an emergency, unreasonable delay, or other necessity, but she never has to uncritically accept the Council's recommendations. The specific authorities that the Act assigns the Secretary when evaluating and implementing Council proposals show her independent discretion on policy. *See* 16 U.S.C. § 1854(a)(3), (b)(3).

When a Regional Council recommends a fishery management plan or amendment, the Secretary has full discretion to "approve, disapprove, or partially approve" the Council's proposal. 16 U.S.C. § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review." *Id.* § 1854(a)(4). The Act also empowers the

Secretary to prepare fishery management plans or amendments herself without a Council proposal if the Council fails to timely submit a plan or if the Secretary disapproves the plan submitted. *Id.* § 1854(c).

The Magnuson-Stevens Act's text does not limit the factors the Secretary may consider in deciding whether to approve, disapprove, or partially approve plans. To be sure, the Act requires the Secretary to review Council-recommended fishery management plans and amendments for consistency "with the national standards, the other provisions of [the Act], and any other applicable law."[3] *See* 16 U.S.C. § 1854(a)(1); *id.* § 1854(a)(3) (upon disapproval or partial disapproval of a plan or amendment, requiring the Secretary to specify the "applicable law" with which the proposal is inconsistent and "recommend[]" how the Council might conform it to that law). But it does not follow, as Plaintiffs argue, that the Act gives the Secretary a ministerial role, requiring the Secretary to rubberstamp Council recommendations unless they violate an express legal requirement. (Br. at 28–31, 34.)

---

[3] Other applicable law includes the Endangered Species Act, Marine Mammal Protection Act, National Environmental Policy Act, Administrative Procedure Act, and tribal treaty rights. *See* NOAA, *Magnuson-Stevens Act Process,* at pdf p. 31 (Table X), https://perma.cc/H7SV-3QS9.

Absent from Plaintiffs' assertion that "[i]f the plan or amendment is lawful, the Secretary must approve it," (Br. at 7), is any citation to the statute. Plaintiffs later try to manufacture the language they want in the Magnuson-Stevens Act, quoting only the word "shall" and inserting their own requirements—rather than Congress's—around it. (*See* Br. at 34 (claiming the Act says, "Council measures 'shall' be approved and implemented if they are lawful.").) But the Act's actual language says only that "[t]he Secretary *shall approve, disapprove, or partially approve* a plan or amendment within 30 days." *See* 16 U.S.C. § 1854(a)(3) (emphasis added). This does not cabin the Secretary's discretion.

True, section 1854(a)(3) does require that the Secretary's notice of disapproval or partial approval "specify . . . the applicable law with which the plan or amendment is inconsistent." But it does not say that the Secretary must approve absent such an inconsistency. It makes no sense to think Congress intended a provision that reads as a reporting requirement to instead operate as a direct limitation on what factors the Secretary may consider without saying so. This is underscored by comparing section 1854(b)(1), which governs when the Secretary must

solic public comment on proposed rules, to section 1854(a)(3).

Section 1854(b)(1) specifies that the Secretary "shall … initiate an

evaluation of the proposed regulations to determine whether they are

consistent with the fishery management plan, plan amendment, this

chapter and other applicable law," and "if that determination is

affirmative, the Secretary shall publish" the proposal for public

comment.[4] This language—which differs from section 1854(a)(3)—shows

Congress knew how to prescribe a particular manner of review when it

wanted to. The Act does not limit the Secretary's review of fishery

management plans or plan amendments.

> **2. Even if limited to review for consistency with the National Standards and applicable law, the Secretary would still retain ultimate discretion over fishery management plans.**

Even if the Magnuson-Stevens Act limits review of Council-

proposed fishery management plans or amendments to consistency

"with the national standards, the [Magnuson-Stevens Act], and any

---

[4] This provision addresses only the publication of *proposed* rules, not the adoption of binding regulations, and does not include the sort of consequences that courts usually require to find such mandatory-seeming language directed at public officials to be enforceable rather than merely stating procedural conditions. *See McIntosh v. United States*, 144 S. Ct. 980, 987–89 (2024).

other applicable law," 16 U.S.C. § 1854(a)(1), the Secretary—not the Councils—would retain ultimate policy discretion when approving plans or amendments. Evaluating whether a plan or amendment is consistent with the National Standards is an inherently policy-laden judgment that necessarily involves significant discretion. To apply the National Standards, the Secretary must judge how to balance competing interests, such as

- What conservation and management measures will best "prevent overfishing" while also "achieving, on a continuing basis, the optimum yield" for the domestic fishing industry? 16 U.S.C. § 1851(a)(1).

- What allocation of fishing privileges is "fair and equitable" to domestic fishing interests; is "reasonably calculated to promote conservation"; and ensures that no one "acquires an excessive share of such privileges"? *Id.* § 1851(a)(4).

- When is it "practicable" to consider efficiency in the use of fishery resources when establishing conservation and management measures? *Id.* § 1851(a)(5).

- How can conservation and management measures "minimize costs and avoid unnecessary duplication"? *Id.* § 1851(a)(7).

- How can measures "take into account the importance of fishery resources to fishing communities" while also remaining consistent "with the conservation requirements of [the Act] (including the prevention of overfishing and rebuilding of overfished stocks)"? *Id.* § 1851(a)(8).

The questions the Secretary must resolve to evaluate consistency with the National Standards[5] underscore that she is responsible and accountable for the policy decisions embodied in any plan or amendment. For example, National Standard 1 requires that fishery management seek "optimum yield," which requires "balancing the various interests that comprise the greatest overall benefits to the Nation," "particularly with respect to food production and recreational opportunities," with the requirements to "prevent overfishing" and "rebuild" overfished stocks. *See* 16 U.S.C. § 1851(a)(1); 50 C.F.R. § 600.310(b)(2)(ii), (e)(3)(i). Assessing whether Council-recommended proposals are consistent with the Standards therefore depends on balancing competing interests, including conservation and exploitation of fishery resources.

Courts have repeatedly recognized the Secretary's "discretion and judgment" in reconciling the disparate concerns contained within the National Standards. *See State of New York v. Raimondo*, 84 F.4th 102, 107 (2d Cir. 2023) ("The national standards' expansive text and

_____

[5] The Secretary has promulgated guidelines describing her interpretation of the National Standards after notice and comment. *See* 16 U.S.C. § 1851(b); 50 C.F.R. §§ 600.305–600.355.

structure reflect that Congress intended for *NMFS* to use discretion and judgment to reconcile this tension when managing the fishery.") (emphasis added) (cleaned up); *Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012) ("The purposes of the national standards are many, and can be in tension with one another. … Compliance with the national standards requires balancing *by the agency* and the exercise of discretion and judgment.") (emphasis added); *All. Against IFQs v. Brown*, 84 F.3d 343, 349–50 (9th Cir. 1996) ("Congress required *the Secretary* to exercise discretion and judgment in balancing among the conflicting national standards.") (emphasis added). The Magnuson-Stevens Act gives "NMFS rulemaking flexibility to react to dynamic natural conditions and account for multiple stakeholders." *State of New York*, 84 F.4th at 107. The language Congress uses—"optimum," "where practicable," "minimize," "take into account"—presumes the Secretary's exercise of discretion and judgment. *See Conservation Law Foundation v. Ross*, 374 F.Supp.3d 77, 91–92 (D.D.C. 2019).[6]

---

[6] Plaintiffs' reliance on *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), is misplaced. (*See* Br. at 33–34.) Unlike the National Standards, the action at issue there—the transfer of permitting authority to state regulators upon application under section 402(b) of the Clean Water Act—was "mandatory" if nine

Plaintiffs are wrong that the Secretary must defer to the Councils' judgment on balancing the competing objectives within the National Standards. (Br. at 31–32.) The statutory text contains no such requirement. Instead, Congress established ten broad objectives for fishery conservation and management and gave the Secretary discretion to faithfully execute Congress's mandate.

### 3. The Secretary has exclusive authority over the terms of binding fishery regulations.

In any event, fishery management plans do not legally bind fishery participants. Plaintiffs' argument conflates fishery management plans with binding regulations. Only the Secretary can promulgate regulations that bind fishery participants. And the Act plainly does not

---

statutory criteria regarding the regulator's legal authority were met. *Id.* at 654. The Environmental Protection Agency had determined that the statutory criteria were met. *Ibid.* Because "[b]y its terms, the statutory language is mandatory and the list exclusive," the Court rejected plaintiffs' claim that the agency also had to consult under section 7 of the Endangered Species Act. *Id.* at 661. The Court recognized that the agency "may exercise some judgment in determining whether a State has demonstrated the authority to carry out § 402(b)'s enumerated statutory criteria," but affirmed the agency's position that it could not add an additional Endangered Species Act requirement to the list. *Id.* at 671. Section 402(b)'s requirements are objective criteria regarding the legal powers of state agencies under state law, *see* 33 U.S.C. § 1342, not the sorts of policy-laden judgments the National Standards call for. And even in that context, the Court recognized the agency's ability to exercise judgment over whether the standards were met.

limit—expressly or otherwise—the Secretary's discretion to revise the Council's proposed regulations before promulgating final rules. If the Secretary disagrees with a Council's proposal, she may decline to publish the proposed rule and return it to the Council for revision. *See* 16 U.S.C. § 1854(b)(1)(B). And once she has received public comment on Council-proposed regulations, the Secretary may also revise the regulations herself before promulgating a final rule. The Act requires only that she "consult with the Council" and publish "an explanation of any differences between the proposed and final regulations" in the Federal Register. *Id.* § 1854(b)(3).

The Secretary thus has ultimate discretion over the contents of implementing regulations. The Act does not limit her authority to revise a Council's proposal, but instead includes only procedural requirements to consult with the Council and explain any changes. Power to alter a proposed rule before it binds fishery participants "rests only with the Secretary." *Fishing Co. of Alaska v. Gutierrez*, 510 F.3d 328, 333 (D.C. Cir. 2007) (citing 16 U.S.C. § 1854(b)(3)) ("The Council is free to submit comments on a proposed rule (as are others), but power to alter the rule before it becomes final rests only with the Secretary."). A final rule—

and thus the Secretary's decision to revise (or not) a proposed rule—is invalid only if "the Secretary acts in an arbitrary and capricious manner in promulgating [the] regulations." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987).

Plaintiffs suggest that, by requiring the Secretary to consult with the Regional Council before finalizing a rule departing from a Council proposal and also requiring the Secretary to issue final regulations within 30 days after the comment period ends, *see* 16 U.S.C. § 1854(b)(3), Congress meant to give Councils a back-door mechanism to compel the Secretary to issue its proposed rule without changes. In Plaintiffs' view, "the Council may simply deny consultation for that 30-day period" and then NMFS must promulgate the Council's proposed regulation without revision, (Br. at 42–45), notwithstanding the Secretary's disagreement or even belief that the proposal is "unlawful," (Br. at 46). If Councils had such power to strongarm the Secretary to issue rules, it might well be constitutionally problematic. But this strawman argument finds no footing in the actual text of the Act. Congress did not, by directing NMFS to attempt consultation, give Councils a pocket veto. If Congress meant to let Councils prevent the

Secretary from revising their proposed regulations, it would have just said so, rather than taking such an "oblique [and] elliptical" approach. *West Virginia v. Env. Prot. Agency*, 597 U.S. 697, 723 (2022).

Moreover, "the requirement that the Secretary attempt to consult with the Council … does not mandate that the Secretary wait for an affirmative response … before making a change." (1-JA-45 (Order at 37). "Consult" simply means to "*ask* the advice or opinion of" or "*seek* advice or information of." *See Merriam-Webster's Collegiate Dictionary* (10th ed. 1996) (emphasis added); *American Heritage Dictionary of the English Language* (3d ed. 1996) (emphasis added). Absent contrary statutory direction, the Secretary completes her obligation to "consult" under section 1854(b)(3) once she solicits Council input and offers an opportunity to respond. Nothing stops her from acting if the Council fails to respond.

Plaintiffs' argument misrepresents the Government's position in another district court matter[7] and ignores governing law. "Time-related

_____

[7] Plaintiffs claim that the Government "argued" that the Secretary had to promulgate the original proposed regulation when he could not consult with the Council in *Oceana, Inc. v. Ross*, No. 17-cv-05146, ECF No. 124, at 2–3 (C.D. Cal. Nov. 18, 2019). (Br. at 42–44.) That is incorrect. The *Oceana* court ordered NMFS both to publish final

directives seek speed by directing a … public official to act by a certain time. Missing that kind of deadline does not deprive the official of the power to take the action to which the deadline applies." *McIntosh*, 144 S. Ct. at 987–88 (citation omitted); *accord Cyberworld Enterprise Technologies, Inc. v. Napolitano*, 602 F.3d 189, 196 (3d Cir. 2010). The Act does not compel the Secretary to promulgate a rule with which she disagrees if a Council rebuffs her consultation.

In short, the Act imposes *no* standard of review constraining the Secretary's review, much less one deferential to the Council's views. "[T]he Secretary's ability to review" Council proposals is not, as Plaintiffs contend, "somehow circumscribed and limited to something like an 'abuse-of-discretion' review." *Flaherty v. Ross*, 373 F. Supp. 3d

---

regulations by a date certain and to consult the Council before revising the proposed regulations. *Id.* at 7. Because the Council did not meet until after the date by which *the district court* ordered NMFS to promulgate regulations, NMFS "d[id] not have an opportunity to consult with the Council on revisions to the regulations *before the Court's deadline.*" 85 Fed. Reg. 7,246, 7,247 (Feb. 7, 2020) (emphasis added). Those regulations were ultimately vacated by another court because NMFS had concluded that they were inconsistent with National Standard 7, but promulgated them "*only to comply with the California district court's order*[.]" *Burke v. Coggins*, 521 F. Supp. 3d 31, 38–39 (D.D.C. 2021) (emphasis added). The erroneous district court order, not the Act, constrained the Secretary in *Oceana*. (*See* 1-JA-45 (Order at 37 n.25).)

97, 109 (D.D.C. 2019). Plaintiffs' argument that Congress intended, *sub silentio*, to compel the Secretary to approve Council-proposed measures notwithstanding her disagreement overreads the Act's plain text.

The extra-textual limitations Plaintiffs read into the Magnuson-Stevens Act cannot be reconciled with its broader structure. Congress expressly assigned the Secretary broad authority to implement the Act, *see*, *e.g.*, 16 U.S.C. § 1855(d), and to act if Regional Councils fail to make necessary proposals, *see id.* § 1854(c); and included multiple textual indications that Councils play an advisory role only, *see* Part I.B., *infra*. Plaintiffs' approach—reading extra-textual limitations into a statute then arguing those limits render the statute unconstitutional—runs directly counter to the courts' duty. Courts construe statutes to avoid constitutional problems, not to seek them out. *See United States v. Hansen*, 599 U.S. 762, 781 (2023) ("When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict."). *See* Part I.D., *infra*.

## B. The Magnuson-Stevens Act assigns Regional Fishery Management Councils only an advisory role.

The Magnuson-Stevens Act establishes Regional Councils as advisory bodies only. The Act gives Councils no authority to take actions that have legal effects or impose legal obligations on any fishery participant. Legal obligations instead flow from the Secretary's decision to adopt Council proposals by regulation. Plaintiffs complain that the Act empowers Councils to "enact all manner of fishery policy … directly affecting the livelihoods of fishermen and their communities," (Br. at 28), but no Council action can do so. Only a rule promulgated by the Secretary directly affects fishery participants.

The primary function Congress assigned Regional Councils is to "prepare and submit" proposals to the Secretary. *See* 16 U.S.C. § 1852(h)(1). As explained above, Councils prepare and submit recommended fishery management plans, amendments, and proposed regulations in a structured process intended to inform the Secretary of regional equities before she establishes federal fishery policies. But these proposals are just that—proposals. The Secretary remains free to approve or disapprove of Council-recommended plans or amendments and to adopt or alter Council-proposed regulations. *See* Part I.A., *supra.*

Both textual and structural features of the Magnuson-Stevens Act confirm the Regional Councils' advisory role. To begin with, Congress twice indicates in the Act's text that it intended Councils to perform an advisory function. Plaintiffs do not address these textual features. First, the Act explains that Congress established Councils to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and *advise on*, the establishment and administration of" fishery management plans in a manner that "take[s] into account the social and economic needs of the States." 16 U.S.C. § 1801(b)(5) (emphasis added). Second, Congress expressly excluded Councils from Federal Advisory Committee Act requirements, *id.* § 1852(i)(1), indicating Congress believed the Councils would otherwise be subject to them. *See* Pub. L. No. 97-453, 96 Stat. 2481 (1983) (providing that "[t]he Federal Advisory Committee Act … shall not apply to the Councils …"). This exclusion would be surplusage if Congress thought it was assigning Councils significant authority, rather than advisory functions. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (cleaned up).

The Magnuson-Stevens Act's structure also shows that the Secretary has authority over the substance of any fishery management plan, amendment, or implementing regulations. The Act requires that Council-proposed plans, amendments, and regulations undergo notice and comment before the Secretary finalizes them, *see* 16 U.S.C. § 1854(a)(1)(B) & (b)(1)(A), and requires the Secretary to "take into account the information, views, and comments received from interested persons," *id.* § 1854(a)(2)(A). That would be pointless if the Secretary lacked discretion to make decisions informed by the comments received. The limits that Congress placed on judicial review—confining it to "[r]egulations promulgated *by the Secretary*" and "actions that are taken *by the Secretary* under regulations which implement a fishery management plan," *see id.* § 1855(f)(1), (2) (emphasis added)—likewise reflect Congress's understanding that only the Secretary, and not Regional Councils, can affect fishery participants in a manner that might require judicial redress.

Plaintiffs mistakenly assert that the word "authority" in 16 U.S.C. § 1852(a)(1)(B) must mean that the Mid-Atlantic Council has significant federal authority. (Br. at 6, 18.) But this provision just identifies the

waters for which each Regional Council makes recommendations. It "does not bespeak actual control." (1-JA-49 (Order at 41.).)

With Councils as advisers, the Secretary remains politically accountable for any binding fisheries regulations. This serves a central aim of the Appointments Clause: "Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure … ought really to fall.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting The Federalist No. 72, at 476 (J. Cooke ed. 1961) (A. Hamilton)). Only the Secretary can decide to impose legal obligations on fishery participants, and there is "a clear and effective chain of command" to the Secretary "from the President, on whom all the people vote." *Arthrex*, 594 U.S. at 11. There is no diffusion of accountability because all of the Act's legal authority is vested in a principal officer, the Secretary.

## C. Council members are not officers of the United States.

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … all [] Officers of the United States" not otherwise addressed in the Constitution, but that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. 2, § 2, cl. 2. To qualify as an officer, an individual must "occupy a 'continuing' position established by law" and exercise "significant authority pursuant to the laws of the United States." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (cleaned up).

Regional Council members do not meet these requirements and are not officers of the United States. Assuming Regional Council members occupy a "continuing" position despite their temporary and episodic duties,[8] none of the functions the Magnuson-Stevens Act assigns Councils involves the exercise of significant federal authority. As discussed above, *see* Part I.B., *supra*, the Councils' role is advisory

---

[8] The Mid-Atlantic Council typically meets a handful of times each year, each meeting lasting just a few days. (5-JA-1122 (Defs. Mem. at 25).)

only. "[A]n individual who occupies a purely advisory position … does not hold a federal office." *See* Memorandum Opinion for General Counsels of the Executive Branch from Steven G. Bradbury, *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 77 (2007) (Bradbury Memo). "[M]ere authority to advise"—even "substantial practical authority to develop and coordinate policy"—is not significant authority absent legal power. *Id.* at 98.

Regional Councils cannot limit, circumscribe, or control the Secretary's ability to regulate fisheries. *See* Part I.A., *supra.* Instead, the Secretary retains final say over the contents of any approved fishery management plan or promulgated regulations. That only the Secretary—and not the Councils—can undertake sovereign acts executing or administering federal fishery management measures is dispositive. "Significant authority" is modern shorthand for meaningful discretion to exercise significant sovereign powers of the United States. That a position becomes an "office" only when it is vested with significant discretion to exercise such powers goes back to the Founding and English common law. *See id.* at 78–87.

An early opinion from the Supreme Judicial Court of Maine, for instance, explained that "the term 'office' implies a delegation of a portion of the sovereign power to, and possession of it by the person filling the office." *Opinion of the Justices*, 3 Greenl. (Me.) 481, 482 (1822). The "legal power" possessed is one that "in its effects [] will bind the rights of others." *Ibid.* Therefore "every 'office,' in the constitutional meaning of the term, implies an authority to exercise some portion of the sovereign power, either in making, executing or administering the laws." *Id.* at 483. Officers are "the means and instruments by which the laws shall be executed." John N. Pomeroy, *An Introduction to the Constitutional Law of the United States* § 642, at 425 (7th ed. 1883).

But there is no sense in which Regional Councils are "invested with some portion of the sovereign functions of government." *Cf.* Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 1, at 1–2 (1890). Contrary to Plaintiffs' claims, Councils cannot "decide fisheries policy," "enact all manner of fishery policies," or exercise "rulemaking power." (Br. at 28.) They have no authority to execute or administer the laws of the United States whatsoever, much less exercise significant discretion in doing so. While Councils may "prepare

and submit" proposals to the Secretary, 16 U.S.C. § 1852(h)(1), only the Secretary can put sovereign weight behind them.

Many courts have therefore recognized that Regional Councils play an advisory role that falls far short of exercising significant authority. "The Council is charged with distilling the members' expertise into recommendations for the Secretary, which the Secretary then independently evaluates to determine whether they comply with her and the President's policy objectives." (1-JA-49 (Order at 41).) While Councils are "heavily involved" in developing plans and proposing regulations, they lack authority to take final action and so the structure of the Magnuson-Stevens Act "reinforces the advisory nature of the Council's role." *Flaherty*, 373 F. Supp. 3d at 104–10.[9]

The Executive Branch has long understood the Regional Councils' role to be wholly advisory and has implemented the Magnuson-Stevens

---

[9] *See also United Cook Inlet Drift Association v. NMFS*, No. 3:21-cv-00247-JMK, 2022 WL 2222879, at *19 (D. Alaska June 21, 2022) (explaining that Regional Councils "are simply advisory bodies and have no legal authority"); *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1157–59 (E.D. Va. 1995) (finding that Councils have "no 'authority' to do anything[,]" and final decision-making power rests with NMFS); *id.* ("Councils appear to be designed to function as advisers, i.e., experts in the field who assist the Secretary in his role in managing the fishery.").

Act accordingly. *See* President Trump Signing Statement on 2018

Amendments to Magnuson-Stevens Act, 2018 WL 6839393 (Dec. 31,

2018) ("Keeping with past practice of the executive branch, my

Administration will treat the plans promulgated by the Council *as*

*advisory only*; the adoption of the plans will be subject to the discretion

of the Secretary of Commerce as part of the regulatory process

described in … the [Magnuson-Stevens Act].") (emphasis added);

President Bush Signing Statement on the 2006 Magnuson-Stevens

Reauthorization Act, 2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12,

2007); President Clinton Signing Statement on the 1996 Sustainable

Fisheries Act, 1996 U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996).

Regional Councils' inability to impose legally enforceable

obligations on fishery participants distinguishes them from officials

courts have found to violate the Appointments Clause. The

administrative law judges in *Lucia*, for example, "exercise[d] significant

discretion" in "tak[ing] testimony, conduct[ing] trials, rul[ing] on the

admissibility of evidence, and . . . enforc[ing] compliance with discovery

orders." 585 U.S. at 247. The Court found them to be officers because

they exercised "nearly all the tools of federal trial judges" in proceedings

against private parties and issued decisions that could be "deemed the action of the Commission" resolving legal matters without further review. *Id.* at 248–49; *see also Freytag*, 501 U.S. at 881–82, 891 (holding that Tax Court special trial judges—who "take testimony, conduct trials, … and … enforce compliance with discovery orders" and could "punish contempts by fine or imprisonment"—were inferior officers.).

And in *Buckley v. Valeo*, the Supreme Court found that Federal Election Commission members were officers under the Appointments Clause because they had "primary and substantial responsibility for administering and enforcing the [Federal Election Campaign] Act," including record-keeping, disclosure, investigative functions, and extensive rule making and adjudicative powers. 424 U.S. 1, 109 (1976). The Commission members had "primary responsibility for conducting civil litigation in the courts of the United States" and "broad administrative powers" of "rulemaking." *Id.* at 140. Plaintiffs emphasize that the Supreme Court included issuing "advisory opinions" when describing the Commissioners' problematic authorities. (Br. at 22.) But the Commission's advisory opinions are administrative actions intended to shape private conduct by providing safe harbor for covered activities,

and so have direct legal effect. *See* 52 U.S.C. § 30108. Plaintiffs confuse them for pre-decisional advice.

Plaintiffs' complaint about the challenged sector reallocation essentially boils down to the fact that the Assistant Administrator considered, approved, and promulgated it as proposed by the Council. Plaintiffs contend that Council members must be officers because when the Secretary approves a Council recommendation, it is the Council's "action" that is ultimately given legal effect. (*See* Br. at 37 (stating that when the Secretary approves a Council proposal, "it is the *Council's* action that becomes effective as written").)

But that proves too much. If the mere possibility that an agency decisionmaker might adopt a recommendation converts the recommender into an officer of the United States, as Plaintiffs propose, the world would be filled with putative officers: notice-and-comment participants or federal advisory committee members whose recommended regulations an agency decisionmaker adopts; environmental organizations whose proposals are selected; agency employees whose draft regulations the decisionmaker approves and promulgates. After all, like the Councils, it is these recommenders'

"handiwork that is made into law, even if" a duly authorized officer "must approve it." (Br. at 37.) But Plaintiffs miss the point: simply recommending proposals to duly authorized decisionmakers does not require *any* sovereign powers of the United States, and so certainly is not exercising significant discretion executing federal authority. "[M]erely render[ing] assistance to another in the performance of [the] functions [of government]" does not entail significant authority. *See* Bradbury Memo, 31 Op. O.L.C. at 98.

Plaintiffs focus on reviewability, complaining the district court's approach would mean that "only officials empowered to make unreviewable decisions are officers." (Br. at 26, 29.) But the problem for Plaintiffs' position is more fundamental—the Magnuson-Stevens Act does not empower Council members to take legally binding actions at all, reviewable or not. For this reason, Plaintiffs' reliance on *Freytag* and *Lucia*, (Br. at 19–20, 37–38), is misplaced. The administrative law judges at issue in those cases were empowered to make numerous decisions that bound the parties before them.

Plaintiffs' complaint that Regional Councils assemble the record supporting their own recommendations, (Br. at 38–40), is similarly

flawed. First, NMFS plays a central role in developing the record before the Councils. NMFS is both represented on each Council and provides technical support services necessary for the Councils' effective functioning, *see* 16 U.S.C. § 1852(f)(1)–(3). NMFS ensures that Councils consider a robust record that can inform and support both the Councils' recommendations and NMFS's consideration of them.

Second, the Council's record forms only part of the administrative record for any final NMFS action. NMFS's administrative record necessarily extends beyond the Council's record, as evidenced by the notice-and-comment process every proposed plan, amendment, and implementing regulation undergoes. "Councilmembers here are only one part of the Secretary's information-gathering apparatus in deciding whether to approve and promulgate [a plan] or regulation." (1-JA-49–50 (Order at 41–42).)

Plaintiffs ignore important differences between agency adjudication and rule-making, and rely on inapposite case law involving creating a factual record for decisions in adjudicative proceedings. (Br. at 38–40 (citing *Freytag*, 501 U.S. 868 (tax judges), and *Lucia*, 585 U.S. 237 (Securities & Exchange Commission administrative law

judges).) Courts considering Appointments Clause challenges in the adjudication context have emphasized an administrative law judge's (or similar official's) ability to shape the factual record for any subsequent legal decision by managing discovery, deciding whether and when to compel the production of evidence, taking testimony, and similar decisions that drive adjudicative fact-finding.

But even if such actions could improperly constrain final decisionmakers in agency adjudications, those concerns do not translate to the rule-making context. Here, the Council's decisions about what to place in the record for *the Council's* recommendation do not limit what NMFS may consider in *NMFS's* rule-making decision. Rather, NMFS is fully empowered to add to the administrative record, and weigh, *any* information that arises from within the agency or through the notice-and-comment process even if it was not before the Council. Thus, despite Plaintiffs' claims, Councils cannot "decid[e] the key facts upon which any finding must be justified." (Br. at 38.) That authority rests by law with NMFS. Councils' ability to contribute to the record before NMFS does not give them significant authority.

In sum, Councils are strictly advisory bodies. Council members do not wield "significant discretion" carrying out "important functions," *cf. Lucia*, 585 U.S. at 247–48, and are not officers of the United States.[10]

Plaintiffs also argue other Magnuson-Stevens Act provisions— ones not implicated in Amendment 22's approval or the Final Rule's promulgation—give Council members significant authority, and so they

---

[10] Plaintiffs contend Council members are principal rather than inferior officers. (Br. at 54–60.) The Court need not reach this question because Council members are not officers at all. But if the Court were to conclude that Council members exercise significant authority in some circumstances, they would do so only as inferior officers subject to the Secretary's supervision.

"Whether one is an 'inferior' officer depends on whether he has a superior" other than the President. *Arthrex*, 594 U.S. at 13 (quoting *Edmond v. United States*, 520 U.S. 651, 662 (1997)). An inferior officer must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* Here, Council members are supervised by the Secretary (a principal officer) and can take no action that legally binds fishery participants absent separate, affirmative action by the Secretary.

Nor is it somehow problematic that Councils are, in practice, supervised by the Assistant Administrator, using the Secretary's delegated authorities, even though she is not a principal officer. (Br. at 58.) Every inferior officer need not be supervised directly—rather than "at some level," *id.*—by a principal officer. That an inferior officer was directly responsible for providing the required oversight "on the ground" does not matter so long as a principal officer has authority to provide oversight as a structural matter. *See id.* at 27; *Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016).

must be officers of the United States. These provisions are not properly before the Court, but regardless, none of them authorizes Regional Councils to take any action binding fishery participants.

First, Plaintiffs rely on the final paragraph of 16 U.S.C. § 1854(a)(3), which provides that a "plan or amendment shall take effect as if approved" if the Secretary does not "notify a Council within 30 days of the end of the comment period" of her approval, disapproval, or partial approval. (Br. at 40–41.) Setting aside the Secretary's ability to stop this from happening by simply disapproving, this provision does not convey significant authority to Councils because fishery management plans and amendments have no legal effect on fishery participants without an additional, subsequent decision by the Secretary. As the district court explained, "even if" a fishery management plan "could take effect without action by the Secretary," it "would not bind any third party." (1-JA-43 (Order at 35).) *See also N.C. Fisheries Ass'n*, 550 F.3d at 17.

Because any plan or amendment so "approved" remains entirely precatory absent implementing regulations, without any direct effect on fishery participants' legal rights or obligations, the possibility a

Council-recommended plan might be deemed approved does not invest Council members with significant federal authority. Rather than implement a plan she disapproves, the Secretary can simply prepare and propose an amendment to fix any plan provision with which she disagrees. And in any event Plaintiffs improperly conflate fishery management plans and amendments—which have no binding legal effect on fishery participants—with regulations that could bind such participants. (*See* 1-JA-44–45 (Order at 36–37).) There is no parallel provision in the Act under which proposed implementing regulations can be deemed "approved." Only the Secretary can promulgate regulations that bind fisheries participants.

Plaintiffs also incorrectly argue that the Magnuson-Stevens Act's provision on emergency regulations and interim measures to prevent overfishing, *see* 16 U.S.C. § 1855(c)(2), allows Regional Councils to "compel the Secretary to issue regulations." (Br. at 52.) This provision, not implicated here, provides that the Secretary "shall promulgate" emergency or interim measures if a Council "requests" such measures by unanimous vote. *Id.* But the Secretary has a representative on each Council subject to her direction—the Regional Administrator, a NMFS

employee—and so there cannot be a "unanimous" vote without the Secretary's support.[11] Moreover, Councils cannot dictate the terms of any emergency or interim measures; the Secretary has full discretion on substance. These provisions and others[12] thus do not give Councils the ability to exercise any significant authority.

_____

[11] Unlike in *Arthrex*, there are no statutory constraints on the Secretary's ability to direct the Regional Administrator's performance of his Council functions, and if he fails to comply, he can be reassigned, 5 U.S.C. § 3395, or even removed from the Senior Executive Service for less than "fully successful executive performance," *id.* § 3592.

[12] Plaintiffs' reliance on sections 1854(h), 1854(c)(3), and 1856(a)(3)(B), (Br. at 48–51), is similarly misplaced. None of these provisions authorizes Regional Councils to exercise executive or administrative authority to bind fishery participants.

Section 1854(h), which governs the repeal or revocation of fishery management plans, does not improperly limit the Secretary's authority. The provision instead simply seeks a Council consensus before existing, Secretarially-approved plans are repealed or revoked. It does not allow Councils to take any action that binds fishery participants. The Secretary retains her authority to amend a plan if the Council fails to recommend an appropriate amendment in a reasonable timeframe, 16 U.S.C. § 1854(c), and Councils cannot repeal or revoke any plan, only the Secretary "may," *id.* § 1854(h).

Plaintiffs contend that, by blocking revocation, Councils could stop the Secretary from "return[ing] regulatory power to the states." (Br. at 50.) This is incorrect. States have no inherent authority to regulate federal fisheries, although they can regulate state-permitted vessels operating in federal waters if there is no fishery management plan or applicable federal regulations, or if state requirements are consistent with applicable plans and regulations. *Id.* § 1856(a)(3)(A). And, of course,

### D. The Court must construe any ambiguity in the Magnuson-Stevens Act to avoid constitutional doubt.

For these reasons, the Magnuson-Stevens Act does not assign significant authority to Regional Councils. But even if the Court found some ambiguity about whether any particular provision might afford Council members significant authority, constitutional avoidance requires reading such provisions to assign Councils an advisory role.

---

with an appropriate basis, the Secretary could amend plans so that their requirements are consistent with state requirements. Moreover, revocation may be difficult to justify if the federal fishery requires conservation and management. And in circumstances where revocation was proper, there would be no management "authority" over the fishery left to "return" to the States. States would simply retain their existing regulatory authority over state-permitted vessels.

Sections 1854(c)(3) and 1856(a)(3)(B) likewise do not give Councils authority to bind fishery participants. Rather, these provisions simply ask the Secretary to seek the Council's concurrence before implementing a plan that delegates management authority over a federal fishery to a State, 16 U.S.C. § 1856(a)(3)(B), or establishes a limited access system, *id.* § 1854(c)(3). (A "limited access system" "limits participation in a fishery to those satisfying certain eligibility criteria or requirements" and may include "limited access privilege[s]" such as "an individual fishing quota." *Id.* § 1802(26), (27).) Only the Secretary can approve a plan including these features and implement it by rule. The Council's concurrence merely ripens the issue for the Secretary's ultimate decision. *Cf. Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. United States*, 259 F. Supp. 2d 783, 796 (W.D. Wis. 2003), *aff'd*, 367 F.3d 650 (7th Cir. 2004).

Plaintiffs' view that the Magnuson-Stevens Act's longstanding Regional Council structure violates the Appointments Clause rests on extravagant inferences and extrapolation, not statutory text. Plaintiffs argue these inferences from the Act limit the Secretary's discretion and so confer significant authority on the Councils. But their interpretive approach—arguing the Act's penumbral emanations create constitutional problems—contravenes the Court's duty to construe statutes to avoid constitutional doubt. The Court should not find the Act to authorize unconstitutional Council actions unless its plain terms unambiguously do so.

If there is a "fairly possible" reading of the Act that is consistent with the Constitution, "the canon of constitutional avoidance would [] counsel [] to adopt it." *See Hansen*, 599 U.S. at 781 (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)). Here, it is at least "fairly possible" to read the Act to convey only advisory responsibilities to Regional Councils. Any ambiguity should be construed to avoid—rather than create—constitutional doubts. The Court should "seek harmony" and confirm the Councils' advisory role, rather than take up Plaintiffs' invitation "to manufacture conflict," *Hansen*, 599 U.S. at 781.

II.     Plaintiffs are not entitled to relief against the Final Rule.

   A.     If Regional Council recommendations improperly
          constrict the Secretary's discretion, statutory
          restrictions on Secretarial discretion should be severed
          to the extent constitutionally necessary.

The Assistant Administrator has authority to disapprove Council

recommendations and to revise proposed regulations, *see* Part I.A.,

*supra*. Her decision to approve Amendment 22 and promulgate the

Final Rule did not violate the Appointments Clause. But if the Court

were to conclude that the Magnuson-Stevens Act nevertheless permits

Regional Councils to constrain the Secretary's discretion in a manner

that constitutes significant authority, then the proper response is

interpret the Act severing any constitutionally problematic constraints.

Only after determining which portions of Magnuson-Stevens Act are

displaced by the Constitution should the Court consider what, if any,

other relief would be appropriate. Here, that analysis shows that

setting aside the Final Rule is not warranted.

"When confronting a constitutional flaw in a statute," the Court

must "try to limit the solution to the problem" by disregarding the

"problematic portions while leaving the remainder intact." *Ayotte*,

546 U.S. at 328–29; *accord Arthrex*, 594 U.S. at 23. The Regional

Councils' advisory functions and the structured process that ensures the Secretary considers state and regional equities sit at the core of Congress's approach to fisheries management. *See* 16 U.S.C. §§ 1801(b)(5), 1851–1855. These aspects of the Councils' role fully comply with Appointments Clause requirements.

Plaintiffs argue that the Magnuson-Stevens Act unconstitutionally empowered the Mid-Atlantic Council to constrain the Secretary's consideration of Amendment 22 and its implementing regulations. They misconstrue the nature of the Secretary's review, *see* Part I.A., *supra.* But if the Court agreed that sections 1854(a)(1)(A) and 1854(b)(1) unconstitutionally constrained the Secretary's review, the Constitution displaces those constraints, and the Court should sever them to the extent the Constitution requires.[13] If aspects of the statute improperly allow Council members to exceed their advisory role and take on authority reserved for officers of the United States, those provisions should be truncated. The Final Rule could be remanded for

---

[13] For instance, the Court might make clear that sections 1854(a)(1)(A) and 1854(b)(1) do not limit the Secretary's discretion to consider other lawful factors, and so the Secretary retains full discretion to decide whether to approve or disapprove any plan or amendment and to revise proposed implementing regulations before promulgating a final rule.

the Secretary's reconsideration. This approach would cure any Appointments Clause concern and confirm that fishery decisions are subject to a chain of command from the President to the Secretary.

The Supreme Court took a similar severance approach to eliminate an Appointments Clause violation in *Arthrex*. *Arthrex* addressed the officer status of judges serving on the Patent Trial and Appeal Board, an adjudicative body. The Court held that the patent judges exercised powers "incompatible with their appointment by the Secretary to an inferior office." 594 U.S. at 23. That incompatibility arose from prohibitions on the relevant principal officer reviewing patent judge decisions, *see* 35 U.S.C. § 6(c), and prohibitions on removing those judges at will, *see* 5 U.S.C. § 7513. Together, these provisions "restrain[ed]" the principal officer from reviewing the decisions, which broke the "chain of command" between the Director and his subordinates. *Arthrex*, 594 U.S. at 15, 27. The Court concluded that this Appointments Clause violation could be eliminated by "a tailored approach," explaining that if the principal officer "were to have the 'authority to take control' of" adjudicative proceedings, then patent judges "would properly function as inferior officers." *Id.* at 25. The Court

thus severed 35 U.S.C. § 6(c) "to the extent that its requirements prevent the [principal officer] from reviewing final decisions rendered by" patent judges. *Ibid.*

A comparable "tailored approach" here would sever the Magnuson-Stevens Act's provisions to the extent they prevent the Secretary from exercising her full discretion when reviewing Regional Council proposals. This approach would make clear that Councils play only an advisory role. Severing any unconstitutional constraints on the Secretary's review of Council proposals would mirror how the Supreme Court severed the constraints in 35 U.S.C. § 6(c), thereby permitting the principal officer in *Arthrex* to review and reject decisions by patent judges. Adopting such an approach here—severing any constraints on Secretarial review inconsistent with the Councils' advisory role—would be the narrowest possible modification to the scheme Congress created with the Act and would cure any constitutional violation.

Plaintiffs argue instead that, if a single provision authorizes Regional Councils to take some action that qualifies as significant authority, the Court should find that large swathes of the Magnuson-Stevens Act are inoperative. Plaintiffs contend Council-recommended

fishery conservation and management measures, although promulgated through regulations by NMFS, should be set aside "if even one putative Council member is improperly appointed." (Br. at 69.) But this blunderbuss approach—calling fifty years of Secretarial actions regulating fisheries based on Council recommendations into question and leaving federal fisheries potentially unregulated and vulnerable to overfishing—cannot be reconciled with the Court's obligation to sever the "problematic portions while leaving the remainder intact." *Arthrex,* 594 U.S. at 23. "Constitutional litigation is not a game of gotcha against Congress, where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Barr v. Am. Ass'n of Pol. Consultants,* 140 S. Ct. 2335, 2351 (2020) (plurality opinion).

Given Congress's purposes in enacting the Magnuson-Stevens Act—to prevent overfishing, rebuild overfished stocks, and provide for sound conservation and management of federal fisheries informed by state and regional voices—there is no doubt Congress would prefer an Act where the Secretary regulates federal fisheries based on the advice of Regional Councils to one where the Secretary was disempowered

from using the Councils and instead regulates fisheries herself through sections 1854(c) and 1855(d) without state or regional input. *Cf. Free Enterprise Fund*, 561 U.S. at 509 ("Nothing in the statute's text or historical context made it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will.") (cleaned up).

This approach follows the "normal rule" that "partial" rather than wholesale "invalidation is the required course," so as not to "nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329 (cleaned up). If the "remainder of the statute is 'capable of functioning independently' and thus would be 'fully operative' as a law," "[t]he Court's precedents reflect a decisive preference for surgical severance rather than wholesale destruction." *Am. Assoc. of Pol. Consultants,* 140 S. Ct. at 2350–52 (plurality opinion) (citation omitted). Here, the Magnuson-Stevens Act would remain an independently functioning, fully operative law.

Plaintiffs also contend other provisions of the Magnuson-Stevens Act not at issue here demonstrate that Council members can exercise

significant authority.[14] These arguments are mistaken, *see* Part I.C., *supra*, and in any event any remedy related to these provisions should be reserved for a case in which their operation is actually at issue. But if the Court views these provisions differently, they too should be severed to the extent necessary under the Constitution to preserve the Regional Councils' core advisory function under the Act.

---

[14] Plaintiffs rely on 16 U.S.C. §§ 1854(a)(3) ("as-if approved" paragraph), 1854(c)(3), 1854(h), 1855(c)(2), and 1856(a)(3)(B). (Br. at 40–41, 48–52.) These provisions were not implicated by the challenged Final Rule.

## B. Plaintiffs have not shown any injury resulting from any constitutional infirmity in Regional Councils.

Plaintiffs also have not shown that any putative constitutional infirmity in Mid-Atlantic Council members' appointments caused any injury they suffer.

As an initial matter, Plaintiffs have not demonstrated injury at all regarding the revised sector allocation for scup. Unlike for summer flounder and black sea bass, Plaintiffs present no evidence that the revised scup catch limits have affected their fishing activities, perhaps because the commercial fishery has not recently come close to harvesting its scup allocation, (5-JA-1114 (Dfts. Mem. at 17 n.5).) Plaintiffs therefore lack standing to challenge—or seek relief regarding—the scup allocation.

As to the other species, Plaintiffs cannot show that the asserted constitutional violation caused injury. First, any injury here flows from the Assistant Administrator's independent decision to promulgate the Final Rule. Second, a duly appointed quorum of the Council voted to recommend the revised sector allocation.

Plaintiffs identify no infirmity in the Final Rule and do not dispute that the Assistant Administrator is a properly appointed

inferior officer duly authorized to exercise the Secretary's Magnuson-Stevens Act authorities. Plaintiffs have not alleged any violations of the National Standards or other provisions of the Act or challenged the Assistant Administrator's decision as arbitrary, capricious, or an abuse of discretion. Plaintiffs merely take issue with the Council's role in providing its recommendation. But that recommendation was purely advisory, and longstanding Executive Branch practice required treating it so regardless. The Final Rule therefore reflects the Assistant Administrator's view on the appropriate sector allocation. And even without the Council's recommendation, the Assistant Administrator would have had authority to revise the sector allocation if she concluded it was necessary for "conservation and management" of the fishery and the Council failed "to develop and submit" an amendment in "a reasonable period of time," 16 U.S.C. § 1854(c)(1)(A), (c)(6).[15] The Assistant Administrator's independent act imposing the sector allocation breaks any causal link between the Council's action and injury to Plaintiffs.

---

[15] Contrary to Plaintiffs' assertion, NMFS would not have "lacked the power *under statute* to issue the Rule" absent a valid Council proposal. (Br. at 63.)

Besides, a duly appointed quorum of the Mid-Atlantic Council recommended the challenged sector reallocation. Thirteen Mid-Atlantic Council members were appointed by the Secretary. 16 U.S.C. § 1852(a)(1)(B), (b)(2)(C). (5-JA-0940–97 (appointments and commissions).) These thirteen members constitute a quorum of the Council. 16 U.S.C. § 1852(e)(1). A majority of them voted in favor of recommending Amendment 22 and implementing regulations. (5-JA-1003–04; 5-JA-1119.) Even if the other members' votes were invalidated, the Council's recommendation would be unchanged.

The Secretary's appointment of these members meets the Appointments Clause's requirements for inferior officers.[16] Congress provided by law, *see* 16 U.S.C. § 1852(b)(2), for their appointment by the Secretary—a "Head[] of Department[]," U.S. Const. Art. 2, § 2, cl. 2. That state governors play some role in identifying qualified candidates knowledgeable about regional concerns does not— contrary to Plaintiffs' claims, (Br. at 61)—make the Secretary's appointments invalid. *See Myers v. United States*, 272 U.S. 52, 274 & n.56 (1926) (Brandeis, J., dissenting) (identifying examples where Congress "confined the

---

[16] Council members would not be principal officers. *See* note 10, *supra*.

President's selection to a small number of persons to be named by others"); *Power of the Secretary of the Treasury to Remove Inspectors of Hulls and Boilers*, 10 Op. Att'y Gen. 204, 205–07 (1862) (finding constitutional initial selection of officer nominees by board including customs officials and district court judge).

Statutory qualifications on officeholding may "not so limit selection and so trench upon executive choice as to be in effect legislative designation." *Myers*, 272 U.S. at 128. But the Magnuson-Stevens Act does not do so. Rather, the Act authorizes the Secretary to determine qualifications for any candidate offered by a governor, 16 U.S.C. § 1852(b)(2)(A), as she has done by regulation, 50 C.F.R. § 600.215(b)(1). And the Act provides for state governors to offer the Secretary a reasonable range of candidates to select from for any vacancy.[17] While at least one Secretarial appointee must come from each of the constituent States, 16 U.S.C. § 1852(a)(1)(B), that is across

---

[17] Contrary to Plaintiffs' claims, (Br. at 6, 61), the Act does not provide for only three candidates per vacancy, but instead provides for three or more candidates *from each constituent state* for a given Regional Council. 16 U.S.C. § 1852(b)(2)(C). That is seven States, or twenty-one or more candidates, for each vacancy on the Mid-Atlantic Council. *Id.* § 1852(a)(1)(B).

all thirteen vacancies.[18] And the Secretary retains discretion to return the list to the governors or make no appointment at all if she is not satisfied with the candidates offered.

Plaintiffs claim that, even if the Secretarial appointees are properly appointed inferior officers, the participation of others in deliberations means that any resulting recommendations are structurally flawed. (Br. 64–68.) But the cases Plaintiffs rely on—principally *Fed. Election Commission v. NRA Pol. Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), and *Nguyen v. United States*, 539 U.S. 69 (2003)—do not involve an Appointments Clause challenge where a quorum of a multi-member entity was duly appointed and endorsed the challenged action. *Nguyen* is not even a constitutional case, but rather involved a question of statutory interpretation. 539 U.S. at 74–75 (applying 28 U.S.C. § 292(a)); *id.* at 82–83 (construing 28 U.S.C. § 46(b)). And whatever persuasive authority *NRA Political Victory Fund* has, it

---

[18] NMFS has determined, by regulation, to treat seven vacancies on the Mid-Atlantic Council as state-obligated seats where the Secretary will only consider candidates proposed by the governor of a particular State. *See* 50 C.F.R. § 600.215(a)(2)(i). But this Executive Branch decision to restrict, voluntarily, the candidates it will consider, unlike a limitation imposed by Congress, cannot implicate the Appointments Clause.

involved unique separation-of-powers issues where congressional agents participated in Executive Branch deliberations. 6 F.3d at 826–27 (discussing separation-of-powers concerns). The only actual Appointments Clause cases Plaintiffs cite involve individual officials making decisions or undertaking adjudications, where any improperly appointed official would have necessarily played a role in any action injuring plaintiffs. That is not the case here.[19]

---

[19] Because a duly appointed quorum of the Mid-Atlantic Council voted to recommend the revised sector allocation, the Court need not reach the status of the remaining Council members. Regardless, the fact that some members serve because of their state office does not automatically offend the Appointments Clause. State officials are routinely authorized to participate in the administration of federal laws without transforming their office from a state office to an office of the United States. *See generally* Bradbury Memo, 31 Op. O.L.C. at 99–100 (explaining that the Appointments Clause "ordinarily does not apply to" state officers). Rather, "[w]here state officials do exercise significant authority under or with respect to federal law, they do so *as state officials*." *Id.* at 100 (emphasis original).

Nor does the Regional Administrator's presence on the Council necessarily pose a problem. The current Regional Administrator, Michael Pentony, was not appointed by the Secretary and so does not qualify as an inferior officer, although, as a NMFS employee, he is subject to direction by the Secretary and Assistant Administrator. However, if this Court determines that he should have been so appointed, then the proper remedy is to remand to the Secretary. Although it has not happened here, the Secretary has statutory authority under the Department's organic acts to appoint the Regional Administrators as officers. *See, e.g.*, *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 618–23 (D.D.C. 2018).

## CONCLUSION

This Court should affirm the district court.

Respectfully submitted,

s/ *John E. Bies*
TODD KIM
*Assistant Attorney General*

RACHEL HERON
ARIELLE MOURRAIN JEFFRIES
JOHN E. BIES
*Attorneys*
Environment and Natural
    Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785
john.bies@usdoj.gov

May 30, 2024
90-8-8-08610

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.      This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,998 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century font.

3.      This Brief complies with the electronic filing requirements of Local Rule 31.1(c) because the electronic version of this brief filed was scanned with a commercial virus scanning program, Microsoft Defender Antivirus, version 1.413.5.0, and, according to the program, is free of viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies filed with the Court.

s/ *John E. Bies*
JOHN E. BIES
Counsel for Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2024, I electronically filed the foregoing answering brief using the court's CM/ECF system, which will notify all registered counsel.

s/ *John E. Bies*
JOHN E. BIES

Counsel for Federal Defendants

# ADDENDUM

The Appointments Clause,
U.S. Const. Art. 2, § 2, cl. 2 ........................................................ 2a

The Magnuson-Stevens Act,
16 U.S.C. § 1801 ............................................................................ 3a

16 U.S.C. § 1851 ............................................................................ 8a

16 U.S.C. § 1852 (excerpts) ...................................................... 10a

16 U.S.C. § 1853 .......................................................................... 23a

16 U.S.C. § 1854 (excerpts) ...................................................... 32a

16 U.S.C. § 1855 (excerpts) ...................................................... 38a

# Constitution of the United States

## Article II. The President

## Const. Art. II § 2, cl. 2

### Section 2, Clause 2. Treaty Making Power; Appointing Power

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter I. Generally

16 U.S.C. § 1801

## § 1801. Findings, purposes and policy

(a) Findings

The Congress finds and declares the following:

(1) The fish off the coasts of the United States, the highly migratory species of the high seas, the species which dwell on or in the Continental Shelf appertaining to the United States, and the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.

(2) Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls, or (C) direct and indirect habitat losses which have resulted in a diminished capacity to support existing fishing levels.

(3) Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage,

interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fishermen.

(4) International fishery agreements have not been effective in preventing or terminating the overfishing of these valuable fishery resources. There is danger that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented.

(5) Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

(6) A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources.

(7) A national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry, including bottom fish off Alaska, is necessary to assure that our citizens benefit from the employment, food supply, and revenue which could be generated thereby.

(8) The collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States.

(9) One of the greatest long-term threats to the viability of commercial and recreational fisheries is the continuing loss of marine, estuarine, and other aquatic habitats. Habitat considerations should receive increased attention for the conservation and management of fishery resources of the United States.

**(10)** Pacific Insular Areas contain unique historical, cultural, legal, political, and geographical circumstances which make fisheries resources important in sustaining their economic growth.

**(11)** A number of the Fishery Management Councils have demonstrated significant progress in integrating ecosystem considerations in fisheries management using the existing authorities provided under this chapter.

**(12)** International cooperation is necessary to address illegal, unreported, and unregulated fishing and other fishing practices which may harm the sustainability of living marine resources and disadvantage the United States fishing industry.

**(13)** While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector.

**(b)** Purposes

It is therefore declared to be the purposes of the Congress in this chapter--

**(1)** to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States, by exercising (A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone established by Presidential Proclamation 5030, dated March 10, 1983, and (B) exclusive fishery management authority beyond the exclusive economic zone over such anadromous species and Continental Shelf fishery resources;

**(2)** to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species, and to encourage the negotiation and implementation of additional such agreements as necessary;

**(3)** to promote domestic commercial and recreational fishing under sound conservation and management principles, including the promotion of catch and release programs in recreational fishing;

**(4)** to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery;

**(5)** to establish Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans under circumstances (A) which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such plans, and (B) which take into account the social and economic needs of the States;

**(6)** to encourage the development by the United States fishing industry of fisheries which are currently underutilized or not utilized by United States fishermen, including bottom fish off Alaska, and to that end, to ensure that optimum yield determinations promote such development in a non-wasteful manner; and

**(7)** to promote the protection of essential fish habitat in the review of projects conducted under Federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.

**(c)** Policy

It is further declared to be the policy of the Congress in this chapter--

**(1)** to maintain without change the existing territorial or other ocean jurisdiction of the United States for all purposes other than the conservation and management of fishery resources, as provided for in this chapter;

**(2)** to authorize no impediment to, or interference with, recognized legitimate uses of the high seas, except as necessary for the

conservation and management of fishery resources, as provided for in this chapter;

(3) to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

(4) to permit foreign fishing consistent with the provisions of this chapter;

(5) to support and encourage active United States efforts to obtain internationally acceptable agreements which provide for effective conservation and management of fishery resources, and to secure agreements to regulate fishing by vessels or persons beyond the exclusive economic zones of any nation;

(6) to foster and maintain the diversity of fisheries in the United States; and

(7) to ensure that the fishery resources adjacent to a Pacific Insular Area, including resident or migratory stocks within the exclusive economic zone adjacent to such areas, be explored, developed, conserved, and managed for the benefit of the people of such area and of the United States.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1851

## § 1851. National standards for fishery conservation and management

(a) In general

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources;

except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

(b) Guidelines

The Secretary shall establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1852 (excerpts)

§ 1852. Regional Fishery Management Councils

(a) Establishment

(1) There shall be established, within 120 days after April 13, 1976, eight Regional Fishery Management Councils, as follows:

* * * * *

### (B) Mid-Atlantic Council

The Mid-Atlantic Fishery Management Council shall consist of the States of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except North Carolina, and as provided in paragraph (3)). The Mid-Atlantic Council shall have 21 voting members, including 13 appointed by the Secretary in accordance with subsection (b)(2) (at least one of whom shall be appointed from each such State).

* * * * *

(2) Each Council shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority.

**(3)** The Secretary shall have authority over any highly migratory species fishery that is within the geographical area of authority of more than one of the following Councils: New England Council, Mid-Atlantic Council, South Atlantic Council, Gulf Council, and Caribbean Council.

## (b) Voting members

**(1)** The voting members of each Council shall be:

**(A)** The principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official.

**(B)** The regional director of the National Marine Fisheries Service for the geographic area concerned, or his designee, except that if two such directors are within such geographical area, the Secretary shall designate which of such directors shall be the voting member.

**(C)** The members required to be appointed by the Secretary in accordance with paragraphs (2) and (5).

**(2)(A)** The members of each Council required to be appointed by the Secretary must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned. Within nine months after November 28, 1990, the Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph.

**(B)** The Secretary, in making appointments under this section, shall, to the extent practicable, ensure a fair and balanced apportionment, on a rotating or other basis, of the active participants (or their representatives) in the commercial and recreational fisheries under the jurisdiction of the Council. On January 31, 1991, and each year thereafter, the Secretary shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives a report on the actions taken by the Secretary to ensure that such fair and balanced apportionment is achieved. The report shall--

    **(i)** list the fisheries under the jurisdiction of each Council, outlining for each fishery the type and quantity of fish harvested, fishing and processing methods employed, the number of participants, the duration and range of the fishery, and other distinguishing characteristics;

    **(ii)** assess the membership of each Council in terms of the apportionment of the active participants in each such fishery; and

    **(iii)** state the Secretary's plans and schedule for actions to achieve a fair and balanced apportionment on the Council for the active participants in any such fishery.

**(C)** The Secretary shall appoint the members of each Council from a list of individuals submitted by the Governor of each applicable constituent State. A Governor may not submit the names of individuals to the Secretary for appointment unless the Governor has determined that each such individual is qualified under the requirements of subparagraph (A) and unless the Governor has, to the extent practicable, first

consulted with representatives of the commercial and recreational fishing interests of the State regarding those individuals. Each such list shall include the names and pertinent biographical data of not less than three individuals for each applicable vacancy and shall be accompanied by a statement by the Governor explaining how each such individual meets the requirements of subparagraph (A). The Secretary shall review each list submitted by a Governor to ascertain if the individuals on the list are qualified for the vacancy on the basis of such requirements. If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor of that determination. The Governor shall then submit a revised list or resubmit the original list with an additional explanation of the qualifications of the individual in question. An individual is not eligible for appointment by the Secretary until that individual complies with the applicable financial disclosure requirements under subsection (k).

\* \* \* \* \*

(E) Whenever the Secretary makes an appointment to a Council, the Secretary shall make a public announcement of such appointment not less than 45 days before the first day on which the individual is to take office as a member of the Council.

(3) Each voting member appointed to a Council by the Secretary in accordance with paragraphs (2) and (5) shall serve for a term of 3 years; except that the Secretary may designate a shorter term if necessary to provide for balanced expiration to terms of office. No member appointed after January 1, 1986, may serve more than three consecutive terms. Any term in which an individual was appointed to replace a member who left office during

the term shall not be counted in determining the number of consecutive terms served by that Council member.

**(4)** Successors to the voting members of any Council shall be appointed in the same manner as the original voting members. Any individual appointed to fill a vacancy occurring prior to the expiration of any term of office shall be appointed for the remainder of that term.

* * * * *

### (c) Nonvoting members

**(1)** The nonvoting members of each Council shall be:

**(A)** The regional or area director of the United States Fish and Wildlife Service for the geographical area concerned, or his designee.

**(B)** The Commander of the Coast Guard district for the geographical area concerned, or his designee; except that, if two Coast Guard districts are within such geographical area, the commander designated for such purpose by the commandant of the Coast Guard.

**(C)** The executive director of the Marine Fisheries Commission for the geographical area concerned, if any, or his designee.

**(D)** One representative of the Department of State designated for such purpose by the Secretary of State, or his designee.

* * * * *

### (d) Compensation and expenses

The voting members of each Council who are required to be appointed by the Secretary and who are not employed

by the Federal Government or any State or local government, shall receive compensation at the daily rate for GS-15, step 7 of the General Schedule, when engaged in the actual performance of duties for such Council. The voting members of each Council, any nonvoting member described in subsection (c)(1)(C), and the nonvoting member appointed pursuant to subsection (c)(2) shall be reimbursed for actual expenses incurred in the performance of such duties, and other nonvoting members and Council staff members may be reimbursed for actual expenses.

## (e) Transaction of business

(1) A majority of the voting members of any Council shall constitute a quorum, but one or more such members designated by the Council may hold hearings. All decisions of any Council shall be by majority vote of the voting members present and voting.

(2) The voting members of each Council shall select a Chairman for such Council from among the voting members.

(3) Each Council shall meet at appropriate times and places in any of the constituent States of the Council at the call of the Chairman or upon the request of a majority of its voting members.

(4) If any voting member of a Council disagrees with respect to any matter which is transmitted to the Secretary by such Council, such member may submit a statement to the Secretary setting forth the reasons for such disagreement. The regional director of the National Marine Fisheries Service serving on the Council, or the regional director's designee, shall submit such a statement, which shall be made available to the public upon request, if the regional director disagrees with any such matter.

**(5)** At the request of any voting member of a Council, the Council shall hold a roll call vote on any matter before the Council. The official minutes and other appropriate records of any Council meeting shall identify all roll call votes held, the name of each voting member present during each roll call vote, and how each member voted on each roll call vote.

**(f) Staff and administration**

**(1)** Each Council may appoint, and assign duties to, an executive director and such other full- and part-time administrative employees as the Secretary determines are necessary to the performance of its functions.

**(2)** Upon the request of any Council, and after consultation with the Secretary, the head of any Federal agency is authorized to detail to such Council, on a reimbursable basis, any of the personnel of such agency, to assist such Council in the performance of its functions under this chapter.

**(3)** The Secretary shall provide to each Council such administrative and technical support services as are necessary for the effective functioning of such Council.

**(4)** The Administrator of General Services shall furnish each Council with such offices, equipment, supplies, and services as he is authorized to furnish to any other agency or instrumentality of the United States.

**(5)** The Secretary and the Secretary of State shall furnish each Council with relevant information concerning foreign fishing and international fishery agreements.

**(6)** Each Council shall determine its organization, and prescribe its practices and procedures for carrying out its functions under this chapter, in accordance with such uniform standards as are prescribed by the Secretary. The

procedures of a Council, and of its scientific and statistical committee and advisory panels established under subsection (g), must be consistent with the procedural guidelines set forth in subsection (i)(2). Each Council shall publish and make available to the public a statement of its organization, practices, and procedures.

(7) The Secretary shall pay--

    (A) the compensation and expenses provided for in subsection (d);

    (B) appropriate compensation to employees appointed under paragraph (1);

    (C) the amounts required for reimbursement of other Federal agencies under paragraphs (2) and (4);

    (D) the actual expenses of the members of the committees and panels established under subsection (g); and

    (E) such other costs as the Secretary determines are necessary to the performance of the functions of the Councils.

## (g) Committees and advisory panels

* * * * *

(4) The Secretary shall establish advisory panels to assist in the collection and evaluation of information relevant to the development of any fishery management plan or plan amendment for a fishery to which subsection (a)(3) applies. Each advisory panel shall participate in all aspects of the development of the plan or amendment; be balanced in its representation of commercial, recreational, and other interests; and consist of not less than 7 individuals who are knowledgeable about the fishery for

which the plan or amendment is developed, selected from among--

> **(A)** members of advisory committees and species working groups appointed under Acts implementing relevant international fishery agreements pertaining to highly migratory species; and

> **(B)** other interested persons.

\* \* \* \* \*

## (h) Functions

Each Council shall, in accordance with the provisions of this chapter--

> **(1)** for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary (A) a fishery management plan, and (B) amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed);

> **(2)** prepare comments on any application for foreign fishing transmitted to it under section 1824(b)(4)(C) of this title or section 1824(d) of this title, and any fishery management plan or amendment transmitted to it under section 1854(c)(4) of this title;

> **(3)** conduct public hearings, at appropriate times and in appropriate locations in the geographical area concerned, so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans, and with respect to the administration and implementation of the provisions of this chapter (and for purposes of this paragraph, the term

"geographical area concerned" may include an area under the authority of another Council if the fish in the fishery concerned migrate into, or occur in, that area or if the matters being heard affect fishermen of that area; but not unless such other Council is first consulted regarding the conduct of such hearings within its area);

(4) submit to the Secretary such periodic reports as the Council deems appropriate, and any other relevant report which may be requested by the Secretary;

(5) review on a continuing basis, and revise as appropriate, the assessments and specifications made pursuant to section 1853(a)(3) and (4) of this title with respect to the optimum yield from, the capacity and extent to which United States fish processors will process United States harvested fish from, and the total allowable level of foreign fishing in, each fishery (except as provided in section4 subsection (a)(3)) within its geographical area of authority;

(6) develop annual catch limits for each of its managed fisheries that may not exceed the fishing level recommendations of its scientific and statistical committee or the peer review process established under subsection (g);

(7) develop, in conjunction with the scientific and statistical committee, multi-year research priorities for fisheries, fisheries interactions, habitats, and other areas of research that are necessary for management purposes, that shall--

(A) establish priorities for 5-year periods;

(B) be updated as necessary; and

(C) be submitted to the Secretary and the regional science centers of the National Marine Fisheries

Service for their consideration in developing research priorities and budgets for the region of the Council;

**(8)** in addition to complying with the standards and requirements under paragraph (6), sections 1851(a), 1853(a)(15), and 1854(e) of this title, and other applicable provisions of this chapter, have the authority to use fishery management measures in a recreational fishery (or the recreational component of a mixed-use fishery) in developing a fishery management plan, plan amendment, or proposed regulations, such as extraction rates, fishing mortality targets, harvest control rules, or traditional or cultural practices of native communities in such fishery or fishery component; and

**(9)** conduct any other activities which are required by, or provided for in, this chapter or which are necessary and appropriate to the foregoing functions.

**(i) Procedural matters**

**(1)** Chapter 10 of Title 5 [Federal Advisory Committees] shall not apply to the Councils, the Council coordination committee established under subsection (l), or to the scientific and statistical committees or other committees or advisory panels established under subsection (g).

**(2)** The following guidelines apply with respect to the conduct of business at meetings of a Council, of the Council coordination committee established under subsection (l), and of the scientific and statistical committees or other committees or advisory panels established under subsection (g):

**(A)** Unless closed in accordance with paragraph (3), each regular meeting and each emergency meeting shall be open to the public.

**(B)** Emergency meetings shall be held at the call of the chairman or equivalent presiding officer.

**(C)** Timely public notice of each regular meeting and each emergency meeting, including the time, place, and agenda of the meeting, shall be provided by any means that will result in wide publicity in the major fishing ports of the region (and in other major fishing ports having a direct interest in the affected fishery), except that e-mail notification and website postings alone are not sufficient. Timely notice of each regular meeting shall also be published in the Federal Register. The published agenda of the meeting may not be modified to include additional matters for Council action without public notice or within 14 days prior to the meeting date, unless such modification is to address an emergency action under section 1855(c) of this title, in which case public notice shall be given immediately.

**(D)** Interested persons shall be permitted to present oral or written statements regarding the matters on the agenda at meetings. All written information submitted to a Council by an interested person shall include a statement of the source and date of such information. Any oral or written statement shall include a brief description of the background and interests of the person in the subject of the oral or written statement.

**(E)** Detailed minutes of each meeting of the Council, except for any closed session, shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all statements filed. The Chairman shall certify the accuracy of the minutes of each such meeting and submit a copy thereof to the Secretary. The minutes shall be made available to any court of competent jurisdiction.

**(F)** Subject to the procedures established under paragraph (4), and the guidelines prescribed by the Secretary under section 1881a(b) of this title, relating to confidentiality, the administrative record, including minutes required under subparagraph (E), of each meeting, and records or other documents which were made available to or prepared for or by the Council, committee, or panel incident to the meeting, shall be available for public inspection and copying at a single location in the offices of the Council or the Secretary, as appropriate.

* * * * *

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1853

§ 1853. Contents of fishery management plans

(a) Required provisions

Any fishery management plan which is prepared by any
Council, or by the Secretary, with respect to any fishery,
shall--

(1) contain the conservation and management measures,
applicable to foreign fishing and fishing by vessels of the
United States, which are--

(A) necessary and appropriate for the conservation and
management of the fishery, to prevent overfishing and
rebuild overfished stocks, and to protect, restore, and
promote the long-term health and stability of the
fishery;

(B) described in this subsection or subsection (b), or
both; and

(C) consistent with the national standards, the other
provisions of this chapter, regulations implementing
recommendations by international organizations in
which the United States participates (including but not
limited to closed areas, quotas, and size limits), and
any other applicable law;

(2) contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interests in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any;

(3) assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification;

(4) assess and specify--

   (A) the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield specified under paragraph (3),

   (B) the portion of such optimum yield which, on an annual basis, will not be harvested by fishing vessels of the United States and can be made available for foreign fishing, and

   (C) the capacity and extent to which United States fish processors, on an annual basis, will process that portion of such optimum yield that will be harvested by fishing vessels of the United States;

(5) specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational,1 charter fishing, and fish processing in the fishery, including, but not limited to, information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic information necessary to meet the requirements of this chapter, and the estimated processing capacity of,

and the actual processing capacity utilized by, United States fish processors;

(6) consider and provide for temporary adjustments, after consultation with the Coast Guard and persons utilizing the fishery, regarding access to the fishery for vessels otherwise prevented from harvesting because of weather or other ocean conditions affecting the safe conduct of the fishery; except that the adjustment shall not adversely affect conservation efforts in other fisheries or discriminate among participants in the affected fishery;

(7) describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary under section 1855(b)(1)(A) of this title, minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat;

(8) in the case of a fishery management plan that, after January 1, 1991, is submitted to the Secretary for review under section 1854(a) of this title (including any plan for which an amendment is submitted to the Secretary for such review) or is prepared by the Secretary, assess and specify the nature and extent of scientific data which is needed for effective implementation of the plan;

(9) include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for--

(A) participants in the fisheries and fishing communities affected by the plan or amendment;

(B) participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants; and

(C) the safety of human life at sea, including whether and to what extent such measures may affect the safety of participants in the fishery;

(10) specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery;

(11) establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority--

(A) minimize bycatch; and

(B) minimize the mortality of bycatch which cannot be avoided;

(12) assess the type and amount of fish caught and released alive during recreational fishing under catch and release fishery management programs and the mortality of such fish, and include conservation and management measures that, to the extent practicable, minimize mortality and ensure the extended survival of such fish;

**(13)** include a description of the commercial, recreational, and charter fishing sectors which participate in the fishery, including its economic impact, and, to the extent practicable, quantify trends in landings of the managed fishery resource by the commercial, recreational, and charter fishing sectors;

**(14)** to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery and;3

**(15)** establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

## (b) Discretionary provisions

Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may--

**(1)** require a permit to be obtained from, and fees to be paid to, the Secretary, with respect to--

**(A)** any fishing vessel of the United States fishing, or wishing to fish, in the exclusive economic zone or for anadromous species or Continental Shelf fishery resources beyond such zone;

**(B)** the operator of any such vessel; or

**(C)** any United States fish processor who first receives fish that are subject to the plan;

**(2)(A)** designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specified types and quantities of fishing gear;

**(B)** designate such zones in areas where deep sea corals are identified under section 1884 of this title, to protect deep sea corals from physical damage from fishing gear or to prevent loss or damage to such fishing gear from interactions with deep sea corals, after considering long-term sustainable uses of fishery resources in such areas; and

**(C)** with respect to any closure of an area under this chapter that prohibits all fishing, ensure that such closure--

**(i)** is based on the best scientific information available;

**(ii)** includes criteria to assess the conservation benefit of the closed area;

**(iii)** establishes a timetable for review of the closed area's performance that is consistent with the purposes of the closed area; and

**(iv)** is based on an assessment of the benefits and impacts of the closure, including its size, in relation to other management measures (either alone or in combination with such measures), including the benefits and impacts of limiting access to: users of the area, overall fishing activity, fishery science, and fishery and marine conservation;

**(3)** establish specified limitations which are necessary and appropriate for the conservation and management of the fishery on the--

> **(A)** catch of fish (based on area, species, size, number, weight, sex, bycatch, total biomass, or other factors);
>
> **(B)** sale of fish caught during commercial, recreational, or charter fishing, consistent with any applicable Federal and State safety and quality requirements; and
>
> **(C)** transshipment or transportation of fish or fish products under permits issued pursuant to section 1824 of this title;

**(4)** prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter;

**(5)** incorporate (consistent with the national standards, the other provisions of this chapter, and any other applicable law) the relevant fishery conservation and management measures of the coastal States nearest to the fishery and take into account the different circumstances affecting fisheries from different States and ports, including distances to fishing grounds and proximity to time and area closures;

**(6)** establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account--

> **(A)** present participation in the fishery;
>
> **(B)** historical fishing practices in, and dependence on, the fishery;

**(C)** the economics of the fishery;

**(D)** the capability of fishing vessels used in the fishery to engage in other fisheries;

**(E)** the cultural and social framework relevant to the fishery and any affected fishing communities;

**(F)** the fair and equitable distribution of access privileges in the fishery; and

**(G)** any other relevant considerations;

**(7)** require fish processors who first receive fish that are subject to the plan to submit data which are necessary for the conservation and management of the fishery;

**(8)** require that one or more observers be carried on board a vessel of the United States engaged in fishing for species that are subject to the plan, for the purpose of collecting data necessary for the conservation and management of the fishery; except that such a vessel shall not be required to carry an observer on board if the facilities of the vessel for the quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized;

**(9)** assess and specify the effect which the conservation and management measures of the plan will have on the stocks of naturally spawning anadromous fish in the region;

**(10)** include, consistent with the other provisions of this chapter, conservation and management measures that provide harvest incentives for participants within each gear group to employ fishing practices that result in lower levels of bycatch or in lower levels of the mortality of bycatch;

**(11)** reserve a portion of the allowable biological catch of the fishery for use in scientific research;

**(12)** include management measures in the plan to conserve target and non-target species and habitats, considering the variety of ecological factors affecting fishery populations; and

**(14)** prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery.

## (c) Proposed regulations

Proposed regulations which the Council deems necessary or appropriate for the purposes of--

**(1)** implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment under section 1854 of this title; and

**(2)** making modifications to regulations implementing a fishery management plan or plan amendment may be submitted to the Secretary at any time after the plan or amendment is approved under section 1854 of this title.

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1854

§ 1854. Action by Secretary

(a) Review of plans

(1) Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall--

(A) immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law; and

(B) immediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

(2) In undertaking the review required under paragraph (1), the Secretary shall--

(A) take into account the information, views, and comments received from interested persons;

(B) consult with the Secretary of State with respect to foreign fishing; and

**(C)** consult with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea and to fishery access adjustments referred to in section 1853(a)(6) of this title.

**(3)** The Secretary shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period under paragraph (1) by written notice to the Council. A notice of disapproval or partial approval shall specify--

    **(A)** the applicable law with which the plan or amendment is inconsistent;

    **(B)** the nature of such inconsistencies; and

    **(C)** recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.

If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved.

**(4)** If the Secretary disapproves or partially approves a plan or amendment, the Council may submit a revised plan or amendment to the Secretary for review under this subsection.

**(5)** For purposes of this subsection and subsection (b), the term "immediately" means on or before the 5th day after the day on which a Council transmits to the Secretary a fishery management plan, plan amendment, or proposed regulation that the Council characterizes as final.

**(b) Review of regulations**

(1) Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and--

(A) if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes, for a public comment period of 15 to 60 days; or

(B) if that determination is negative, the Secretary shall notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the fishery management plan, plan amendment, this chapter, and other applicable law.

(2) Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation under paragraph (1).

(3) The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (1)(A). The Secretary shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations.

### (c) Preparation and review of Secretarial plans

(1) The Secretary may prepare a fishery management plan, with respect to any fishery, or any amendment to any such plan, in accordance with the national standards, the other provisions of this chapter, and any other applicable law, if--

(A) the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a fishery management plan for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management;

(B) the Secretary disapproves or partially disapproves any such plan or amendment, or disapproves a revised plan or amendment, and the Council involved fails to submit a revised or further revised plan or amendment; or

(C) the Secretary is given authority to prepare such plan or amendment under this section.

(2) In preparing any plan or amendment under this subsection, the Secretary shall--

(A) conduct public hearings, at appropriate times and locations in the geographical areas concerned, so as to allow interested persons an opportunity to be heard in the preparation and amendment of the plan and any regulations implementing the plan; and

(B) consult with the Secretary of State with respect to foreign fishing and with the Secretary of the department in which the Coast Guard is operating with respect to enforcement at sea.

**(3)** Notwithstanding paragraph (1) for a fishery under the authority of a Council, the Secretary may not include in any fishery management plan, or any amendment to any such plan, prepared by him, a provision establishing a limited access system, including any limited access privilege program, unless such system is first approved by a majority of the voting members, present and voting, of each appropriate Council.

**(4)** Whenever the Secretary prepares a fishery management plan or plan amendment under this section, the Secretary shall immediately--

    **(A)** for a plan or amendment for a fishery under the authority of a Council, submit such plan or amendment to the appropriate Council for consideration and comment; and

    **(B)** publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published.

**(5)** Whenever a plan or amendment is submitted under paragraph (4)(A), the appropriate Council must submit its comments and recommendations, if any, regarding the plan or amendment to the Secretary before the close of the 60-day period referred to in paragraph (4)(B). After the close of such 60-day period, the Secretary, after taking into account any such comments and recommendations, as well as any views, information, or comments submitted under paragraph (4)(B), may adopt such plan or amendment.

**(6)** The Secretary may propose regulations in the Federal Register to implement any plan or amendment prepared by the Secretary. In the case of a plan or amendment to which paragraph (4)(A) applies, such regulations shall be submitted to the Council with such plan or amendment. The comment period on proposed regulations shall be 60 days, except that the Secretary may shorten the comment period on minor revisions to existing regulations.

**(7)** The Secretary shall promulgate final regulations within 30 days after the end of the comment period under paragraph (6). The Secretary must publish in the Federal Register an explanation of any substantive differences between the proposed and final rules. All final regulations must be consistent with the fishery management plan, with the national standards and other provisions of this chapter, and with any other applicable law.

* * * * *

## (h) Repeal or revocation of a fishery management plan

The Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council.

* * * * *

United States Code

Title 16. Conservation

Chapter 38. Fishery Conservation and Management

Subchapter IV. National Fishery Management Program

16 U.S.C. § 1855

§ 1855. Other requirements and authority

* * * * *

(c) Emergency actions and interim measures

(1) If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing, without regard to whether a fishery management plan exists for such fishery.

(2) If a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a fishery management plan exists for such fishery--

(A) the Secretary shall promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by unanimous vote of the members who are voting members, requests the taking of such action; and

(B) the Secretary may promulgate emergency regulations or interim measures under paragraph (1) to address the emergency or overfishing if the Council, by less than a unanimous vote, requests the taking of such action.

(3) Any emergency regulation or interim measure which changes any existing fishery management plan or amendment shall be treated as an amendment to such plan for the period in which such regulation is in effect. Any emergency regulation or interim measure promulgated under this subsection--

(A) shall be published in the Federal Register together with the reasons therefor;

(B) shall, except as provided in subparagraph (C), remain in effect for not more than 180 days after the date of publication, and may be extended by publication in the Federal Register for one additional period of not more than 186 days, provided the public has had an opportunity to comment on the emergency regulation or interim measure, and, in the case of a Council recommendation for emergency regulations or interim measures, the Council is actively preparing a fishery management plan, plan amendment, or proposed regulations to address the emergency or overfishing on a permanent basis;

(C) that responds to a public health emergency or an oil spill may remain in effect until the circumstances that created the emergency no longer exist, Provided, That the public has an opportunity to comment after the regulation is published, and, in the case of a public health emergency, the Secretary of Health and Human Services concurs with the Secretary's action; and

(D) may be terminated by the Secretary at an earlier date by publication in the Federal Register of a notice of termination, except for emergency regulations or interim measures promulgated under paragraph (2) in which case such early termination may be made only upon the agreement of the Secretary and the Council concerned.

## (d) Responsibility of Secretary

The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter. The Secretary may promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.

* * * * *

## (f) Judicial review

(1) Regulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that--

(A) section 705 of such title is not applicable, and

(B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.

(2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

**(3)(A)** Notwithstanding any other provision of law, the Secretary shall file a response to any petition filed in accordance with paragraph (1), not later than 45 days after the date the Secretary is served with that petition, except that the appropriate court may extend the period for filing such a response upon a showing by the Secretary of good cause for that extension.

**(B)** A response of the Secretary under this paragraph shall include a copy of the administrative record for the regulations that are the subject of the petition.

**(4)** Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

\* \* \* \* \*