**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-1420
_____

RAYMOND LOFSTAD; GUS LOVGREN,
                              Appellants

v.

GINA RAIMONDO, in her official capacity as Secretary of
the United States Department of Commerce; JANET COIT,
in her official capacity as Assistant Administrator of the
National Marine Fisheries Service; NATIONAL MARINE
FISHERIES SERVICE
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3:22-cv-07360)
District Judge: Honorable Robert Kirsch
_____

Argued: July 10, 2024

Before: BIBAS, FREEMAN, and RENDELL, *Circuit Judges*

(Filed: September 25, 2024)

Michael Poon            **[ARGUED]**
Damien M. Schiff
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
    *Counsel for Appellants*

John Edward Bies        **[ARGUED]**
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P.O. Box 7415
Washington, DC 20044
    *Counsel for Appellees*

J. Timothy Hobbs, Jr.
K&L Gates
501 Commerce Street, Suite 1500
Nashville, TN 37203
    *Counsel for Amicus Seafood Harvesters of America in Support of Appellee*

———————

OPINION OF THE COURT

———————

BIBAS, *Circuit Judge*.

    The buck stops with the President—but not when unelected officials get a veto. Under a federal fishing law, a Regional Council can veto some actions taken by the Secretary of Commerce. That power is significant. But the Council members

were never appointed by the President, as the Constitution requires. Two fishermen rightly challenge this scheme. The remedy, we hold, is to sever the pocket-veto powers so the Council plays only an advisory role.

## I. THE FISHERMEN CHALLENGE LOWERED FISHING LIMITS

### A. The Magnuson-Stevens Act Regulates U.S. Fisheries

Nearly half a century ago, Congress passed the Magnuson-Stevens Act to conserve and manage U.S. fisheries. 16 U.S.C. §1801(a)(6). The Act sets up eight Regional Fishery Management Councils. §1852. One of them, the Mid-Atlantic Council, oversees the waters from New York down through Virginia. §1852(a)(1)(B). Of its twenty-one voting members, state governors appoint seven, the Secretary of Commerce appoints thirteen from a pool of nominees submitted by state governors, and the regional director of the National Marine Fisheries Service sits in the last spot. §1852(b)(1). None is appointed by the President or confirmed by the Senate.

Each Council prepares fishery management plans and proposes amendments to them. §1852(h)(1). These plans must include conservation measures to prevent overfishing and keep U.S. fisheries healthy and stable in the long term. §1853(a)(1). To prevent overfishing, each plan must specify how to set each fishery's annual catch limits. §§1852(h)(6), 1853(a)(15); 50 C.F.R. §600.310(f)(1), (4); *see also Oceana, Inc. v. Coggins*, 606 F. Supp. 3d 920, 923–24 (N.D. Cal. 2022). Plans can also delegate managing fisheries to states. §1856(a)(3)(B). When they do, the relevant state may adopt and enforce regulations that are "consistent with" the plan. *Id.*

Once a Council drafts a plan or amendment, the Secretary of Commerce reviews it. 16 U.S.C. §1854(a)(1). After sixty days for public comments, she has thirty days to approve, partially approve, or disapprove it. §1854(a)(3). If she does nothing, the plan or amendment takes effect. *Id.* If she disapproves it, she must explain how it conflicts with applicable law and send it back to the Council. *Id.* If the Council fails to submit a revised plan or amendment, the Secretary can craft her own. §1854(c)(1).

Plans are implemented by regulation. §1851(a). First, the Council proposes regulations. §1853(c). (Among other things, these regulations set annual catch limits for fisheries.) Then, after letting the public comment, the Secretary decides whether to promulgate or reject them. §1854(b)(1), (3). She can also revise proposed regulations after "consult[ing] with the Council" and explaining any changes in the Federal Register. §1854(b)(3). But nothing in the statute requires the Council's approval for those changes. On the contrary, if the Secretary disapproves a plan or the Council fails to make one in reasonable time, the Secretary can make her own plan and regulations; the Council may only advise on these. §§1854(c), 1855(d).

Each Council can also block (or pocket veto) three of the Secretary's actions:

- First, it can block setting limits on who can fish in each fishery. The Secretary can set up a limited-access fishing system, but only if a majority of the Council approves it. §§1854(c)(3), 1802(26)–(27).

4

- Second, it can block delegating fishery management to a state. The Secretary can delegate that power to some states only if three-quarters of the Council approves it. §1856(a)(3)(B).

- Last, it can block repealing a plan. The Secretary can repeal a plan only if three-quarters of the Council approves. §1854(h).

The Councils also have various advisory functions. They hold public hearings, make periodic reports, hear from scientific and statistical experts, and recommend what research is needed. §1852(g)–(h).

### B. After the Council Lowered Fishing Limits, the Fishermen Sued

In 2022, the Mid-Atlantic Council approved an amendment to its fishery-management plan, lowering the amount of scup, summer flounder, and black sea bass that commercial fishermen could catch in that region. The Council sent that amendment plus a rule to implement it to the Secretary. After the notice-and-comment period, the Secretary approved the amendment and promulgated the rule. Amendment 22 to Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan, 87 Fed. Reg. 68,925 (Nov. 17, 2022) (codified at 50 C.F.R. pt. 648).

Raymond Lofstad and Gus Lovgren are commercial fishermen who fish in those waters. Fewer fish to catch means lower profits, so they sued the government. They claim that, by proposing the amendment and its implementing rule, the Council's members acted as "Officers of the United States." U.S. Const. art. II, §2, cl. 2. And because the members were not properly

appointed by the President or the head of a department, they claim, the rule should be set aside.

The District Court disagreed. It reasoned that because the Council merely makes suggestions and proposals, Council members do not exercise "significant authority." App. 40–43 (quoting *Lucia v. SEC*, 585 U.S. 237, 245 (2018)). So it concluded that they are not "Officers of the United States." *Id.* (quoting U.S. Const. Art. II, §2, cl. 2). The court denied the fishermen's motion for summary judgment and instead granted the government's cross-motion. The fishermen now appeal.

We review the District Court's grant of summary judgment de novo. *Tundo v. County of Passaic*, 923 F.3d 283, 286 (3d Cir. 2019). The parties agreed that no discovery was needed and that the court could decide the case on the administrative record. The only question is a purely legal one: whether the government or the fishermen are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The fishermen are.

The merits issue, in Parts III and IV, is whether Council members are officers of the United States. (They are.) They were not properly appointed, so the remedial issue in Part V is what to do about that problem. (Sever the unconstitutional powers that Council members exercise.) First, though, in Part II we must confirm that the fishermen have standing to bring this suit. (They do.)

## II. THE FISHERMEN HAVE STANDING

To invoke federal jurisdiction, a plaintiff must have standing to sue. He "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The fishermen have standing. First, a "litigant need not show direct harm or prejudice caused by an Appointments Clause violation …. Such harm is presumed." *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 154 (3d Cir. 2020). What is more, the fishermen show evidence of two injuries: For one, they have enough evidence at this stage for "'a here-and-now-injury'" because they claim that they were subject to "an agency … wielding authority unconstitutionally." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189, 191 (2023) (quoting *Seila L. LLC v. CFPB*, 591 U.S. 197, 212 (2020)). They argue that the Council members were appointed improperly, making all their actions (like the plan and any amendments to it) unlawful. For another, they allege that the amendment cost them money. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). They usually catch summer flounder and black sea bass up to or near the annual catch limits. By lowering those limits, the amendment reduces how many fish they may catch and how much money they make. So the fishermen have shown enough of an injury.

Second, their claimed injuries trace back to the Council members' appointments. They say that without a properly appointed Council, there is no plan; and without a plan (or a rejected plan or the Council's failure to make one in a reasonable time), the Secretary cannot make regulations. §§ 1853(c), 1854(a)(1). Third, we could remedy those injuries by undoing the amendment and its implementing regulation. That is enough for standing.

### III. THE COUNCIL MEMBERS ARE OFFICERS OF THE UNITED STATES

The Constitution specifies procedures for appointing some federal officials, called "Officers of the United States." U.S. Const. art. II, §2, cl. 2. Principal officers must be nominated by the President and confirmed by the Senate. *Id.* "[I]nferior Officers" may, with Congress's approval, be appointed by "the President alone, … the Courts of Law, or … the Heads of Departments" of the executive branch. *Id.* But these procedures need not apply to hiring mere employees—"lesser functionaries subordinate to officers of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976) (per curiam).

To distinguish officers from employees, the Supreme Court has given us two guideposts. First, employees' duties may be merely "occasional or temporary," while officers' duties must be "continuing and permanent." *Lucia*, 585 U.S. at 245 (quoting *United States v. Germaine*, 99 U.S. 508, 511–12 (1879)). As the government did not dispute, Council members' duties are continuing.

Second, officers must "exercis[e] significant authority" under federal law. *Id.* (quoting *Buckley*, 424 U.S. at 126). That inquiry turns on how much "power an individual wields in carrying out his assigned functions." *Id.* Having significant duties and discretion to carry them out is significant authority. *Freytag v. Comm'r*, 501 U.S. 868, 881–82 (1991). Power akin to a federal judge's also suffices. *Id.*; *Lucia*, 585 U.S. at 246. So do "broad administrative powers" to make rules, issue advisory opinions, and decide who is eligible to get funds and to run for office without day-to-day supervision. *Buckley*, 424 U.S. at 140–41.

Our inquiry also turns on whether another part of the federal executive, legislative, or judicial branch can "control or direct[ ]" how an official exercises her powers. *Id.* at 126 n.162.

The government argues that the Council's role is purely advisory. And the fishermen agree that advisory powers are not enough. To be sure, many of the Council's powers are advisory. But we must take each power on its own. *United States v. Arthrex*, 594 U.S. 1, 24 (2021) (plurality opinion). As with many poisons, a little unconstitutional power is deadly. And some of the Council members' powers go well beyond advice: They can block some actions by the Secretary of Commerce. Because those powers are significant, the Council members are officers, not just employees.

### A. The Council's Pocket-Veto Powers Are Significant Authority

The Council can block the Secretary of Commerce from acting in three situations. The Secretary must get its approval before adopting a limited-access fishery system, delegating fishery management to a state, or repealing a plan. §§ 1854(c)(3), (h), 1856(a)(3)(B). By withholding their assent, Council members can pocket veto those actions.

The Founders understood the veto power's significance. The King of England could veto Parliament's laws. 1 William Blackstone, *Commentaries* *154–55. Royal governors regularly vetoed colonial legislatures' acts, restricting local government and angering the Founding generation. Bernard Bailyn, *The Origins of American Politics* 67–69 (1968); Edward Campbell Mason, *The Veto Power: Its Origin, Development and Function in the Government of the United States (1789–*

*1889)* § 7, at 17 (1890). In declaring independence, the colonists began their list of grievances against the King by objecting that he "ha[d] refused his Assent to Laws, the most wholesome and necessary for the public good" and had blocked governors from passing needed laws. The Declaration of Independence ¶¶ 3–4 (U.S. 1776). Independence would change all that.

After freeing themselves from the Crown, the Founders refused to give any American official an English-style absolute veto. 2 Joseph Story, *Commentaries on the Constitution of the United States* §§ 878–79, at 343–45 (1833); Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 278 (2009). Instead, the Constitution gave the President only a qualified veto, letting two-thirds of Congress override it. U.S. Const. art. I, § 7, cls. 2–3. The Founders adopted it as a check on "improper laws" and "a device to maintain the proper separation of powers." *The Federalist* No. 73, at 443 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (first quotation); Gordon S. Wood, *The Creation of the American Republic, 1776–1787*, at 553 (1998) (second one). To reassure colonists, Hamilton insisted that the president would use his veto only "with great caution." *The Federalist* No. 73, at 444.

Even so, the veto is a fearsome power. Opponents of the Constitution fretted that the veto would put the President above the law, making him another king. *See, e.g.*, Impartial Examiner, No. 4 (June 11, 1788), *reprinted in* 5 *The Complete Anti-Federalist* 196 (Herbert J. Storing ed., 1981) (5.14.38). And a future President rightly described it as "beyond all comparison, [the President's] most formidable prerogative." Woodrow Wilson, *Congressional Government: A Study in American Politics*

52 (1885). The mere existence of the veto power may shape legislation by deterring expansive measures that might provoke it. *See The Federalist* No. 73, at 446.

The Council's pocket-veto power is especially significant because it undermines the democratic chain of command. The Constitution trusts the President with significant powers, like the veto, because he is elected and accountable to the voters. Executive officers below the President are not. So they must be "accountab[le] to the public through a clear and effective chain of command down from the President, on whom all people vote." *Arthrex*, 594 U.S. at 11 (internal quotation marks omitted).

The Council's pocket-veto powers thwart that chain of command. The Council need not reflect the President's views because it is an advisory body. But the Secretary of Commerce, who heads the Department of Commerce, answers to the President and the people. And Council members can refuse to let her set up limited-access fisheries, delegate to states, or repeal a plan. By blocking her actions, the Council wields significant authority. And no one can override the Council's pocket veto (unlike the President's limited veto). That is enough to make Council members officers, not employees.

### B. The Council's Other Challenged Powers Are Not Significant

The fishermen also challenge three other Council powers, but none of them counts as significant authority. First, there is the Council's power to propose plans and amendments. When rejecting a plan or amendment, the Secretary must identify and explain "the applicable law with which the plan or amendment

is inconsistent." §1854(a)(3)(A). The fishermen claim that the Secretary may disapprove a plan or amendment only by identifying a specific law with which it conflicts—not for moral, cultural, environmental, or other reasons. But this provision does not expressly condition disapproval on a conflict with law, so the government argues that the Secretary may disapprove a plan or amendment for any reason. To avoid that constitutional issue, we adopt the government's reasonable reading. *Gomez v. United States*, 490 U.S. 858, 864 (1989); Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 138–39 (2010). On this reading, the buck stops with the Secretary (and thus the President). Because she may disapprove plans and amendments for any reason, the Council's mere power to propose them is not significant.

The fishermen hint that a Council's plan delegating fishery management to a state under §1856(a)(3)(B) could "take effect" under §1854(a)(3) if the Secretary fails to act within thirty days. They also suggest that such a plan could have legal force absent any federal regulations because the state could regulate and enforce the plan itself. In that situation, the Council's plan would have legal effect without the Secretary's approval. Yet the fishermen have not properly developed this argument on appeal. Rather than raise it in their opening brief, they waited until oral argument, so they forfeited it. *Ghana v. Holland*, 226 F.3d 175, 180 (3d Cir. 2000). Thus we reserve judgment on whether Sections 1854(a)(3) and 1856(a)(3)(B) could combine to create significant authority.

Second, there is the consultation requirement. Before revising any proposed regulations, the Secretary must consult with the Council. §1854(b)(3). The fishermen worry that the

Council could just refuse to consult and thus force its proposed regulations to become law. The government denies that the law works that way; all the Secretary need do is solicit the Council's views and give it a chance to respond. To avoid that constitutional issue, we again adopt the government's reasonable reading. The consultation requirement does not give the Council a back door to force its proposals into law.

Finally, there is the emergency-regulations power. If the Council finds an emergency and votes unanimously, "the Secretary shall promulgate emergency regulations or interim measures … to address the emergency or overfishing." § 1855(c)(2)(A). The fishermen stress that the word "shall" requires the Secretary to act. But the Council cannot force the Secretary to take any particular action. And the Secretary can and does block unanimous votes by having her designee (the Regional Director) vote against all such measures. This Council authority is not significant either.

### IV. COUNCIL MEMBERS ARE PRINCIPAL OFFICERS

The Council members are not only officers, but principal officers. To decide whether an officer is principal or inferior, courts often consider whether the officers have power to make final decisions for the United States. *Arthrex*, 594 U.S. at 13–14. Inferior officers are those "whose work is directed and supervised at some level by others who were appointed by [the] President[]." *Edmond v. United States*, 520 U.S. 651, 663 (1997). Officers with unreviewable authority are principal officers. *Arthrex*, 594 U.S. at 23.

Council members have unreviewable authority. "[N]o principal officer at any level within the Executive Branch directs

and supervises" Council members' pocket vetoes. *Id.* at 14 (cleaned up). On the contrary, they exercise their pocket vetoes over a principal officer: the Secretary of Commerce. Thus, they are principal officers. They should be appointed by the President and confirmed by the Senate, but they are not. Their appointments are unconstitutional.

## V. THE REMEDY IS TO SEVER THE UNCONSTITUTIONAL POWERS

The fishermen ask us to invalidate the amendment. But we need not go so far. When a statute is constitutionally flawed, "we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (internal quotation marks omitted). Even though this statute has no severability clause, we can sever an unconstitutional provision unless Congress evidently would not have passed the remaining parts without the invalid ones. *Id.* at 509. To figure this out, we look at the statute's text and historical context. *Id.*

Even if we knock out the pocket vetoes, the statute remains "fully operative." *Id.* (internal quotation marks omitted). The Council's "most significant responsibility" is drafting proposed plans; that duty remains untouched. *NRDC v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014) (K.B. Jackson, J.). What is more, the government conceded at argument that these pocket-veto provisions are rarely used and that severing them would not disrupt the statutory scheme. So we will sever the pocket-veto powers in Sections 1854(c)(3), 1854(h), and 1856(a)(3)(B). Those severances suffice to remove the Council's significant authority.

Without those powers, the Council members are mere employees who fall outside the Appointments Clause. They did not use their unconstitutional powers to enact or tweak the amendment in this case. Their advisory role in proposing the amendment plus its implementing regulation was proper.

\* \* \* \* \*

Executive officials who have significant authority must be properly appointed. Because the Council members were not, we sever the pocket-veto provisions that gave them significant authority. Without those powers, the Council members are no longer officers but rather employees. As employees, they need not be appointed by the President or Secretary. We will thus reverse the District Court's order granting summary judgment for the government and instead render judgment for the fishermen, relieving the Council of its significant authority.

*Lofstad v. Raimondo*, No. 24-1420

**RENDELL**, *Circuit Judge,* dissenting:

I appreciate the majority's view that the councils do important work and can, in certain instances, block or cause action by the Secretary. But I wrestle with whether the power they exercise really equates to "significant authority." "Authority," perhaps, but "significant;" I am not so sure. "Significant Authority," to me, should be reserved for those who exercise executive power. And, as the District Court concluded, the power to actually promulgate regulations is where the rubber meets the road. The Secretary does that, not the Councilmembers.

The caselaw does not help us discern whether the presidential appointment principles really "fit" here.[1] We are

---

[1] The jurisprudence on who counts as an Officer for purposes of the Appointments Clause is limited to commissioners with significant authority in overseeing elections and special judges with the ability to issue final decisions in tax and SEC cases without review. *Buckley v. Valeo*, 424 U.S. 1 (1976); *Freytag v. Comm'r*, 501 U.S. 868 (1991); *Lucia v. SEC*, 585 U.S. 237 (2018). I view those roles as a far cry from the Councilmembers', and as wielding far more discretion and power. And the Supreme Court has admitted its guidance is not particularly helpful. *See Lucia*, 585 U.S. at 245-46 ("The standard is no doubt framed in general terms, tempting advocates to add whatever glosses best suit their argument. . . . And maybe one day we will see a need to refine or enhance the test *Buckley* set out so concisely. But that day is not this one[.]").

1

in uncharted territory. And the consequences of reaching the conclusion that the majority reaches are huge, upending a scheme that has existed and functioned effectively for years, as the amicus points out.[2] The majority does a creditable job of avoiding that result, but does so, I fear, by gutting the powers given the Councils by Congress. I wonder whether we really should be doing this. The cases in which we have explored this failsafe tactic seem to me to be less invasive.[3]

The other hesitancy I face is a pragmatic one. There are 118 voting members of the eight councils. They are chosen by diverse appointers based on unique expertise that qualifies them to assist the Secretary in this specific area, with special scientific and economic ramifications. They are not to carry out

---

[2] "Appellants' requested relief is drastic, would needlessly scrap the system for managing ocean fisheries that has been in place for nearly 50 years, would jeopardize the health of ocean fisheries, and would cause massive uncertainty and economic losses." Br. of Seafood Harvesters of America as *Amicus Curiae*, ECF No. 26 at 23.

[3] While we should "use a scalpel rather than a bulldozer" in curing constitutional defects, the majority's scalpel cuts too deeply. *Seila L. LLC v. CFPB*, 591 U.S. 197, 237 (2020). "Constitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation." *Id.* at 230. In *Seila Law*, the remedy was quite simple: the offending tenure restriction could be severed readily from the Dodd-Frank Act while leaving the CFPB's structure and duties fully operative and intact. *Id.* at 235. But here, the majority's cure excises precisely what Congress gave the Councils authority to do.

policy of the President as such. How many other executive bodies are there that advise and exercise some authority regarding matters requiring special expertise? Do we really believe each of these members of the councils need to be appointed by the President and confirmed by the Senate? This seems unwieldy, cumbersome, and fraught with potential political wrangling.

      On balance, I would affirm the District Court's order as I believe that the buck stops with the Secretary, not the Councils, and we should avoid rewriting the legislative scheme.